T.C. Memo. 2005-208

UNITED STATES TAX COURT

FPL GROUP, INC. AND SUBSIDIARIES, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5271-96.          Filed August 31, 2005.

Robert T. Carney, Paul S. Manning, and Christopher
Faiferlick, for petitioner.

Benjamin A. DeLuna, James F. Kearney, Robert Dillard, and
Donald Burkhart, for respondent.

CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION . . . . . . . . . . . . . . 4

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . 5

A.  Nuclear Fuel Assemblies . . . . . . . . . . . . . . . . . . . 8

B.  Miscellaneous Nuclear Property . . . . . . . . . . . . . . 14
    1.  Main Steam Isolation Valve (MSIV) Air
        Accumulation System . . . . . . . . . . . . . . . . . 14
    2.  Surveillance System for Heat Exchangers . . . . . . . 16
    3.  Reactor Vessel Probes . . . . . . . . . . . . . . . . 18
    4.  Raceway Protection System . . . . . . . . . . . . . . 19
    5.  Spent Fuel Rack Systems . . . . . . . . . . . . . . . 21
    6.  Area Radiation Monitoring System . . . . . . . . . . 25
    7.  Nuclear Fuel Transfer System . . . . . . . . . . . . 27

C.  Environmental Property . . . . . . . . . . . . . . . . . . 29
    1.  Wastewater Neutralization Treatment System . . . . . 29
    2.  PCB Transformers . . . . . . . . . . . . . . . . . . 33

D.  Simulator and Training Buildings . . . . . . . . . . . . . 36

E.  Load Management System . . . . . . . . . . . . . . . . . . 41

F.  St. Lucie Backfit Construction . . . . . . . . . . . . . . 48
    1.  Underwater Intrusion System . . . . . . . . . . . . . 49
    2.  Condensate Polisher Tie Line . . . . . . . . . . . . 52
    3.  Instrument Air Upgrade . . . . . . . . . . . . . . . 54

G.  St. John's River Power Park (SJRPP) . . . . . . . . . . . 56

H.  The Southern Company Contracts . . . . . . . . . . . . . . 66

I.  Integrated Transmission Line Systems . . . . . . . . . . . 74

J.  Distribution and Transmission Substations . . . . . . . . 80

K.  Regional Planning . . . . . . . . . . . . . . . . . . . . 82

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

A.  The Statutory Landscape . . . . . . . . . . . . . . . . . 87

B.  TRA Section 204(a)(3)--Supply or Service Contracts . . . 92

1.     Property Purchased and/or Installed Pursuant
to the Tariff . . . . . . . . . . . . . . . . . 94
    a.     The Tariff Is Not a Contract for
Purposes of TRA Section 204(a)(3) . . . . . 95
    b.     The Tariff Does Not Readily Identify the
Property in Issue . . . . . . . . . . . . . 101
    c.     Documents Incorporated by Reference Into
the Supply or Service Contract . . . . . . 102
    d.     Property Readily Identifiable From the
Related Documents . . . . . . . . . . . . . 106
    e.     Class Life of Nuclear Fuel Assemblies
Pursuant to TRA Section 203(b)(2) . . . . . 124
2.     Are the Southern Company Contracts TRA Section
204(a)(3) Supply or Service Contracts? . . . . . 128
3.     Are the DRI Documents TRA Section 204(a)(3)
Supply Contracts? . . . . . . . . . . . . . . . 134

C.    TRA Section 203(b)(1)(A)--The "Binding Contract" Rule . . 136
1.     Nuclear Fuel Transfer System . . . . . . . . . . 138
2.     Southern Interchange Contract . . . . . . . . . 140
3.     LMS Equipment Under A.B. Chance Contract . . . . . 144
4.     St. John's River Power Park (SJRPP) . . . . . . . 147

D.    TRA Section 203(b)(1)(B)--"Self-Constructed Property" . . 152
1.     "Wrap Up" Work and "Enhancements and
Deficiencies" Work at the SJRPP . . . . . . . . 158
2.     Distribution and Transmission Substations . . . . . 165
3.     Transmission Line Systems . . . . . . . . . . . 169
4.     "Backfit" Items at St. Lucie . . . . . . . . . . 176
    a.     Underwater Intrusion System . . . . . . . 177
    b.     Condensate Polisher Tie Line . . . . . . . 179
    c.     Instrument Air Upgrade . . . . . . . . . . 181
5.     Spent Fuel Rack Systems . . . . . . . . . . . . 184

E.    TRA Section 203(b)(1)(C)--"Plant Facility Rule" . . . . 187
1.     "Backfit" Items at St. Lucie . . . . . . . . . . 189
2.     "Wrap up" Work and "Enhancements and
Deficiencies" Work at the SJRPP . . . . . . . . 191
    a.     Written Specific Plan . . . . . . . . . . 192
    b.     Costs Committed or Incurred . . . . . . . 194
3.     Distribution and Transmission Substations . . . . 196
    a.     Written Specific Plan . . . . . . . . . . 197
    b.     Commencement of the Construction . . . . . 199
    c.     Costs Committed or Incurred . . . . . . . 202

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . 204

Appendix A:  Equipment Installed at Substations . . . . . . . 205

Appendix B:  DRI Project . . . . . . . . . . . . . . . . . . 208

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge:  Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
|------|-----------|
| 1988 | $922,601 |
| 1989 | 15,183,930 |
| 1990 | 5,228,640 |
| 1991 | 1,788,565 |
| 1992 | 5,867,463 |

Petitioner did not make any claim for investment tax credits (ITCs) in its original returns for the taxable years 1988, 1989, and 1990.  On the same date that respondent issued the notice of deficiency, petitioner filed Forms 1120X, Amended U.S. Corporation Income Tax Returns (amended returns), for its taxable years 1988, 1989, and 1990.  In the amended returns, petitioner claimed additional ITCs[1] as follows:

| Year | Amount |
|------|--------|
| 1988 | $33,308,287 |
| 1989 | 44,336,798 |
| 1990 | 55,760,749 |

On March 21, 1996, petitioner filed its petition in this case listing these same amounts.  In its first and second amended

---

[1] In the amended returns, petitioner claimed refunds.

petitions, petitioner reduced its claim for additional ITCs as follows:

| Year | Amount |
|------|--------|
| 1988 | $31,737,038 |
| 1989 | 41,553,822 |
| 1990 | 51,973,051 |

On January 14, 2002, petitioner submitted its trial memorandum in which it further reduced the additional ITCs claimed as follows:

| Year | Amount |
|------|--------|
| 1988 | $7,681,335 |
| 1989 | 7,862,335 |
| 1990 | 13,320,979 |

The issue addressed in this opinion is whether FPL Group, Inc., & Subsidiaries (FPL) is entitled to ITCs for certain property and equipment it placed in service during the taxable years 1988, 1989, and 1990.[2] Resolution of this issue requires us to explore the strictures of the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, 100 Stat. 2058, which repealed the ITC and provided relief from the ITC repeal in transitional rules.

                         FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the first, second, third, and fourth supplemental stipulations of facts, and the accompanying exhibits

---

[2] This case involves multiple issues. The ITC issue addressed in the opinion was tried and briefed separately.

are incorporated herein by this reference.  Petitioner's principal place of business was in North Palm Beach, Florida, when its petition was filed.

Petitioner is the parent corporation of a publicly traded holding company that filed consolidated Federal income tax returns on a calendar year basis for its 1988 through 1992 taxable years.  FPL is a first-tier, wholly owned subsidiary of petitioner with operations throughout most of the east and lower west coasts of the State of Florida and is a member of the consolidated group.  As a public utility, FPL is subject to regulation by various State and Federal agencies, including the Florida Public Service Commission (FPSC), the Federal Energy Regulatory Commission (FERC), and the Nuclear Regulatory Commission (NRC).

To generate electricity, FPL operates nuclear and nonnuclear power plants.  FPL owned and operated four nuclear electric generating units, named:  St. Lucie Unit 1, which was operational commencing in 1976; St. Lucie Unit 2, which was operational commencing in 1983; Turkey Point Unit 3, which was operational commencing in 1972; and Turkey Point Unit 4, which was operational commencing in 1973.

During the years at issue, FPL was under the jurisdiction of the FPSC, which regulated and supervised the rates charged by and

the services provided by FPL to its customers.[3]  FPL's charges to its customers for their use of electricity were based upon a tariff.  A tariff is a document that contains the terms, conditions, rates, and charges that a company may charge and a customer must pay for the service offered by a utility. According to the tariff, "Service under the tariff is subject to orders of governmental bodies having jurisdiction and to the currently effective 'General Rules and Regulations for Electric Service' on file with the Florida Public Service Commission." From time to time, FPL could, and did, request adjustments to the tariff rates, terms, and conditions.[4]  FPL's customers did not

---

[3] Michael Wilson, FPL's vice president of government relations and a former FPSC commissioner, testified:

> The Public Service Commissioner provided economic regulation of those utilities which the legislature put in their charge or their jurisdiction which entailed setting rates for various classes of customers, determining the investment level that companies had, quality of service regulation, hearings on a number of different issues regarding service and rates.

[4] Mr. Wilson testified:

> a company which decides that it is not receiving a reasonable return on its investment or costs have gone up would apply to the Public Service Commission for a rate increase.  * * *

> Those would be the subject of hearings and testimony by public counsel, by intervenors, large, industrial customers * * *

Claude Villard was a nuclear fuel witness for FPL before the FPSC from 1995 to 1997.  He testified:

(continued...)

sign the tariff. Under the tariff, a customer may obtain service from FPL by applying in writing, by telephone, or in person. The tariff included a fuel clause, which calculated the cost of fuel and of purchased power in accordance with a formula "to reflect the cost of fossil and nuclear fuels and purchased power for each kilowatt-hour delivered".

A.  Nuclear Fuel Assemblies

FPL claims ITCs for nuclear fuel assemblies in the 1988, 1989, and 1990 taxable years. Generally, to generate electricity at a power plant, a heat source heats water to form steam, which drives a turbine of an electric generator. At a nuclear power plant, the heat source is a nuclear fission reaction in a nuclear reactor. The nuclear fission reaction occurs in the "core" of the reactor where an arrangement of nuclear fuel assemblies (fuel assemblies or nuclear fuel) is located. Essentially, a fuel assembly is loaded with nuclear fuel rods, which house enriched uranium pellets. Fuel fabrication refers to the process of making the pellets, putting those pellets into a fuel rod, and bundling these rods together into different support components to make a fuel assembly.

---

[4](...continued)
under [F]PSC rules, every six months Florida Power and Light has to submit to the [F]PSC the costs that it intends to recover from the customer. And it has to have it approved by the [F]PSC * * *.

Nuclear fuel must be replaced because it wastes over time and from use.  During the years at issue, FPL's nuclear reactor units used an 18-month reloading cycle; it replaced one-third of the fuel assemblies in the reactor core with new fuel assemblies every 18 months.[5]  In 1988, 1989, and 1990, petitioner depreciated the nuclear fuel over 5 years for tax purposes.

The fabrication of fuel assemblies is a multistep process. The first step in the process is the acquisition of uranium from the mines.  The second step is to convert the uranium to uranium hexafluoride (UF6), a gaseous compound.  The third step is the enrichment process, which is accomplished by increasing the amount of uranium 235 in the gas.  The fourth step is to convert the gas into U2, a uranium oxide powder.  The uranium oxide powder is pressed into pellets, which are then loaded into tubes or rods.  The rods are then bundled together to form a fuel assembly.  The design of the fuel assemblies is specific to the type of reactor used.[6]

---

[5] Mr. Villard testified that the reload took about 1 week to complete, during which time the power plant was shut down.

[6] For example, one of FPL's nuclear power plants, the St. Lucie Unit 1 reactor, is a 14 by 14 array of fuel rods, whereas another of FPL's nuclear power plants, Turkey Point Units 3 and 4, uses a 15 by 15 array.

FPL entered into a series of long-term contracts to meet its expected fuel assemblies needs.[7]  In 1979, FPL entered into an agreement of settlement with Westinghouse Electric Corp. (Westinghouse) to supply FPL with uranium.  Under the agreement, Westinghouse agreed to supply FPL with uranium at a rate of 135,000 pounds per year beginning in 1987 and continuing for 7 years, through and including 1994, or a total of 1,080,000 pounds.  The agreement gave FPL the option to terminate the agreement upon 6 months' prior written notice to Westinghouse with no consequences.  Additionally, FPL could cancel the agreement if Westinghouse failed to meet specific delivery deadlines.

Similarly, on July 25, 1978, FPL entered into a sales agreement with International Minerals & Chemical Corp. (IMC) to deliver a minimum of 400,000 pounds of "uranium concentrates" per year for 13 years.  IMC and FPL entered into a second sales agreement on October 4, 1978, under which FPL purchased uranium concentrate.

On September 9, 1974, Potomac Electric Power Co. (PEPCO) and Kerr-McGee Nuclear Corp. executed a contract to chemically process uranium.  This agreement called for the conversion of

---

[7] Mr. Villard testified that to change to another NRC-approved supplier, it would take at least 3 to 4 years before actually getting the first new full batch to be delivered.  The process of changing to a supplier not approved by the NRC took 5 to 10 years.

10,190,700 pounds of uranium concentrates into UF6 from 1978 through 1990.  On February 10, 1978, this agreement was assigned to FPL.  The contract was never terminated.

On October 23, 1984, FPL entered into a contract with the Department of Energy (DOE) under which the DOE agreed to provide FPL with a minimum of 70 percent of FPL's enrichment services.[8] The term of the contract was the lesser of the life of the nuclear power facility or 30 years.  FPL could terminate the contract at no cost with 10 years' advance notice.  On April 29, 1985, FPL and the DOE entered into an amendment to the contract to provide additional supply.  On February 11, 1985, FPL entered into a contract for sale with AGIP URANIO S.p.A. for certain uranium enrichment services.  The contract was terminated as of September 30, 1987.

On November 5, 1979, FPL entered into a contract with Westinghouse for the purchase of services to design and fabricate fuel assemblies for Turkey Point Units 3 and 4.  FPL could terminate the contract "only if Turkey Point 3, or Turkey Point 4 is permanently shut down for any reason whatsoever."

On January 30, 1982, FPL entered into a contract with Exxon Nuclear Co. for the supply and delivery of fuel assemblies.  According to the contract, "FPL may terminate Reload Regions

---

[8] The contract provided that FPL had no obligation to purchase enrichment services from the DOE in the fiscal years 1984, 1987, and 1988.

other than [Region] XN-1 for convenience by giving Seller notice of such termination no later than seventeen (17) months prior to the * * * [preliminary scheduled delivery date] that is to be terminated."

FPL budgeted the costs associated for each step in the fuel assembly process. Carl R. Bible, Jr., an FPL engineering manager, testified that "Budget items are used to authorize funds to be expended on various activities." A 1986 Capital Expenditures Budget Item (budget item or BI) No. 562 lists the gross cost of expenses to convert uranium concentrates to $UF6$ as $1,925,000.[9] A 1986 BI No. 563 lists the gross cost of enrichment services as $21,397,000.[10] A 1986 BI No. 564 for fabrication of nuclear fuel for St. Lucie Unit 1 (including engineering and design work) lists the gross cost as $600,000.[11]

_____

[9] The budget item breaks down the expenditure as $1,717,000 in gross property additions and $208,000 for an allowance of funds during construction. This budget item was approved on Oct. 14, 1985, and contemplated a projected 5-year schedule for conversion as follows: $1,717,000 for 1986; $2,282,000 for 1987; $2,794,000 for 1988; $4,097,000 for 1989; and $3,673,000 for 1990.

[10] The budget item breaks down the expenditure as $19,266,000 in gross property additions and $2,131,000 for an allowance of funds during construction. This budget item was approved on Oct. 14, 1985, and contemplated a projected 5-year schedule for enrichment as follows: $19,266,000 for 1986; $20,318,000 for 1987; $43,826,000 for 1988; $29,544,000 for 1989; and $33,786,000 for 1990.

[11] The date that this budget item was approved is illegible on the Court's copy. The budget item contemplated a projected 5-
(continued...)

A 1986 BI No. 565 for fabrication of nuclear fuel for St. Lucie Unit 2 (including engineering and design work) lists the gross cost as $2,151,000.[12]  A 1986 BI No. 566 for fabrication of nuclear fuel for Turkey Point Unit 3 lists the gross cost as $4,640,000.[13]  A 1986 BI No. 567 for fabrication of nuclear fuel for Turkey Point Unit 4 lists the gross cost as $760,000.[14]  A 1986 BI No. 561 for uranium purchases for Turkey Point Units 3

---

[11](...continued) year schedule for fabrication expenses as follows:  $600,000 for 1986; $9,921,000 for 1987; $9,775,000 for 1988; zero for 1989; and $10,940,000 for 1990.

[12] The budget item breaks down the expenditure as $1,651,000 in gross property additions and $500,000 for an allowance of funds during construction.  This budget item was approved on Oct. 14, 1985, and contemplates a projected 5-year schedule for fabrication expenses as follows:  $1,651,000 for 1986; $10,932,000 for 1987; $9,310,000 for 1988; $3,984,000 for 1989; and $12,009,000 for 1990.

[13] The budget item breaks down the expenditure as $4,433,000 in gross property additions and $207,000 for an allowance of funds during construction.  This budget item was approved on Oct. 14, 1985, and contemplates a projected 5-year schedule for fabrication expenses as follows:  $4,433,000 for 1986; $1,337,000 for 1987; $3,593,000 for 1988; $4,556,000 for 1989; and $2,450,000 for 1990.

[14] The budget item breaks down the expenditure as $355,000 in gross property additions and $405,000 for an allowance of funds during construction.  This budget item was approved on Oct. 14, 1985, and contemplates a projected 5-year schedule for fabrication expenses as follows: $355,000 for 1986; $4,320,000 for 1987; $3,097,000 for 1988; $2,258,000 for 1989; and $5,253,000 for 1990.

and 4 and St Lucie Units 1 and 2 lists the gross cost as $44,545,000.[15]

FPL placed fuel assemblies in service with total capitalized costs (tax basis) of $51,684,173, $70,782,440, and $133,263,604 in the 1988, 1989, and 1990 taxable years, respectively.

B.  Miscellaneous Nuclear Property

  1.  Main Steam Isolation Valve (MSIV) Air Accumulation System

The MSIV air accumulation system is a safety item, required by the NRC, that shuts down a nuclear power plant and protects the reactor core in an emergency.  FPL claims ITCs for the MSIV air accumulation system in the 1989 and 1990 taxable years.

On July 29, 1985, FPL issued a licensee event report (licensee event report),[16] in which its engineering department determined that the valves at Turkey Point Units 3 and 4 were unable to close the MSIV in accordance with its original

---

[15] The budget item breaks down the expenditure as $36,836,000 in gross property additions and $7,709,000 for an allowance of funds during construction.  This budget item was approved on Oct. 14, 1985, and contemplates a projected 5-year schedule for fabrication expenses as follows: $36,836,000 for 1986; $42,633,000 for 1987; $50,889,000 for 1988; $63,267,000 for 1989; and $54,725,000 for 1990.

[16] A licensee event report is a document required to be written and submitted to the NRC.  When something at the plant does not meet design requirements, the report describes the problem and the corrective action taken.

design.[17]  The licensee event report indicates that the design of the valves will be upgraded to ensure that each valve meets the final safety analysis report.  An FPL engineering study, issued in July 1985, "recommended that design modifications be implemented on an expedited basis" and that continued operation was warranted.

A 1987 BI No. 155 includes, inter alia, Main Stream Isolation.  The budget item contains an October 13, 1986, date underneath "APPROVED BY - CORPORATE OFFICER".  FPL issued an expenditure requisition (ER)[18] No. 4573 to "Install a low pressure air accumulator system".  The ER also states:  "This emergency ER is being prepared due to the length of time it takes to obtain ER approval.  The work is currently scheduled for the 1988 Refueling Outage.  We anticipate this ER to be revised by October 1988."  The earliest date on the ER is October 1, 1988,

---

[17] Mr. Bible testified that in the licensee event report, FPL committed to the NRC to resolve the valve problem.

[18] Richard Engstrom, FPL's supervisor of power plant accounting, testified as to the distinction between an ER and a work order as follows:

> A work order is basically * * * issued to capture and record costs associated with a specific project at a specific location.  An ER which stands for expenditure requisition, it basically identifies the type of work order such as a transmission work order, distribution work order, a specific work order.  However, sometimes they are used interchangeably, particularly when it comes to a specific work order.
> * * *

which is under a "received" stamp.  Additionally, the ER bears an October 3, 1988, date underneath a stamp that reads "Authorization Certified Accounting Department".  The ER was revised in early 1989 "to reflect a definitive construction estimate" and again in early 1991.

With respect to the installation of the MSIV air accumulation system, petitioner incurred capitalized costs (tax basis) of $2,846,306 and $126,666, for equipment placed in service in the 1989 and 1990 taxable years, respectively.

2.  Surveillance System for Heat Exchangers

The surveillance system for heat exchangers (surveillance system) consisted of temperature and flow instruments to ensure that the heat exchanger, which is designed to remove heat, performed properly.  FPL claims ITCs for the surveillance system in the 1989 and 1990 taxable years.

On April 15, 1985, FPL responded to a notice of violation issued by the NRC with respect to its nuclear generating facility at Turkey Point.  One of the corrective steps articulated in the letter was the "development of a surveillance program".[19]

_____

[19] Mr. Bible testified that this letter was FPL's "commitment to the NRC to perform these modifications and put this system in place.  It's a written commitment from the officers of our company to the NRC, requiring us to perform these actions."

FPL developed or established an action item[20] to oversee the development of a surveillance program, which is a system that monitors the heat exchangers.[21] In a request for engineering assistance, dated November 5, 1985, Turkey Point requested a modification of its plant.[22]

ER No. 3811, dated March 1988, and supplemented in October 1988, discussed upgrading the surveillance system at Turkey Point Unit 3. Similarly, ER No. 3854, dated April 1988, with supplements dated October 1988 and May 1991, discussed the same scope of work with respect to Turkey Point Unit 4.

With respect to the acquisition and installation of the surveillance system, petitioner incurred capitalized costs (tax basis) of $123,742 and $324,668 for equipment placed in service during the 1989 and 1990 taxable years, respectively.

---

[20] An action item is the method by which FPL tracks its commitments to the NRC.

[21] Mr. Bible testified that there is typically a 3-year lag time to comply with the NRC requirements.

[22] Mr. Bible testified that a "Request for engineering assistance is how engineering gets a turn on to perform a project here." He explained:

> What will happen is engineering will produce a design package, which is how you install things. It will show drawings, specifications from buying equipment, instructions from the field as to how to install that equipment and update all the associated designs for the power plant.

3. Reactor Vessel Probes

A reactor vessel probe measures the water level in a nuclear reactor core. A reactor vessel probe is custom made and takes up to 45 weeks to obtain. FPL claims ITCs for the reactor vessel probes in the 1988 taxable year.[23]

As a result of an accident at the Three Mile Island nuclear facility (TMI),[24] the NRC imposed "Action Plan Requirements", known as "NUREG-0737", to prevent similar accidents at other nuclear plants. One of the regulatory guidelines[25] that resulted from the TMI accident was the requirement that nuclear plants monitor coolant inventory. FPL's nuclear plants were designed before this guideline and did not have reactor vessel probes; as a result, FPL installed reactor vessel level monitoring instrumentation. On July 18, 1986, FPL sent a letter to the Office of Nuclear Reactor Regulation, which detailed the technical specifications concerning its proposed reactor vessel monitoring system. On December 5, 1986, the NRC sent FPL a

---

[23] In the taxable years 1989 and 1990, petitioner claims reductions in the amount of the ITC, which resulted from reductions in the amount of the qualified costs (tax basis) of the property.

[24] The TMI nuclear plant failed to maintain the proper water level in the nuclear reactor, which resulted in a partial meltdown in its core.

[25] Many of the guidelines were embodied in Regulatory Guideline 1.97, Instrumentation for Light-Water-Cooled Nuclear Power Plants to Assess Plant and Environs Conditions During and Following an Accident, issued by the NRC and dated May 1983.

letter detailing modifications to FPL's proposed changes.  On July 28, 1987, the NRC sent a letter to FPL advising it that the technical specifications as modified were approved.

ER No. 9302 details the purchase of two spare reactor vessel level probes in the authorized amount of $348,000.  The earliest date on the ER is November 1, 1985.  The ER was revised to account for an increase in cost of the project to $798,223, which was approved in late 1989.

With respect to the acquisition of the reactor vessel probes, petitioner incurred capitalized costs (tax basis) of $862,757, -$126,353,[26] and -$12,983 for equipment placed in service during the 1988, 1989, and 1990 taxable years, respectively.

4.  Raceway Protection System

A "raceway" is a system of metal conduits or trays that is used to transport electric cables from one place to another throughout a facility and protects the cables from fire hazards. FPL claims ITCs for the raceway protection system in the 1989 and 1990 taxable years.

Appendix R--Fire Protection Program for Nuclear Power Facilities Operating Prior to January 1, 1979, 45 Fed. Reg. 76611

---

[26] Mr. Engstrom testified that negative numbers were a result of FPL's debit/credit accounting system.  On brief, petitioner explained that the amount of qualified costs (tax basis) was reduced in the taxable years 1989 and 1990; as a result, the ITC must be reduced in those years.

(Nov. 19, 1980), contains general and specific requirements for protecting electric cables from fire hazards. The specific requirements section of appendix R provides detailed requirements for "separation of cables and equipment" and "enclosure of cable and equipment". In a letter dated October 11, 1985, FPL explained to the Office of Nuclear Reactor Regulation that:

> [FPL] notified the NRC in late August 1985 concerning an additional scope of work identified relating to * * * Appendix R requirements at our Turkey Point Nuclear facility.
>
> The additional scope of Appendix R work was identified as a result of an evaluation of the original Appendix R Safe Shutdown analysis, and was completed in September 1985. In August 1985, based on preliminary results of the evaluation, FPL committed to provide a report detailing the additional scope of work and a proposed schedule for completion of the modifications.

With respect to the St. Lucie plant, a 1984 BI No. 147 Rev. 2 budgeted $19 million to meet the requirements of appendix R and was approved on February 21, 1984. FPL revised this BI several times to increase the budgeted amount to $26 million for the St. Lucie plant.

A 1984 BI No. 933 Rev. 3, approved on March 23, 1984, budgeted $45 million to "Upgrade the present fire protection capabilities at Turkey Point Units #3 and #4 to meet * * * appendix 'R'" requirements. FPL revised this BI several times, and the ultimate authorization was approved in August 1986 for $87 million.

ER No. 4276, approved in 1988, authorized $1.8 million for fire protection modifications to the raceway protection for Turkey Point.  This ER was revised in 1989 to decrease the amount authorized for the expenditure to $1,081,459.  Similarly, ER No. 6256, approved in 1989, authorized $10 for the raceway protection for Turkey Point, which was revised in late 1989 to $358,000, and revised again in early 1991 to decrease the amount authorized to $263,722.

With respect to the installation of the raceway protection system, petitioner incurred capitalized costs (tax basis) of $969,676 and $239,161 for equipment placed in service in the 1989 and 1990 taxable years, respectively.

5.  Spent Fuel Rack Systems

FPL's use of nuclear fuel to generate electricity requires it to replace one-third of the fuel assemblies every 18 months. FPL uses spent fuel racks to store its used nuclear fuel.  FPL claims ITCs for the spent fuel rack systems in the 1988, 1989, and 1990 taxable years.

Under the Nuclear Waste Policy Act of 1982, Pub. L. 97-425, sec. 302, 96 Stat. 2257 (nuclear waste act), the Federal Government was required, in exchange for fees paid by electric utilities, to handle the disposal and permanent storage of spent or used fuel beginning in 1998.  The purpose of the nuclear waste act was to develop repositories for disposing of high-level

radioactive waste and spent nuclear fuel. The nuclear waste act provided that persons owning and operating civilian nuclear power reactors were primarily responsible for providing interim storage of spent nuclear fuel.

Accordingly, FPL was required to store spent nuclear fuel until 1998; as a result, FPL needed to expand its on-site spent fuel rack system at each of its nuclear generating plants. As of January 7, 1983, the enactment date of the nuclear waste act, FPL knew the amount of spent fuel it would need to store and the design of the expanded spent fuel rack systems at St. Lucie and Turkey Point.

FPL removed spent nuclear fuel from the reactor and transferred it via the fuel transfer system to a containment building, using a series of underwater tunnels. The spent fuel was then transferred from the containment building to the fuel handling building.

The spent fuel rack system at each of FPL's nuclear generating plants consisted of two large pools of water, approximately 40 feet deep, with metal storage racks at the bottom. Each pool and system of racks was located proximately to one of the two nuclear reactors, which were located side by side. Because FPL had additional space in the pools, it expanded its storage facilities by increasing the number of storage racks in the pool. FPL designed its system so that each pool could

accommodate the spent fuel of either reactor; in the past, FPL had obtained licenses to transfer spent fuel from one pool to the other.

A 1982 BI No. 139, approved on August 30, 1982, budgeted $300,000 to procure and install spent fuel storage racks to increase capacity at Turkey Point Unit 3. A section of the BI labeled "purpose and necessity" states:

> The original design for Turkey Point Unit #3 had a spent fuel storage capacity of 217 assemblies. In 1977 the original racks were replaced with high density stainless steel racks which provided a capacity of 621 assemblies. The capacity was increased due to the lack of off-site spent fuel reprocessing facilities.

The BI went through several revisions.

Similarly, FPL began expansion of the spent fuel facility at St. Lucie Unit 1 in 1982. A 1982 BI No. 177, approved on July 13, 1982, budgeted $46 million for various projects at St. Lucie, including spent fuel storage racks. This BI also underwent a series of revisions. ER No. 9304, dated December 1985, authorized $1.5 million for "phase I" of the project for design engineering, to remove the existing spent fuel racks, and to install new high density racks.[27] This ER was revised in late 1986 and processed in March 1987 to include construction and material costs, increasing the amount authorized by about $9.5

---

[27] This ER was associated with BI No. 190, approved in late 1985, which budgeted $1.5 million for engineering costs for the St. Lucie Unit 1 spent fuel storage rack project.

million to $11 million.  This ER was again revised in late 1988/early 1989 to decrease the amount of the authorization by $2,067,000 to the "present estimate" of $8,933,000.

ER No. 1760, dated late 1986/early 1987, authorized the expenditure of $12 million to procure and install spent fuel storage racks for Turkey Point Unit 4.  FPL revised this ER in late 1988/early 1989 to decrease the amount authorized by $4 million.

A 1986 BI No. 190, approved in late 1985, budgeted $1.5 million to remove the existing spent fuel storage racks at St. Lucie Unit 1 and install new high density spent fuel storage racks.  The allotted amount was authorized for engineering with a total estimated cost of $10.3 million.[28]

A 1987 BI No. 198[29] budgeted $12 million for Turkey Point Unit 4 to "Procure and install spent fuel storage racks to increase capacity from 614 assemblies to provide sufficient storage capacity through the end of licensed operation in 2007."[30]

---

[28] Mr. Bible testified on cross-examination that this document showed that no costs were incurred before January 1986.

[29] The date that BI No. 198 was approved is illegible.

[30] Mr. Bible testified that, according to the document, no construction costs were incurred before January 1987, and only $1 million was scheduled to be incurred in 1987 and $11 million thereafter.

With respect to the acquisition and installation of the spent fuel rack system, petitioner incurred capitalized costs (tax basis) of $6,713,729, $532,892, and $6,646,960 for equipment placed in service in the 1988, 1989, and 1990 taxable years, respectively.

6.  Area Radiation Monitoring System

An area radiation monitoring system measures the radiation throughout a nuclear electric generating plant.  The system consists of a local monitor that measures radiation and cabling to the control room where readouts from all the monitors are displayed.  FPL claims an ITC for the area radiation monitoring system in the 1990 taxable year.

NUREG 0737 and Supplement 1 to NUREG 0737, dated December 17, 1982, provide regulatory guidelines for radiation monitoring.[31]  On February 23, 1984, the NRC issued an order confirming FPL's commitments to comply with Supplement 1 to NUREG 0737 with respect to Turkey Point Units 3 and 4.

A 1988 BI No. 145, approved on August 20, 1987, budgeted $1.9 million to replace the area radiation monitoring system.  A section of the BI labeled "purpose and necessity" states:

---

[31] According to these regulatory guidelines:

It is our intent that the guidance documents themselves * * * are not to be used as requirements, but rather they are to be used as sources of guidance for NRC reviewers and licensees regarding acceptable means for meeting the basic requirements.

The existing equipment has high maintenance due to equipment age and unavailability of parts.  The equipment is obsolete.  The replacement of the equipment is a Nuclear Regulatory Commission (NRC) Requirement to meet the recommendations of Regulatory Guideline 1.97.  The full scope of work has not been defined.

Phase I  - Engineering and Procurement $1,900,000

Phase II - Construction

The total cost of the project is estimated to be $3,800,000 to $12,500,000 depending on which alternative is implemented.  The expected completion date of Phase II is December, 1990.

This BI was revised twice in 1989, decreasing the amount budgeted

for phase I of the project to $550,000.

ER No. 5339, processed on March 3, 1989, authorized $950,000

for an area radiation monitoring system.  The ER states:

This project is to replace the entire existing Area Radiation Monitoring System with new state of the art components for Turkey Point.

Purpose and Necessity:
The existing Area Radiation Monitoring System requires very high maintenance, also the equipment is obsolete.  Replacement of the Area Radiation Monitoring System has been committed to the NRC under compliance of R.G. 1.97 Rev. 3.

This is a phased ER:

Phase I  - Engineering & Procurement

Phase II - Construction

This ER is for engineering and procurement only. The ER will be revised later to include construction. Removal costs and property retirements will be addressed when the ER is revised for Phase II.  The authorized amount is included in the 1989 Capital Budget.

As indicated above, the ER was revised in late 1990/early 1991 to increase the amount authorized to $1,350,000.

With respect to the acquisition and installation of the area radiation monitoring system, petitioner incurred capitalized cost (tax basis) of $657,253 for equipment placed in service in the 1990 taxable year.

### 7. Nuclear Fuel Transfer System

A nuclear fuel transfer system is an underwater system consisting of motors and equipment that transports spent nuclear fuel from the reactor to the spent fuel pool. FPL reconstructed its nuclear fuel transfer system at Turkey Point. The reconstruction modernized the system by installing a two-cable hoist, changing a number of monitors that measured the load, and changing a number of drive motors and associated equipment. FPL claims ITCs for the nuclear fuel transfer system in the 1988, 1989, and 1990 taxable years.

A 1984 BI No. 569, approved on October 24, 1983, budgeted $1,178,000 for the fuel transfer system upgrade for Turkey Point Units 3 and 4. The BI describes the work to be performed as:

> Upgrade the nuclear fuel transfer system on Unit #3 & #4, with out [sic] of water electric drive motor (replaces underwater air drive motor), counter weights on the upenders, winch load monitors for the upenders, quick opening transfer tube closures, dual cables and hoist load monitors for the spent fuel pit bridge crane hoists.

BI No. 569 appears to be a revision of BI No. 934, which originally authorized $831,000 in 1982. This budget item was also revised in late 1984 and late 1985.

ER No. 7031 authorized $417,879 to upgrade the fuel transfer system for Turkey Point Unit 4. This ER was revised in 1989 to increase the amount authorized by $712,217. The ER includes a description that states that the modifications were designed by Stearns Catalytic Corp. (Stearns Catalytic). Effective December 17, 1984, FPL issued a purchase order to Stearns Catalytic, authorizing $663,975 to provide labor and materials for the transfer upgrade modification of Turkey Point Units 3 and 4. A nuclear safety change order was issued to Stearns Catalytic, with an effective date of December 19, 1985, to reopen, clarify, and revise the purchase order.

ER No. 4133, approved and processed in 1988, authorized $200,000 for modification to convert a single cable hoist to a dual cable hoist, and for the installation of a new hoist load indicator system for Turkey Point Unit 4.

With respect to the acquisition and installation of the fuel transfer system, petitioner incurred capitalized costs (tax

basis) of $430,432, $391,294, and $662 for equipment placed in service in the 1988, 1989, and 1990 taxable years, respectively.

C.  Environmental Property

As a utility company, FPL is subject to environmental regulations by Federal, State, and local governmental agencies, including the Environmental Protection Agency (EPA), U.S. Coast Guard, and the Florida Department of Environmental Protection. Environmental regulations applicable to FPL relate to several natural resources, including air, water, waste, animals, and plants.  The purpose of environmental regulations, as applicable to FPL, is to ensure that FPL generates, transmits, and distributes electricity in a manner that will protect human health and the environment.

1.  Wastewater Neutralization Treatment System

A wastewater neutralization treatment system treats the wastewater coming from the mineralizer regenerate.  The mineralizer water is ultrapure water that is placed into the boiler to generate the steam, which ultimately drives the generator to create electricity.  Wastewater is hazardous for corrosivity.  FPL claims ITCs for the wastewater neutralization treatment system in the 1988 and 1990 taxable years.

FPL received temporary operating permits (TOPs) from the State of Florida, Department of Environmental Regulation, for its

Martin County and Port Everglades plants.[32]  The TOPs were issued

pursuant to the Resource Conservation Recovery Act.

On May 7, 1985, the Department of Environmental Regulation

issued permit Nos. HT 43-068555 and HT 06-068527, each of which

allowed FPL "to operate two hazardous waste surface impoundments

for the treatment of corrosive wastes (D002) by

neutralization".[33]  According to the TOPs, FPL was required to

"inspect and/or certify the surface impoundment, dikes, liners

and other associated structural and monitoring equipment as

required by * * * [Florida statute] and in accordance" with EPA

regulations.  Additionally, the TOPs state:

> Within 30 days issuance of this permit, the permittee
> [FPL] shall submit to the department for approval a
> schedule for closure of the existing surface

---

[32] The parties each requested that we find as fact that FPL received TOPs for each of its nine fossil fuel power plants. However, the documentary evidence reflects TOPs issued were for FPL's Martin County and Port Everglades plants.  Each of the TOPs in the record had an effective date of May 1985, and one permit expired on July 15, 1986, and the other had an expiration date of May 15, 1987.

[33] Ray Butts, FPL's manager for strategic and regulatory planning, testified that the TOPs required FPL to install new wastewater neutralization treatment systems at its fossil plants. He further testified that FPL was required to install:

> new tanks for the actual treatment of the water, the
> ancillary piping that goes with that, as well as the
> various pieces of equipment to support that activity
> including monitoring equipment such as pH meters or
> water level meters.  It also included the maintenance
> of the existing basins to ensure that they had liners
> that did not leak as well as embankments or retaining
> walls that would prevent any over-topping of water.

> impoundment(s) with a binding committment [sic] to construct and have operational an elementary neutralization unit or total enclosed treatment facility.  This binding committment [sic] shall include the authorization to commit funds by F P & L for the engineering, design, and construction of said units. The elementary neutralization unit or total enclosed system shall be constructed and operational within fifty (50) weeks from issuance of this permit.  * * *

If FPL failed to provide a binding commitment, it then had:  (1) 90 days to submit a groundwater monitoring plan; (2) 30 days from the approval of the groundwater monitoring plan to install the necessary monitoring wells; (3) within 15 days after completion of the installation of the monitoring wells, to submit a certification of the well construction by the engineer of record for approval; and (4) 15 days from approval of well construction and certification, to begin sampling the groundwater monitoring well.

A 1986 BI No. 951, approved on October 15, 1985, budgeted $1.4 million to "Design and construct neutralization tanks for fossil fuel power plants" that controlled the pH level of water discharged from the plant.  A section of the BI labeled "purpose and necessity" states:

> Existing and pending state and federal environmental regulations require the control of the pH range of water discharged from water treatment facilities at power plants.  * * *  State and federal regulatory agencies no longer recognize the present means of using existing open neutralization basins to be in compliance with regulations.

> Installation of neutralization tanks is the most cost effective means of regulatory compliance.  * * *

Another alternative considered was to obtain new permits for the water treatment plants to operate as hazardous waste treatment facilities.

To continue operating without modification or obtaining a new permit to operate as a hazardous waste treatment facility would not meet federal and state statutory requirements.  * * *

ER No. 9956, processed on December 5, 1988, authorized $93,603 for the purchase and installation of neutralization basin liners at the Port Everglades plant.  A section of the ER labeled "purpose and necessity" states:

The existing liner is approaching the end of its serviceable life.  These basins are now regulated by State and Federal law.  Any breech [sic] of the liner must be reported to State regulatory authorities. Excess reporting of leaks could bring about enforcement action.  The existing liners will not be removed; the new liner will be placed on top of the existing liners.

ER No. 2286, processed on September 4, 1987, authorized the expenditure of $70,290 to install a neutralization tank for FPL's Riviera fossil plant.  ER No. 3068[34] authorized the purchase and installation of a pH meter for the neutralization tank at FPL's Fort Myers fossil plant.  ER No. 8831, processed on September 6, 1985, authorized $19,440 to "Construct in place a concrete block retention wall around the Water Treatment Plant neutralization basin" at the Turkey Point fossil plant.[35]

---

[34] Because of the quality of the copy in the record, neither the date nor the amount can be determined.

[35] Mr. Butts testified that FPL purchased all the property
(continued...)

With respect to the installation of wastewater neutralization treatment system, petitioner incurred capitalized costs (tax basis) of $241,469 and $233,742 for equipment placed in service in the 1988 and 1989 taxable years, respectively.

2.  PCB Transformers

Polychlorinated biphenyls (PCBs) are a hydrocarbon that has been chlorinated.  PCBs have been identified by environmental regulators as a potential risk to human health and the environment.  The Toxic Substance Control Act of 1976, Pub. L. 94-469, 90 Stat. 2003, current version at 15 U.S.C. sec. 2605 (2000), prohibits the manufacture, processing, or distribution in commerce or use of PCBs in any manner other than in a totally enclosed manner.  FPL previously used PCBs in its fossil fuel power plant transformers.  FPL claims ITCs for the replacement of PCB transformers in the 1988, 1989, and 1990 taxable years.

In 1982, the EPA promulgated a rule, 40 C.F.R. sec. 761 (1982) (the PCB rule), that regulates the use of PCBs.  The PCB rule, inter alia:  (1) "Prohibits the use of PCB Transformers and PCB-filled electromagnets (with a PCB concentration of 500 ppm or greater) * * * after October 1, 1985, and requires a weekly inspection of this equipment for leaks of dielectric fluid until that date"; (2) "Authorizes the use of all other PCB Transformers

---

[35](...continued)
according to the specific conditions of the TOPs.

for the remainder of their useful lives, and requires a quarterly inspection of this equipment for leaks of dielectric fluid"; and (3) "Prohibits the use of all other large PCB Capacitors after October 1, 1988".  According to the PCB rule:

> If a PCB Transformer is found to have a leak which
> results in any quantity of PCBs running off or about to
> run off the external surface of the transformer, then
> the transformer must be repaired or replaced to
> eliminate the source of the leak.  In all cases any
> leaking material must be cleaned up and properly
> disposed of * * * in no case later than 48 hours of its
> discovery.  * * *

In response to the PCB rule, FPL commenced a program to remove PCBs from its electrical equipment, including all power transformers at its power plants.[36]

A 1986 BI No. 895, approved in October 1985, budgeted $16.4 million to "Replace all PCB filled distribution capacitors" over a 6-year period "to conform with new EPA regulations, and commenced in the first quarter of 1983 and are to be completed in the third quarter, 1988."  A section of the BI labeled "purpose and necessity" states that "Recent EPA regulations released August 25, 1982 prohibit the use of all large PCB-filled capacitors after October 1, 1988."

A 1986 BI No. 904, approved in October 1985, budgeted $13 million to "Replace all PCB filled distribution transformers" over a 3-year period to commence in the first quarter of 1984 and

---

[36] Mr. Butts testified that a PCB leak was a "reportable event" to the EPA.

to be completed in the fourth quarter of 1986.  A section of the BI labeled "purpose and necessity" states that "Recent concerns with PCB fluids and by-products of PCB's resulting from fire have made it advantageous to replace these transformers before end of life."

The record contains copies of ER Nos. 1997, 3042, 3043, 3331, 3337, 3498, 3567, 3568, 4210, 4211, 4213, 3971, and 4455, which authorized the expenditure of funds to "replace the existing generator grounding transformer (containing PCB contaminants) with a PCB free transformer"[37] at FPL's power plants.[38]  Similarly, ER No. 4440, processed on December 8, 1988, authorized $341,396 to "replace Pressurizer Heater P.C.B. oil filled transformers with Non-P.C.B. dry type" at St. Lucie Unit 2.  A section of the ER labeled "purpose and necessity" states that "Having transformers on site filled with this oil containing P.C.B.'s in this Regulatory, Environmental, and litigious climate is a liability" for FPL.[39]

With respect to the replacement of PCB transformers, petitioner incurred capitalized costs (tax basis) of $886,616,

---

[37] Although not all of these ER's contain the exact quoted language, they each contain similar language.

[38] Mr. Butts testified that these ERs were the result of the PCB rule.

[39] Mr. Butts testified that this ER was the result of the PCB rule.

$748,411, and $36,053 for equipment placed in service in the 1988, 1989, and 1990 taxable years, respectively.

D.    Simulator and Training Buildings

At some point, the NRC and FPL's management held various management and enforcement conferences concerning Turkey Point.[40] In February 1984, FPL presented a performance enhancement program for Turkey Point to the NRC.[41]  Part of the performance enhancement program was to establish on-site training facilities and to obtain plant reference simulators.  FPL claims ITCs for the simulator and training buildings in the 1988, 1989, and 1990 taxable years.

On July 13, 1984, the NRC sent a letter to FPL, which states in part:

> Based on recent NRC inspection activities and the enforcement history of the Turkey Point Facility, we conclude that * * * [FPL] has not given sufficient management attention to ensuring adherence to regulatory requirements.  * * *

The NRC included a confirmatory order with the letter, which states in part:

---

[40] Thomas J. DePlonty, FPL's project manager, testified that during this period Turkey Point was placed on a "watch list" and was considered one of the 10 worst nuclear plants operating at that time.

[41] The performance enhancement program stated:  "This document is specific to Turkey Point Plant however, where appropriate, the results and lessons learned will be applied to the St. Lucie Plant."

> Because of NRC concerns regarding the extent of problems at the Turkey Point Plant, FPL presented information on January 13, 1984 describing management actions taken to improve operational performance at the site. A more comprehensive FPL program was developed and presented to the NRC on February 17, 1984. * * *

Accordingly, on July 11, 1984, the NRC ordered FPL to, inter alia, "implement the Turkey Point Performance Enhancement Program".

A 1983 BI No. 543, approved in late 1982, budgeted $100,000 to "Purchase and install a plant control room specific simulator at Turkey Point and St. Lucie Plants." The budget item was divided in two phases. Phase I provided for the development of simulator technical specifications, and phase II provided for simulator procurement and installation.[42] FPL revised BI 543 in 1984, authorizing $21,980,000 (which was apparently "phase II") to "Provide control room specific simulators for the Turkey Point and St. Lucie nuclear power plants." This revision referenced a third phase to the project, which "will include construction of the buildings and simulator installation. These costs are estimated at $2,800,000." This BI 543 was revised in March 1984 to increase the amount budgeted for all three phases to $32 million. This revision envisioned training centers as part of phase III, which had an estimated cost of $10,020,000. In late

---

[42] BI No. 543 only dealt with phase I.

1984/early 1985, FPL revised this BI to increase the overall budgeted amount to $35 million.

ER No. 7172, referencing BI No. 543, was processed in 1984 and approved $10,675,000 to design, fabricate, and install a control room specific simulator for the St. Lucie power plant. This ER was revised in late 1988/early 1989 to increase the amount approved to $13,150,000 and revised again in 1991 to increase the amount approved to $14,520,000. ER No. 8223, referencing BI No. 543, was processed in 1985, and authorized $375,000 to provide detailed design and engineering necessary to construct the training facility at the St. Lucie nuclear power plant. FPL revised this ER in 1986 to increase the amount approved to $5.5 million, and again in 1988 to increase the amount approved to $7,050,000. ER No. 7173, referencing BI No. 543 and approved in 1984, authorized $10,780,000 to design, fabricate, and install a control room specific simulator for Turkey Point. This ER was revised in late 1988/early 1989 to increase the amount approved to $11,550,000.

A 1987 BI No. 103, approved in 1986, budgeted $2,437,000 to "provide the capital additions necessary to equip the Training/Simulator [at the St. Lucie nuclear power plant] with state of the art tooling, mockups, and equipment." ER No. 1817, which references BI No. 103 and was approved in early 1987, authorized $330,000 to purchase mockup equipment and plant

specific training aids for the St. Lucie nuclear power plant. ER No. 1818, which also references BI No. 103 and was approved in early 1987, authorized $628,000 to purchase equipment for the simulator at the St. Lucie plant. ER No. 1819, which references BI No. 103 and was approved in early 1987, approved $521,000 to purchase a security system and other equipment for the St. Lucie plant simulator project. ER No. 1820, which references BI No. 103 and was approved in early 1987, authorized $917,000 for the purchase of equipment and training aids for the St. Lucie nuclear power plant simulator project. This ER was reprocessed in late 1990, and was reestimated to decrease the amount approved to $614,989.

A 1989 BI No. 482, approved in late 1988, budgeted $786,000 for the necessary additional equipment for the training/simulator building. ER No. 5448, referencing BI No. 482 and approved in 1989, authorized $300,000 to purchase "NIS Pack mockup that duplicates plant equipment to conduct training" for Turkey Point. This ER was revised in 1990 to increase the amount authorized to $382,262.

A 1987 BI No. 483, approved in late 1986, budgeted $1,807,000 to "provide capital funds necessary to equip the Training/Simulator Building [at Turkey Point] with state of the art mockups equipment and tooling." ER No. 2374, referencing BI No. 483 and approved in 1987, authorized $95,000 to purchase

Turkey Point specific training aids and mockups.  ER No. 2442, referencing BI No. 483 and approved in 1987, authorized $35,000 to "Purchase a test/training cabinet that will duplicate the equipment associated with the [Turkey Point] plant's process and area radiation monitoring systems."  ER No. 2486, referencing BI No. 483 and approved in 1987, authorized $682,000 to purchase shop equipment and training aids for Turkey Point.

A 1988 BI No. 558, approved in late 1987, budgeted $1,467,000 to provide "THE CAPITAL FUNDS NECESSARY TO EQUIP THE TRAINING/SIMULATOR BUILDING."[43]  ER No. 3381, referencing BI No. 558 and approved in 1988, authorized $275,000 for the purchase of a "See-Through Power Plant Operational Model" for Turkey Point.

ER No. 5447, referencing BI No. 577 and approved in early 1989, authorized $200,000 for a "Flux Map System Training Model" for Turkey Point.  This ER was revised in June 1989 to increase the amount authorized to $270,000.

ER No. 8224, referencing BI No. 543 and approved in early 1985, authorized $325,000 to provide detailed design and engineering necessary to construct the training facility at Turkey Point.  This ER was revised in 1986 to increase the amount

---

[43] This BI did not specify for which site, Turkey Point or St. Lucie, these funds were budgeted.

authorized to $4.7 million for the construction of the simulator training facility at Turkey Point.[44]

With respect to the construction of the simulator training buildings, petitioner incurred capitalized costs (tax basis) of $1,486,050, $1,458,213, and $345,914 for equipment placed in service in the 1988, 1989, and 1990 taxable years, respectively.

E.    Load Management System

A load management system (LMS) is a group of components that control appliances in customers' homes to reduce peak demand for electricity.  Peak demand is the time during the day with the highest demand for electricity.  In reducing the demand during peak times, load management reduces FPL's need to construct additional facilities to provide electricity.  Load management reduces peak demand by remotely turning on and off certain appliances in customers' homes.  Customers voluntarily participate in the LMS, and FPL gives its customers rebates in exchange for their participation.  FPL claims ITCs for the LMS in the 1988, 1989, and 1990 taxable years.

The three major components of the LMS are the central computer, the substation control equipment, and the transponders located at customers' homes.  Telephone and power lines connect

_____

[44] Mr. DePlonty testified that physical construction of the St. Lucie plant training facility did not start until after April 1986.  However, Mr. DePlonty testified that development of the simulator, a training aid, began before the construction of the building that housed the simulator.

these components to each other.  The central computer is a mainframe type of computer, issuing commands through telephone lines to substation equipment, and is fully redundant, meaning that FPL purchased two central computers, one of which was used and one of which served as a backup.  When FPL purchased the central computer at the beginning of the LMS implementation, the system could handle 600,000 to 700,000 customer locations (transponders) and the corresponding substation equipment.  When FPL purchased the central computer it also purchased related software,[45] and its software license was perpetual.

The substation control equipment received commands from the central computer, translated those commands, and sent the commands through power lines to transponders in customers' homes.  Substation control equipment includes the control receiving unit, the outbound modulation unit, the modulation transformer unit, the inbound processing unit, and the associated equipment.  Transponders are installed at customers' homes, the transponders accept commands that are sent from the substation equipment, and they act on the commands by turning appliances on or off at customers' homes.  Although the components of the LMS function in an integrated manner, each transponder, once installed, was

---

[45] According to a document entitled "SOFTWARE PRODUCTS LICENSE AGREEMENT", the software was licensed from A.B. Chance Load Management Systems (A.B. Chance), effective on Oct. 4, 1985.

operated and placed in service independent of any other transponder. FPL began placing transponders in service during the beginning of 1985 and continued to do so through the date of trial.

On September 17, 1980, the FPSC issued an order proposing rules. According to the general goals listed in the order, "The Florida Energy Efficiency and Conservation Act requires increasing the efficiency of the electric * * * systems of Florida". The order also called for a public hearing on the proposed rules.

During 1980-81, FPL prepared the "Energy Management Plan for the '80s" (the plan) and submitted it to the FPSC.[46] The articulated objective of the plan was to "Reduce use of home appliances at times of FPL system peak, thereby reducing peak demand." The plan called for a load management system. The plan document states that "FPL has recently obtained * * * [FPSC] approval to implement a two year test on 1,000 residential customers beginning in the fall of 1980".

In January 1983, FPL published a bidirectional communication system requirements study that outlined "FPL's future load

---

[46] Armando Garcia, an engineer at FPL, testified that FPL submitted the energy management plan to the FPSC in response to the FPSC order and that the FPSC approved the plan. Mr. Garcia explained that the FPSC had to approve the energy management plan "Because we do recover the costs and any costs that, money we collect on our customers has to be approved by the" FPSC.

management and energy conservation programs designed to meet the FPSC mandated goals."[47]  The study recommended, inter alia, that FPL procure and install a bidirectional communication system to implement load control.  In addition to the study, FPL published a technical report that detailed the project expenditures by year.

In November 1983, FPL prepared a technical specification that detailed how the LMS was supposed to work, its properties, and its requirements.[48]  FPL used the technical specification to secure bids from vendors to build the LMS.

On October 4, 1985, FPL entered into an agreement (the LMS contract) with A.B. Chance Load Management Systems (A.B. Chance).[49]  An FPL purchase order incorporated into the LMS contract acted as A.B. Chance's authority to "furnish the Phase I

---

[47] For example, the FPSC's Sept. 17, 1980, order proposing rules included goals to "reduce the average annual growth of kilowatt demand * * *.  The specific goals for the 1980-85 period are to reduce growth rates so that the total KW demand in 1985 does not exceed that of 1984 by more than 2.212%".

[48] The technical specifications included a "tentative delivery schedule" for the years 1985 through and including 1992. Mr. Garcia testified:

> we knew that we were going to go long term with the system and that, because of the nature of it, you had to go with one vendor.  This is what the vendor was told and he was given the scope of the project and the values that we were talking about in order to submit an accurate bid.

[49] Mr. Garcia testified that FPL's technical specifications were incorporated into the LMS contract.

Load Management System" to FPL for a total price of $11,477,432.

One of the terms included in the LMS contract was a price

guarantee:

>    Prices for all parts of the Work shall remain firm
>    throughout Phase I except as otherwise indicated in
>    Base Bid Schedule Appendix I.
>
>    It is FPL's intent to competitively bid its
>    requirements for Phases II and III.  However, Contractor
>    agrees that the maximum price it will charge FPL during
>    Phases II and III will be the lowest price the Contractor
>    then currently charges its other customers of Contractor's
>    load management system equipment of the same model, type,
>    system size, quantity purchase and similar contractual
>    terms.  * * *[50]

Under the LMS contract, FPL purchased an entire system, including

hardware, software, etc.[51]  The LMS contract contemplated the

purchase of, inter alia, 10,000 plug-in transponders, 2,000

surface mount transponders, central computers, software licenses,

---

[50] Concerning the LMS contract, Mr. Garcia testified:

>    There was no commitment to the work on FPL's part
>    at that time to purchase any equipment beyond what is
>    described here as Phase I.
>
>       *    *    *    *    *    *    *
>
>    * * * [However, it] was made clear to the vendor
>    throughout the document that our intention was to do
>    the whole LMS project.  * * *

[51] The LMS contract refers to "phase I" but apparently that
term is not defined within the body of the voluminous contract.
Given the description of the items to be provided by A.B. Chance
and those which are described in FPL's budget items, see infra,
we assume that "phase I" for the LMS contract is the same as
"phase I" for budget item purposes.

etc.[52]  The LMS contract contained a termination clause for convenience that provides:

>     upon 15 days Written Notice to Contractor, FPL may at its sole discretion and without prejudice to any other right or remedy, terminate this Contract.  * * *
>
>     Upon such termination, FPL shall pay such amount as Contractor and FPL may agree is to be paid by reason of such termination, but in event of failure to agree upon the amount to be paid by reason of such termination, FPL shall pay the Contractor and Contractor agrees to accept in full payment of all FPL's obligations to the Contractor under this Contract, an amount consisting of:
>
>     1.    All amounts which are due to the Contractor as a result of Contractor satisfactorily reaching payment milestones in accordance with * * * [the LMS contract] which FPL has not yet paid Contractor, plus
>
>     2.    An amount equal to 10% of the progress payment for any Contract milestone not started and for which no preparatory or startup costs have been incurred by Contract at the time of termination, plus
>
>     3.    If a portion of a Contract milestone is terminated, an amount equal to the costs which Contractor is unable to mitigate * * * and 10% of the progress payment determined by multiplying the percentage of such Work which

---

[52] Although the terms of the LMS contract were for "phase I," Mr. Garcia testified that "once we made the commitment [to the LMS], it was a huge investment and we would continue with that vendor unless there was a catastrophic event."  He further testified:

>     the contract was always envisioned as a single contract and all the purchases have been made under the same contract.  Phase I, Phase II and [Phase] III were designations given in order to better manage the contract.  You would not get a contract for 10 or 20 years originally.  It just doesn't make sense.

has not been completed times the progress payment of such uncompleted milestones being terminated.

A 1986 BI No. 897 budgeted $15 million to purchase: 12,000 load control transponders; 1,050 metering transponders; and 500 surface mount load survey transponders, communication equipment for substations, test equipment, and computer hardware and software. The budget item states that work was to begin in 1985 and was to be completed in 1988. It further states that a load management communications system is necessary to meet the demand and energy goals of the FPSC and FPL's energy management plan. This budget item permitted FPL to implement phase I of the LMS:

Initially, the Load Management System will be sized for 10,000 load control points and 1,000 TOU [Time-of-Use] meter points, and 500 load survey points. After Phase I is thoroughly tested and results are satisfactory, the system will be expanded to support 388,000 load control points and 220,000 TOU Rate customers by 1994.

BI No. 897 was revised in 1989 to increase the amount budgeted for phase I to $20 million. The budget item states:

Phase II of the program is covered under Budget item 868 which calls for the System to be expanded to support 250,000 load control points by 1993.
Total Program Capital ($000)
Phase I    -      $ 20,000
Phase II   -        90,000
All future
Phases     -        95,000
Total            $205,000

A 1989 BI No. 868 budgeted $90 million for phase II of the LMS. The budget item states that work was to begin in 1989 and was to be completed in 1993. It also explains that phase II will

increase the LMS from 10,000 to 250,000 load control points and from 15 to 183 substations.

According to a summary of exhibits submitted at trial relating to the cost of the LMS equipment purchased from A.B. Chance in 1988, 1989, and 1990, FPL installed transponders with a total cost of $18,061,148, substation equipment with a total cost of $6,044,979, and master station equipment with a total cost of $7,478,426 for a total cost of $31,584,553.[53]

With respect to the installation of the LMS, petitioner incurred capitalized costs (tax basis) of $362,837, $15,156,624, and $39,351,031 for equipment placed in service in the 1988, 1989, and 1990 taxable years, respectively.

F.   St. Lucie Backfit Construction

St. Lucie Unit 1 was operational in 1976, and St. Lucie Unit 2 was operational in 1983.  There are two categories of backfit items:  (1) Items that are the part of the plan completed after commercial operation, and (2) items developed after commercial operation, resulting from regulatory requirements or performance problems.

---

[53] Mr. Garcia testified that all the equipment purchased from A.B. Chance was purchased under the same contract.  He also testified that as of the day of trial, FPL was still purchasing equipment from A.B. Chance.

1.  Underwater Intrusion System

An underwater intrusion system protects a power plant using a barrier system.[54] Mr. Paduano testified that "The system consists of a bridge across the intake canal with a suspension of a barrier, and underwater and surface detection devices." FPL claims an ITC regarding the underwater intrusion detection system for the 1990 taxable year.

On October 25, 1984, the NRC sent a letter to FPL concerning St. Lucie's physical security plan. The letter stated in pertinent part:

> Other changes which were in response to NRR's letter of June 5, 1984, relative to the Underwater Intrusion Detection System (UIDS), are in need of additional clarification. However, this additional information request does not delay the acceptance of your proposed UIDS. You should commence implementation of that system upon receipt of this letter.[55]

In response to an FPL letter and a meeting regarding the intake canal barrier and intrusion detection system, on November 14, 1985, the NRC sent a letter to FPL concerning St. Lucie Units 1 and 2 physical security plan. The letter stated in part:

> We have determined that the proposal presented by Florida Power and Light Company * * * is technically insufficient in that the underwater portion does not satisfy the requirements of 10 CFR 73.55(c)(4) * * *

---

[54] Harry Paduano, a former manager with FPL, testified that the underwater intrusion system was required by the NRC.

[55] Mr. Paduano testified that this letter in effect required FPL to modify the underwater intrusion system.

*     *     *     *     *     *     *

You should take whatever steps are necessary to have this matter resolved and the system installed by the date committed to in your security plan.

On December 21, 1989, FPL sent a letter to the NRC concerning St. Lucie's intrusion detection system. The letter stated in part:

The NRC found in its December 7, 1989 letter, that the system currently installed at St. Lucie Plant does not meet regulatory requirements or guidance for detection capability. * * *

*     *     *     *     *     *     *

FPL's plan [sic] to meet with the NRC in February 1990 to update the Staff on its approach to resolution of this issue.

On May 1, 1990, the NRC sent a letter to FPL concerning its conceptual design of the intrusion detection system's intake canal. In that letter, the NRC "determined that your conceptual design is consistent with" regulatory requirements. However, the letter cautioned that approval of the conceptual design does not constitute final approval.

ER No. 6475, processed on October 24, 1983, authorized $2,188,000 to "perform work after the commercial operation of St. Lucie Unit No. 2 in order to meet regulatory requirements, comply with technical specifications, achieve full operating capability and increase plant availability." The ER specified that "Backfit Item No. 166, Underwater Intrusion Detection" was to be completed and in service by March 31, 1984. In 1986, the amount authorized

was increased to $5.9 million.  The ER included a report of construction action prepared on May 9, 1984, which is associated with ER No. 6475.  The report of construction action stated that construction work started on May 1, 1984.[56]  Another report of construction action prepared on February 27, 1987, stated that the underwater intrusion detection was completed on February 25, 1987.

ER No. 4866, approved in late 1988/early 1989, authorized $360,000 for the St. Lucie underwater intrusion detection system. The ER stated in pertinent part:

> [FPL] is committed to the * * * [NRC] for the development of an underwater intrusion detection system for the intake canal.  This is a security measure.
> * * *
>
> This ER is necessary as the presently installed system does not satisfy the requirements of the [NRC].  This has caused an extensive effort in research and development of this specialty system.  This research has identified the need to:  Install an additional sonar head and a surface detection system.  These additional requirements have made it necessary to fund and perform these modifications.[57]

With respect to the modification and construction of the underwater intrusion system, petitioner incurred capitalized costs (tax basis) of $338,665 for equipment placed in service in the 1990 taxable year.

---

[56] Mr. Paduano testified that the construction work on the underwater intrusion system began before 1986.

[57] Mr. Paduano testified that this ER "added additional detection capabilities."

2.  <u>Condensate Polisher Tie Line</u>

A condensate polisher purifies the feedwater that enters the steam generator to protect the generator from corrosion.  The design for each of the reactors at the St. Lucie plant included a condensate polisher.  FPL claims ITCs for the condensate polisher tie line in the 1989 and 1990 taxable years.

Apparently, in 1982 there was a plan change or modification for St. Lucie Unit 1.  An engineering study, dated November 13, 1985, recommended the use of cross-tie piping to protect the generator from corrosion.  The recommended system would purify the feedwater in the second unit by using the polishers at the first unit.  The system uses the cross-tie lines to purify the feedwater by passing the water discharged from the condensate pumps at St. Lucie Unit 2 to the condensate polishers at St. Lucie Unit 1.  After passing through the condensate polisher, the water returns to the condensate system at St. Lucie Unit 2 via the cross-tie lines, and then the water feeds through the steam generators.[58]

ER No. 6195, processed on June 22, 1983, authorized the expenditure of $15,243,000 as part of the "backfit program" on St. Lucie Unit 2.  The ER states:

---

[58] In a letter dated Jan. 9, 1986, Mr. Paduano recommended the installation of the cross-tie option for St. Lucie Unit 2. The record contains numerous letters describing the design process for going forward with the condensate polisher cross-tie line for St. Lucie Unit 2.

It is necessary to perform work after commercial operation of St. Lucie Unit No. 2 in order to meet regulatory requirements, comply with technical specifications, achieve full operating capability and increase plant availability.

According to the ER, work was to be completed and in service by May 31, 1985.[59]  A revision to ER No. 6195 was processed on February 8, 1984, to increase the amount authorized to $18,288,000.  FPL revised the ER again in 1986 and 1987 to decrease the amount authorized to $3,830,000.  The decrease was explained as follows:

The previous scope of work included the installation of a complete full flow condensate polisher at Unit 2.  An examination of the steam generators during the recent refueling outage resulted in an engineering determination that the existing condensate polisher at Unit 1 could serve the needs of both units.  The scope of work is being reduced to a condensate tie line between the two units.

After the decrease, the ER was again revised to increase the amount authorized to $4,828,000 to account for extensive modifications.

With respect to the installation of the condensate polisher tie line at the St. Lucie nuclear power plant, petitioner incurred capitalized costs (tax basis) of $3,826,317 and $388,906 for equipment placed in service in the 1989 and 1990 taxable years, respectively.

---

[59] Mr. Paduano testified that the construction related to the condensate polisher at St. Lucie Unit 2 commenced before 1986.

3.  Instrument Air Upgrade

At a power plant, an instrument air system operates the valves located throughout the plant.  The instrument air system provides the force that changes the positions of the valves in the plants.  FPL claims ITCs for the instrument air upgrade for the 1988, 1989, and 1990 taxable years.

Apparently, the instrument air system at St. Lucie Unit 1 experienced problems, and FPL initiated a study to determine the cause of the problems.[60]  The study culminated in a recommendation on June 22, 1983, to remove existing equipment and replace it with new equipment.  A letter dated October 22, 1984, states that FPL held a meeting in May 1984 to discuss the problems and potential solutions for the instrument air systems for both units at St. Lucie.  In that letter, FPL expressed its intent to solicit bids to acquire four new compressors and two new dryers.  According to a letter dated December 28, 1984, FPL anticipated that it would complete the bid review and provide an engineering schedule by January 18, 1985.

ER No. 9009, processed on October 23, 1985, authorized $75,000 to upgrade the instrument air system at St. Lucie Unit 1. The ER stated:

> The present instrument air systems are not capable
> of suppling [sic] the total plant needs for instrument

---

[60] Mr. Paduano testified that the instrument air upgrade was a type 1 backfit item.

air.  Additional air stations are needed to be installed in order to provide the equipment with the necessary instrument air.  Two new additional air compressors will be installed, and the air dryer will be replaced.

The present air compressors are operating continuously indicating insufficient air capacity.  The system suffers from a lack of adequate pressure for the main steam isolation valves * * *.  The existing dryer is not properly drying air at the present system flow rates.

ER No. 9009 estimated that the upgrade would be completed by November 30, 1986.  In late 1985, the amount authorized was increased to $692,000.  In late 1988/early 1989, the ER was increased to $1,765,000 "due to schedule duration increase and a growth in scope."  The duration increase was due to "rescheduling of Engineering and a Plant Operations requirement that some work be accomplished during a plant outage."  According to a report of construction action, the construction began on October 26, 1985.  According to another report of construction action, construction stopped to await a construction package needed to complete the work, and the work was to resume during the summer of 1987.

ER No. 9303, processed on February 26, 1986, authorized $692,000 to upgrade the instrument air system on St. Lucie Unit 2.  ER No. 9303 essentially listed the same need for the upgrade as described in ER No. 9009.  In late 1988/early 1989, FPL increased the amount authorized to $1,464,000 because of growth in the scope of the project.  According to a report of construction action, construction started on the instrument air

system upgrade on May 12, 1986.  According to another report of construction action, the instrument air system upgrade was put in service on April 27, 1989.

With respect to the installation of the instrument air upgrade, petitioner incurred capitalized costs (tax basis) of $1,541,741, $1,717,941, and $316,912 for equipment placed in service in the 1988, 1989, and 1990 taxable years, respectively.

G.    St. John's River Power Park (SJRPP)

The Jacksonville Electric Authority (JEA) and FPL entered into an agreement, dated April 2, 1982, to jointly own and operate the St. John's River Power Park (SJRPP).  FPL owns a 20-percent interest, and the JEA owns an 80-percent interest of the SJRPP as tenants in common.  FPL claims ITCs for the SJRPP equipment in the 1988, 1989, and 1990 taxable years.

The SJRPP burns coal to generate steam to turn the turbines that generate electricity.  The major components of the SJRPP include:  Hyperbolic cooling towers, bore houses, turbine houses, steam generators, switcher, precipitators, scrubbers, chimney, and coal facilities.  SJRPP Units 1 and 2 each had their own boiler, turbine, and control panel.  The SJRPP includes a water-borne coal terminal, which is connected to the main part of the

facility by conveyor systems located on a piece of land that is approximately 3.5 miles long by 100 feet wide.

Buildings at the SJRPP serve a support function to the electrical power generation components.  The buildings are not significant compared to the other parts of the SJRPP facilities in terms of size and cost.

In operation, Units 1 and 2 both use coal from the SJRPP's coal yard and coal-unloading facilities (train and ship).  The SJRPP's conveyor system serves both Units 1 and 2.  Employees of the SJRPP work on both Units 1 and 2.  Both these units use the SJRPP's inventory, storage, and tool rooms.  The SJRPP includes other facilities common to both Units 1 and 2, such as the switch yard, waste water treatment, limestone handling, shipment handling, and rotary coal dumper.  Unit 1 is capable of supporting the critical systems of Unit 2 and vice versa.  These critical systems are "cross connected" to support one another, and include the instrument air/service units, condensate systems, cooling water systems, and auxiliary steam systems.

The SJRPP Unit 1 and the common facilities were placed in service in 1987, and Unit 2 was placed in service in 1988.  After Unit 1, the common facilities, and Unit 2 were placed in service, certain construction completion work remained, including "wrap up" work and "enhancements and deficiencies" work.  "Wrap up" work included predominantly contract closeout work related to

construction contracts with unrelated parties. "Wrap up" work was within the original design of the SJRPP.

The SJRPP agreement defined the physical facilities to include: (1) Two coal-fired electric generating units, along with all of their necessary equipment; (2) a coal handling system, including coal storage facilities;[61] and (3) a switchyard.[62] The same building contains the generators for Units 1 and 2. Both units use the same coal yard. The control room houses control panels for both Units 1 and 2.

---

[61] The SJRPP agreement also stated: "Currently being studied is the conceptual design for and feasibility of a facility to provide for the waterborne delivery and transfer of fuel."

[62] John P. Reid, business manager for the SJRPP, testified that it was always intended that the SJRPP would include two coal fire units.

The SJRPP agreement states in pertinent part:

> 5.9  Commitments on Behalf of Co-Owner.
> 5.9.1 Authority of Agents to Commit.  JEA shall
> have the authority to act as agent on behalf of
> FPL (i) to the extent actions are authorized
> * * *[63]

According to a final cost report, as of September 30, 1993, the final cost totaled $860,703,589.96 for Unit 1, $510,248,946.56 for Unit 2, and $60,227,555.61 for the coal terminal.[64]

Numerous third parties contracted to provide materials, services, and other aspects of the construction of the SJRPP. Excavation for the construction of the SJRPP commenced in December 1982, and the first concrete was poured in 1983.  The parties submitted into evidence a summary of third-party

---

[63] Mr. Reid explained his understanding of this provision as:

> [the] JEA is the leading manager of the construction operation and maintenance and long term ownership of the facility and because of their contracting requirements was the lead manager of the facility of the construction and operation of the facility.  This section under the JOA states that [the] JEA, from * * * [FPL's] perspective, [the] JEA will have the authority to act as agent on behalf of * * * [FPL] in all those * * * issues.

Additionally, Mr. Reid testified that the JEA and FPL managed the SJRPP project by committee, with two representatives from each owner serving as representatives.

[64] Mr. Reid testified that the cost of Unit 1 far exceeded the cost of Unit 2 because the common facilities had to be erected in time to support the first unit built.

construction contracts related to the SJRPP.  The summary lists

the major contracts for the SJRPP Units 1 and 2, the base award

values of the contracts, the effective dates, and the subject

matter.  The parties stipulated that, except for one contract,

each contract identified in the summary contained an introductory

paragraph, of which the following is representative:

> This Agreement, Executed this ___ day of ___ in the
> A.D. ___ by and between JACKSONVILLE ELECTRIC
> AUTHORITY, Jacksonville, Florida, hereinafter OWNER,
> and ___, hereinafter called CONTRACTOR.[65]

The parties stipulated that each contract identified in the

summary contained a clause defining "Owner", of which the

following is representative:

> Owner "means the [Jacksonville Electric] Authority
> and any person, firm, partnership, joint venture,
> company, corporation or other entity obtaining an
> ownership interest or ownership participation in the
> Project.  The Authority shall represent all entities
> comprising Owner with regard to all relations between
> the Owner and Contractor under this Contract."

The parties stipulated that each contract identified in the

summary contained a termination clause, of which the following is

representative:

---

[65] The excepted contract contained the following language:

This Agreement, Executed the 11th day of September in
the A.D. 1985 by and between Jacksonville Electric
Authority on its behalf and agent for Florida Power and
Light, hereinafter Owner and Johnson Control, Inc.,
hereinafter Contractor.

44.0 <u>Termination for Convenience</u>

44.1 At any time after the acceptance of this Contract, Owner shall have the absolute right to terminate the entire Contract. In the event of termination, Contractor shall be paid for all disbursements and expenses which Contractor has incurred or becomes obligated for prior to the date of Contractor's receipt of the notice of termination plus costs incurred in compliance with Section 44.2 below, less the reasonable resale value of Equipment which shall have been ordered, obtained or fabricated in connection with this Contract plus a sum as profit bearing the same ratio to the profit that Contractor would have received upon completing this Contract as the value of the Work completed as of the date of receipt of the notice of termination bears to the Contract Price.

44.2 Upon receipt of such notice of termination, Contractor shall:

44.2.1 Stop the performance of the Work hereunder except as may be necessary to carry out such termination.

44.2.2 Take any other action toward termination of the Work which Owner may reasonabley [sic] direct, including all reasonable efforts to provide for a prompt and efficient transition as directed by Owner.

44.3 All payments made by Owner against the Contract Price prior to termination shall be credited to the amount, if any, due Contractor as provided in Section 44.1.

44.4 Except for amounts due pursuant to Section 44.1, upon termination as provided in Section 44.1 Owner will have no liability to Contractor for any cause

whatsoever arising out of or in connection with such termination.

44.5 If the sum of all previous payments and credits made by Owner exceeds the sum payable under Section 44.1, such excess shall be refunded by Contractor to Owner immediately upon determination of such excess by the Parties.[66]

According to an actual cost report, as of December 31, 1985, the total amount expended on the SJRPP was $703,407,644.[67] According to that report, as of December 31, 1985, FPL's obligation was $140,681,529. Apparently a retention account was created,[68] which totaled $31,259,567 as of December 31, 1985.

---

[66] Mr. Reid testified that, as of Dec. 31, 1985, it was 100 percent likely that FPL and the JEA would continue with the existing contractors, and that there was a zero percent likelihood that the JEA or FPL would terminate these contracts. Furthermore, Mr. Reid testified that neither the JEA nor FPL exercised the termination clause.

[67] Mr. Reid testified that, as of Dec. 31, 1985, the SJRPP was between 60- and 65-percent complete. According to Mr. Reid's testimony and the stipulated summary of the SJRPP contracts, as of Dec. 31, 1985, FPL and the JEA were "committed" to spend $810,902,712. Mr. Reid testified that this sum "represents cash out the door."

[68] As Mr. Reid testified:

Retention is monies withheld from the contractors invoice pending overall completion, successful completion of the contract of work and/or performance testing acceptance, monies withheld from the contractors invoice on a monthly basis.

However, Mr. Reid also testified that the retained amounts were owed to the contractors.

Additionally, as of December 31, 1985, there was an unpaid liability of $5,569,907.[69]

According to an actual cost report dated January 31, 1986, the total expenditures to date were $726,985,585.  During January 1986, $23,964,311 was expended on the SJRPP.  This amount paid in January 1986, covered contract work performed during November and December of 1985.[70]  According to the actual cost report, as of January 31, 1986, FPL's obligation was $145,477,686.

A 1986 BI No. 148 Rev. 4 budgeted $239,087,000 "To participate with * * * [the JEA] in the joint construction of the first of two coal-fired steam generating units."  The BI explained that this amount was predicated upon FPL's owning 20 percent of the unit's capital cost.  This BI stated that work started in 1979 and would be completed in April 1987.  FPL approved this BI in late 1985 with only the construction of phase III yet to be completed.  BI No. 148 Rev. 5, approved on October 13, 1986, decreased the amount budgeted to $231 million.  According to the revision, the estimated completion date of construction was April 15, 1987.  Approved on August 20, 1987, BI

---

[69] Mr. Reid testified that the unpaid liability was for purchase orders that were amounts outside or above and beyond contractor expenditures.

[70] Mr. Reid testified that FPL and the JEA were liable to the contractors in January 1986 for work performed in November and December of 1985.  This amount, however, did not include the amounts retained from contractors.

No. 148 Rev. 6 decreased the amount budgeted to $216 million.  BI No. 148 Rev. 7, approved in late 1988, again decreased the amount budgeted to the SJRPP project to $204 million.  Finally, BI No. 148 Rev. 8 increased the amount budgeted to $207 million in late 1989.

A 1986 BI No. 149 Rev. 4, approved in late 1985, authorized $166,453,000 to participate in the construction of Unit 2.  BI No. 149 Rev. 5 decreased the amount budgeted to this project to $148 million.  BI No. 149 Rev. 6 decreased the amount budgeted to $124 million.  BI No. 149 Rev. 7 again reduced the amount budgeted to $121 million.

ER No. 5736, approved in late 1982/early 1983, authorized the expenditure of $228,116,000 for the SJRPP Unit 1 "To participate with * * * [the JEA] in the joint construction of the first of two coal-fired steam generating units."  The estimated date of completion of construction, startup, and initial operation of the plant was April 1, 1987.  The amount authorized was decreased to $214,535,000 in late 1986/early 1987.  In late 1987/early 1988, the amount authorized was decreased again to $202,637,000.  The revision stated that the unit was operational at the time of the revision.  On June 30, 1988, ER No. 5736 was closed "To meet both regulatory and corporate accounting requirements".  The amount authorized in that revision was apparently again decreased to $179,979,000.  In late 1988/early

1989, ER No. 5736 was reestimated to $181,990,000. In early 1991, FPL increased the ER to $196,666,000. This revision was increased "to incorporate [the] JEA owners and FPL owners costs from ER's 5737 and 4290 respectively, and also costs accumulated to this ER prior to opening ER 4110 (SJRPP Unit 1 Construction Wrap-Up)."

ER No. 4110, which authorized the expenditure of $22.6 million for the SJRPP Unit 1 wrap up work,[71] was initiated "to specifically cover the project costs (excluding the JEA and FPL owner's costs) beyond June 30, 1988."[72] In late 1988/early 1989 the amount authorized under ER No. 4110 was decreased to $8,736,000. This ER was again revised in 1989 to decrease the amount authorized to $8,016,400. A few months later, at the end of 1989, the ER was revised and the amount authorized was decreased to $7,354,900. Finally, in 1991, FPL revised the ER to decrease the amount authorized to $6,575,000. The parties

---

[71] Mr. Reid defined "wrap up" work as:

the work that was completed after both units went commercial. It's typical of a job this size that you're going to have punch list type items after the units both went commercial. Included into that is examples whereas, as I stated, was contract close out, retention releases, * * * insurance settlements and enhancements.

[72] Mr. Reid testified that the "wrap up" work authorized in ER No. 4110 was within the original design of the SJRPP. He explained that "The wrap up was predominantly the construction and close out of those large dollar contracts and the associated expense with those."

stipulated that a series of ERs were used by FPL to authorize amounts to be spent on the SJRPP.[73]

With respect to the installation of equipment at the SJRPP, petitioner incurred capitalized costs (tax basis) of $1,702,649, $2,376,238, and ($360,804) for equipment placed in service in the 1988, 1989, and 1990 taxable years, respectively.

H.    The Southern Company Contracts

On October 18, 1979, FPL entered into an interchange contract with an affiliated group of corporations providing electric power in several southeastern States, including Georgia (collectively referred to as the Southern companies).  The interchange contract enabled FPL to acquire coal-fired power from the Southern companies.  An "interconnection" between power companies links the two companies' systems to enable them to purchase, sell, and exchange power.  Before 1979, FPL did not have any interconnections with the Southern companies.

---

[73] For simplicity, the following list identifies these ERs and the respective amounts authorized:  (1) ER No. 6473, $1,900; (2) ER No. 6477, $7,300; (3) ER No. 6483, $105,400; (4) ER No. 6487, $96,500; (5) ER No. 6609, $22,400; (6) ER No. 6638, $35,000; (7) ER No. 6631, $8,900; (8) ER No. 6640, $14,600; (9) ER No. 6627, $3,100; (10) ER No. 6629, $1,000; (11) ER No. 6645, $4,400; (12) ER No. 6623, $2,500; (13) ER No. 6633, $14,300; (14) ER No. 6637, $8,800; (15) ER No. 6639, $38,400; (16) ER No. 6642, $16,800; (17) ER No. 6651, $9,800; (18) ER No. 6653, $11,200, revised to $116,000; (19) ER No. 6611, $21,800; (20) ER No. 6654, $2,200; (21) ER No. 6722, $9,600; (22) ER No. 6716, $2,500; (23) ER No. 6728, $6,600; (24) ER No. 6730, $11,700; and (25) ER No. 6644, $9,200.

The interchange contract specifically required FPL to construct a 230-kV transmission line from its Duval substation near Baldwin, Florida, to a point on the Florida-Georgia State line.[74]  FPL completed the 230-kV transmission line required by the interchange contract between November 1979 and January 1980. In addition, the contract required FPL to provide communications, telemetering, and automatic generation control equipment, together with such other facilities as may be required for load dispatching purposes and for control of power flow and reactive plan.  FPL claims ITCs for the acquisition and construction of equipment associated with the Southern company supply contract in the 1988, 1989, and 1990 taxable years.

Subsequent to establishing the interconnection with the Southern companies under the interchange contract, FPL was interested in buying more power from the Southern companies. Effective February 19, 1981, the Southern companies and FPL entered into a unit power sales agreement (power agreement) under which the Southern companies sold power to FPL.  The power agreement continued until May 31, 1995, "or such extended period agreed to by the parties under the provisions" of the contract. Also, on February 19, 1981, the Southern companies and FPL entered into amendment No. 1 to the interchange contract.

---

[74] The Southern companies were required to construct a 230-kV transmission line on their side of the Florida-Georgia State line to deliver the power.

Amendment No. 1 required both the Southern companies and FPL to establish two additional interconnections (500-kV transmission lines) with specific reference to the point of origin and destination. Both the Southern companies and FPL were also required to provide, install, operate, and maintain such associated terminal and other facilities as may be necessary to permit effective use of such interconnection. Each of the transmission lines required under amendment No. 1 was completed by December 31, 1982.

On July 23, 1981, FPL and the Southern companies entered into amendment No. 2 to the interchange contract. This amendment accelerated the effective date listed in amendment No. 1 to the interchange contract (December 31, 1982) to a date before August 1, 1982.

On February 18, 1982, the Southern companies and FPL entered into an amended and restated unit power sales agreement (amended power agreement). Under the amended power agreement, the Southern companies agreed to sell more power to FPL, and FPL agreed to acquire more power from the Southern companies. The amended power agreement recognized that FPL would construct certain internal transmission lines to allow FPL to increase its purchases of unit power capacity during the contract period, which began on January 1, 1985. The contemplated facilities were: (i) A 500-kV transmission line from its Duval substation

to its Rice substation continuing to its Poinsett substation; (ii) a separate 500-kV transmission line from its Duval substation to its Poinsett substation; and (iii) a 500-kV transmission line from its Poinsett substation to its Martin plant.  FPL covenanted to "use [its] best efforts consistent with Prudent Utility Practices to complete such facilities by the time such facilities are needed to purchase the increased unit power capacity on January 1, 1985."  FPL completed each of the transmission lines required under the amended power agreement by January 1, 1985.  As of September 1985, FPL had developed a transmission expansion program for the years 1985 through 1990.

A 1983 BI No. 273 budgeted $9,670,000 to construct approximately 13 miles of 240-kV line from the Corbett substation to the Ranch substation; extend the Orange River-Ranch 240-kV line into the Corbett substation; "reconductor" the 240-kV line from the Cedar substation to the Ranch substation; install two 240-kV terminals for the Corbett lines; and upgrade the Cedar

terminal in the Ranch substation.[75]  FPL revised this budget item in 1985 to decrease this project's budget to $7 million.

A 1983 BI No. 274 budgeted $28.4 million as a conceptual estimate to construct a new 500-240-kV transmission substation, the Corbett substation, consisting of four 500 MVA autotransformers, one 500-kV line terminal and four 240-kV line terminals.  According to the budget item, the work was to begin in November 1985 and was to be completed in May 1987.

A 1985 BI No. 272 budgeted $24.2 million as a conceptual estimate to construct approximately 33 miles of 500-kV transmission line between the Corbett substation and the Martin plant.[76]  It also states FPL's plan to construct a 500-kV terminal at the Martin plant switchyard.[77]  The budget item scheduled work to commence in May 1986 and to be completed in May 1987.  ER No. 1248, which refers to BI No. 272 and was processed

---

[75] Thomas Sanders, an engineer employed by FPL, testified:

> This is the construction of 13 miles of new 230 KV line.  There are two miles of 230 KV line.  Between the two constructions, they basically integrate the 500 KV Corbett substation with the existing 230 KV system that's in the area.  There is also a reconductoring of the 230 KV line from Cedar to Ranch and the two 240 KV terminals for the Corbett lines and the upgrade of the Cedar and the ranch terminal.

[76] BI No. 272 was originally authorized in 1983 for $23 million.

[77] Mr. Sanders testified that, according to this budget item, this work was needed "to reliably transfer contracted foreign power purchases from the Southern [Companies]."

in 1986, authorized the expenditure of $15,294,000 to "Construct 33 miles of 500 KV transmission line from proposed Corbett Substation to Martin Plant."[78]

ER No. 1224, approved in 1986, authorized $16,599,430 to construct the Corbett substation, a "500/230 kV air insulated substation". ER No. 1249, approved in 1986, authorized the expenditure of $4,412,159 to construct approximately 11 miles of double circuit 230-kV transmission line.[79] ER No. 2383, approved in 1987, authorized the expenditure of $896,375 to construct approximately 2.5 miles of double circuit 230-kV transmission line looping the Orange River-Ranch 230-kV line into the Corbett substation. ER No. 1984, approved in 1987, authorized the expenditure of $113,550 to, inter alia, "Convert the Ranch No. 2, 230kV line to Corbett 230kV line." ER No. 1479, approved in 1986, authorized the expenditure of $94,840 for the Orange River subrelaying equipment for the Corbett 230-kV line. ER No. 1778, approved in early 1987, authorized the expenditure of $593,620 to upgrade a portion of the "230 kV yard at Ranch Substation * * * to accommodate the Corbett No. 1 and No. 2, 230 kV lines."

---

[78] Mr. Sanders testified that this expenditure requisition was approved in 1986, and construction began after such approval. He also testified that FPL started receiving power under the Southern company contracts before the construction of the property.

[79] Mr. Sanders testified that the Southern company contracts did not specifically identify the property listed in ER No. 1249.

A 1987 BI No. 304, entitled "Transmission Plant--
Systemwide--Miscellaneous--1987", approved in 1986, budgeted $9.8
million for transmission lines, substations, relay projects, and
miscellaneous projects. ER No. 3276, approved in late 1987/early
1988, authorized the expenditure of $738,140 to replace five 230-
kV transmission breakers at the St. Lucie plant. On the basis of
a study by the system planning department, the ER states that the
then-existing breakers would become overstressed because of the
500-kV transmission expansion. A 1989 BI No. 267, entitled
"Transmission Plant--Systemwide--Miscellaneous--1989", approved
in 1988, budgeted $23,456,000 to, inter alia, upgrade and replace
various transmission lines. ER No. 5334, approved in late
1988/early 1989, authorized the expenditure of $1,192,967 to
install one 500-kV bus tie breaker at the Poinsett substation.
ER No. 1776, approved in 1987, authorized the expenditure of
$3,401,908 to install a 500-kV 2 breaker terminal.[80] A 1988 BI
No. 264, approved on October 15, 1987, entitled "Transmission
Plant Systemwide Miscellaneous--1988", budgeted $12,045,000 to,
inter alia, install high voltage switched capacitor banks at
three locations. ER No. 3216, approved in late 1987/early 1988,
authorized the expenditure of $1,257,310 to add two 230-kV MVAR

---

[80] Mr. Sanders testified that this expenditure was "an
integral part of the 500 KV transmission system that we built."

capacitor banks to the Poinsett substation.  A section of the ER

labeled "purpose and necessity" states, in part:

> an increased load demand coincident with the nuclear
> units at Turkey Point out of service and insufficient
> reactive support will reduce the transfer capability of
> the FPL ties with Southern to scheduled firm
> interchanges in the 1988 to 1990 time frame.  * * *

> *     *     *     *     *     *     *

> Installation of these capacitor banks and
> associated equipment * * * will provide an increase in
> transfer capability of the ties with Southern * * *.

ER No. 3623, approved in early 1988, authorized the expenditure

of $992,000 to add a second 230-kV capacitor bank to the Levee

substation.[81]  ER No. 3219, approved in 1988, authorized the

expenditure of $1,182,715 to add two 88 MVAR 230-kV capacitor

banks to the Duval substation.

A 1986 BI No. 129, approved in 1985, budgeted $13.1 million

to install high initial response exciters.[82]  ER No. 9327,

approved in 1986, authorized the expenditure of $1,225,000 to

install a high initial response excitation system at Turkey Point

Unit 2.  ER No. 9334, approved in 1986, authorized the

expenditure of $740,000 to install a high initial response

---

[81] The purpose and necessity stated in this ER is very
similar to that stated in ER No. 3216.

[82] Mr. Sanders testified that the installation or
construction of the high initial response exciters was required
by the interchange contract to effectively utilize the interface.

excitation system at Martin Unit No. 1.  ER No. 9337, approved in 1986, authorized the expenditure of $1,215,000 to install a high initial response excitation system at Port Everglades Unit No. 4. ER No. 9329, approved in 1986, authorized the expenditure of $970,000 to install a high initial response excitation system at Turkey Point Unit 4.  ER No. 9326, approved in 1986, authorized the expenditure of $1,185,000 to install a high initial response excitation system at Turkey Point Unit 1.

With respect to the equipment relating to the Southern company supply contract and the interchange contract, petitioner incurred capitalized costs (tax basis) of $39,605,571, $2,648,789, and $1,169,866 for equipment placed in service in the 1988, 1989, and 1990 taxable years, respectively.

I.   Integrated Transmission Line Systems

FPL claims ITCs for components added to the Midway-Jensen-Crane transmission line system in the 1989 and 1990 taxable years.  FPL also claims ITCs for components added to the Andytown-Lauderdale transmission line system in the 1988, 1989, and 1990 taxable years.

In 1983, FPL filed an application for corridor certification under the Florida Transmission Line Siting Act proposing the Midway-Jensen-Crane 230-kV transmission line.  The transmission line supported the entire load in this particular area of

Florida.[83]  FPL had a reliability problem because a single transmission line fed several substations in the area.  As a result, if the transmission line lost service at one end, all of the substations would experience an outage.  FPL planned to break that line into two segments, including the new Midway-Jensen-Crane line.  To reliably serve the load in that area, the plan also called for additional distribution substations to the west.

A 1982 BI No. 244, approved in late 1981, budgeted $1.5 million to:  (1) Acquire 16 miles of 15-foot-wide right-of-way from Jensen substation to Midway substation; (2) acquire a 10-acre substation site for a distribution/switching station from Turnpike substation; and (3) acquire 7.5 miles of 15-foot-wide right-of-way from the Turnpike substation to the Crane substation.  According to the BI, the work was to be started in January 1982 and was to be completed in December 1985.  FPL revised BI No. 244 in late 1982 to increase the amount authorized by $200,000 to acquire an additional 1.5 acres at the Jensen substation for its expansion.  In early 1982, ER No. 5058, which references BI No. 244, authorized the expenditure of $200,000 to purchase approximately 10 acres of land as a site for the purposed Turnpike substation.

---

[83] Mr. Sanders testified that the Midway-Turnpike-Jensen transmission line system operated as an integrated unit, and that FPL viewed the system as one integrated piece of equipment.

A 1986 BI No. 330, approved in 1985, budgeted $1.2 million to construct a 230-23-kV one-transformer two-feeder distribution substation.[84]  The BI states:

> The City of Port St. Lucie has experienced an estimated 67% increase in population from 1980 to 1983.  * * * Economic studies have indicated that the addition of Turnpike Substation with its two feeders connected to the proposed Midway-Sandpiper 230 kV line is the most cost effective method of addressing this load growth.

ER No. 8476, which references BI No. 330 and was approved in early 1985, authorized the expenditure of $1,856,836 to construct the Turnpike substation.

A 1988 BI No. 206, approved in 1987, budgeted $2.3 million as a conceptual estimate to construct approximately 7.7 miles of single pole concrete 230-kV line from the Turnpike substation to the proposed Crane substation.  The stated reason for budgeting this amount was:

> The area adjacent to Palm City and Martin Downs is presently being subjected to expansive residential, commercial, and industrial development. * * *
>
> *    *    *    *    *    *    *
>
> * * * It is proposed to construct Crane Substation and the associated Crane-Turnpike 230 kV line to address the expected load growth and service reliability to the area.
>
> This line extension will be utilized in the development of the Turnpike-Crane-Bridge-Plumosus future circuit.

---

[84] Mr. Sanders testified that BI No. 330 was to build the Turnpike substation.

ER No. 5366, which referenced BI No. 206 and was processed in late 1988/early 1989, authorized the expenditure of $2,226,922 to construct approximately 7.7 miles of 230-kV single circuit transmission line from the existing Turnpike substation to the proposed Crane substation.  The ER explained that the "ER will provide service for the expected load growth and improve service reliability to the area."

A 1988 BI No. 307, approved in 1987, budgeted $1,530,000 to construct the Crane substation, which consists of a 230-23-kV line, one transformer, and a two feeder distribution substation. FPL approved this BI because "The area adjacent to Palm City and Martin Downs is presently being subjected to expansive residential, commercial, and industrial development."

ER No. 4512, approved in 1988, authorized the expenditure of $111,245 to install a third regulated feeder position to the Turnpike substation.  The ER anticipated that construction would begin on March 1, 1989.  ER No. 5056, approved in late 1988/early 1989, authorized the expenditure of $240,928 to add a third 230-kV line terminal to the Turnpike substation.  The ER stated that "The present 138kV network * * * will become inadequate to serve load in 1989."

A 1986 BI No. 246, approved in 1985, budgeted $5,860,000 for a conceptual estimate to construct approximately 16 miles of single pole concrete 230-kV line from the Andytown substation to

the Trace substation.  The BI stated that "Extensive development is presently occurring in the Southwest Broward County area".  Apparently, FPL anticipated that one development project in this area would have an ultimate peak demand of 270 MVA.  New substations were anticipated to be built, and FPL proposed to construct a fourth Andytown-Lauderdale plant 230-kV line to serve the new substations.[85]

ER No. 1333, which referenced BI No. 246 and was approved in late 1986, authorized the expenditure of $2,502,710 to construct approximately 9.5 miles of single pole concrete 230-kV transmission line from the Andytown substation to the Trace substation.  ER No. 1645, which referenced BI No. 246 and was processed in late 1986/early 1987, authorized the expenditure of $962,036 to install equipment at the Andytown substation.  ER No. 1676, which references BI No. 246, authorized the expenditure of $152,090 to install equipment at the Andytown substation.

A 1986 BI No. 253, approved in late 1985, budgeted $1.1 million to construct approximately 3.5 miles of single circuit, single pole concrete 230-kV line to serve the Trace substation. The BI states that the project was initially authorized in 1984, and that the project was completed in May 1985.  The reason for the BI was "to construct Trace Substation by the summer of 1985

---

[85] Mr. Sanders testified that "This line was constructed to serve the load growth in western Broward County."

to serve new customers in Bona Venture Estates and Arvida's Weston development".[86]

A 1986 BI No. 254, approved in late 1985, budgeted $900,000 to construct approximately 2.5 miles of single circuit, single pole concrete 230-kV transmission line.  The BI stated that it was initially authorized for $600,000 in 1984 and that, at that time, the line was under construction.  The BI stated that this expenditure was needed because of growth in the area from new development and increased demand for electricity.[87]  ER No. 1332, which references BI No. 254, authorized the expenditure of $2,265,570 to construct approximately 7.5 miles of single pole concrete 230-kV transmission line from the Hiatus substation to the Melaleuca substation.

With respect to the installation of the Midway-Jensen-Crane transmission line system, petitioner incurred capitalized costs (tax basis) of $119,911 and $3,109,573 for equipment placed in service in the 1989 and 1990 taxable years, respectively.  With respect to the installation of the Andytown-Lauderdale transmission line, petitioner incurred capitalized costs (tax basis) of $6,436,912, $545,188, and $16,707 for equipment placed

---

[86] Mr. Sanders testified that this BI was for the Melaleuca-Trace section of the Andytown-Lauderdale line.

[87] Mr. Sanders testified that "This is another section of the Andytown-Lauderdale number four line, the Hiatus Springtree section."

in service in the 1988, 1989, and 1990 taxable years, respectively.

J.   Distribution and Transmission Substations

A distribution substation transforms transmission voltage of electricity from high voltage/lower current to low voltage/higher current; i.e., to "distribution voltage".  The distribution voltage is distributed through feeder wire (either overhead or underground), then through either aerial or pad-mounted transformers, and then to utility customers (residential or commercial).  A transmission substation either consolidates transmission lines or transforms voltage from one voltage to another.  FPL used similar procedures for designing and constructing distribution substations to those it used for transmission substations.  Typically, FPL builds a distribution substation on approximately 5 acres of property, with approximately 1 acre in the middle of the property developed for the substation.  FPL claims ITCs for the distribution and transmission substation components in the 1988, 1989, and 1990 taxable years.

The most important components of a distribution substation are the "power transformers" (transformers) because this equipment transforms the voltage from transmission voltage to distribution voltage.  Also, the transformers are significantly more expensive than the other items in the substation.  A

distribution substation contains other necessary and related electrical and structural components, including pull-off structures, switches, bus work, feeders, voltage regulators, equipment contained within a "relay vault" (a concrete block enclosure for electrical equipment), wire, cable, control panels, fencing, concrete, and steel. Regulations require that a chain link fence enclose distribution and transmission substations. FPL viewed each distribution and transmission substation as a single facility.[88]

FPL planned a distribution substation typically 5 years in advance. The planning process included an analysis of the number of transformers required. Substations are built according to more than 100 structural and electrical plans. The plans graphically illustrate the location of the transformers and feeder positions. To build a substation, FPL was required to obtain permits from local, State, and sometimes Federal agencies.

To allocate funds to the project, FPL prepared a budget item the year before a substation was constructed. After the budget item received approval, an engineer prepared an expenditure requisition to authorize the payment for the project against the budget item. Once the budget item and the expenditure requisition received approval, FPL prepared detailed drawings for

---

[88] Ken Veronee, an employee of FPL, testified that each distribution and transmission substation was a self-contained unit.

the substation. Finally, construction would begin, typically in three phases: Site prep work (clearing trees and vegetation on the property); substation construction; and installation and testing of equipment. FPL individually named each distribution and transmission substation, normally on the basis of geography.

A plot plan was essentially FPL's overall layout of the substation on the piece of property. The plot plan graphically illustrated the general orientation of the high voltage bus work, location and number of transformers, location of the relay vault, and all low voltage distribution substation equipment. FPL created the plot plan when it prepared the substation's first budget item because the budget was based upon the plot plan.

FPL claims an ITC for equipment installed at numerous substations, including transformers and feeders. In the interest of brevity and ease of explanation, a table has been prepared to illustrate FPL's claims that is attached as appendix A.

With respect to the distribution and transmission substations, petitioner incurred capitalized costs (tax basis) of $3,264,386, $8,091,517, and $4,413,670 for equipment placed in service in 1988, 1989, and 1990 taxable years, respectively.

K.  Regional Planning

FPL had a distribution planning group that planned and provided for an orderly, cost effective expansion of FPL's electrical distribution system over the long term. The

distribution planning group provided extensive analysis.
Annually, this group collected data related to electrical power
needs from residential customers, small businesses,
commercial/industrial customers, large customers, and
governmental customers.  The distribution planning process
involved:  (i) Evaluation of load demands on the distribution
system; (ii) analysis of alternatives for providing electrical
service to customers, currently and over the long term; (iii)
evaluating the cost and reliability of alternatives against any
risk associated with the alternative; and (iv) selection of the
best alternative.

"Load" is the demand for electricity from customers.  The
distribution planning group made projections of "load growth"
over the short, medium, and long terms.[89]  To project load
growth, the distribution planning group conducted an extensive
analysis of, inter alia, historical load growth and anticipated
land uses in relevant areas.  The distribution planning group's
expertise in analyzing load growth allowed FPL to determine the

---

[89] Michael H. Hernandez, FPL's operations support
supervisor, testified:

> Distribution planning will go ahead and first
> measure how much of our actual loading we have on our
> existing equipment.  We will review that loading.  We
> will go ahead and forecast loads into the future and
> determine if there are any future weaknesses, either
> current or future, and plan for alternatives of how to
> go ahead and deal with those projected weaknesses.
> * * *

size and number of distribution substations that FPL needs for its distribution system.

A development of regional impact (DRI) project is a large development project that has an impact beyond a particular municipality and becomes subject to the requirements of the Florida Administrative Code.  Examples of DRI projects include large housing developments and commercial construction projects (regional malls and stadiums).  Regional planning councils throughout the State of Florida review DRI projects.  FPL claims ITCs for the acquisition and construction of property related to the DRI projects in the 1988, 1989, and 1990 taxable years.

Before a developer of a DRI project is permitted to commence construction, the developer must submit an application for development approval to the appropriate regional planning council.  The application for development approval requires, inter alia, a statement or letter from the offsite source of electricity indicating its ability to provide electric service at all times during and after the development.[90]  To fulfill a

---

[90] Mr. Hernandez explained how FPL responded when a developer requested power:

> We review it to see what work is going to be required in order to serve the project.  We establish a file on the project.  We go ahead and determine an area of study including the project.  We look at the existing facilities we have within the area.  We look at the demand on those existing facilities.  We look at what other additional projects are coming on in service in
>                                                 (continued...)

requirement of the application for development approval, a developer submits a letter of inquiry to the offsite source of electricity, in this case FPL, as to whether it can meet the developer's electricity needs for his proposed development.[91] The letter from FPL to the developers generally stated that FPL was ready and able to provide the needed electrical services to serve the development project.

For example, the record contains an application for development approval for the Palm Beach International Airport. This application was made according to section 380.06(6) of the Florida Statutes to the Bureau of Land and Water Management, Division of State Planning, Department of Administration, State of Florida. The Palm Beach County Department of Airports made the application to undertake a DRI project. Included with the

---

[90](...continued)
that area, also what additional vacant land is in that same area, and then look at alternative ways of serving it, whether it can be served from existing facilities, whether it requires new facilities, and what new facilities it requires. * * *

[91] Mr. Hernandez testified as follows:

Q:   And what does the special process require of
     the developer?

A:   As I said, the developer has to make an
     application, and prior to making that
     application they must first apply to Florida
     Power and Light a request for service. They
     must enumerate how much energy they are going
     to use * * * and they have to show how much
     load or demand they are going to have * * *

application is a letter from the developer to FPL concerning its load needs for the DRI project.[92]  On June 1, 1981, FPL wrote a letter to the Palm Beach County Department of Planning, Zoning & Building stating that it anticipated "no problem in providing electric service" for the DRI project, the Palm Beach International Airport.  The record contains a portion of the Treasure Coast Regional Planning Council's DRI update which lists, inter alia, the Palm Beach International Airport project.[93]  The document is in table format with columns and rows detailing the specifics of each project.  One of the columns is titled "Effective Date", which was February 16, 1982, for the Palm Beach International Airport project.[94]

The Palm Beach International Airport project is representative of the many DRI projects in the record for which FPL claims ITCs.  Petitioner introduced work orders for the

---

[92] Mr. Hernandez was asked and answered as follows:

Q:   At the time FPL issues the response letter,
     is it possible to know exactly how much cable
     and trench will be required?

A:   No, it wouldn't because the developer hasn't
     finalized his plans; and, therefore, we don't
     know the exact routes of these cables.

[93] Mr. Hernandez testified:  "This document establishes the status of the project and shows that the project has been given permission to go ahead."

[94] Mr. Hernandez testified that "The effective date is the date that the project has permission to move ahead."

various DRI projects for which it claims ITCs.  Because of the
large number of DRI projects and in the interest of brevity, we
will detail in appendix B the information from the work orders
that petitioner cites on brief to support its claimed ITCs.

With respect to equipment related to the DRI projects,
petitioner incurred capitalized costs (tax basis) of $1,464,901,
$3,609,855, and $4,832,205 for equipment placed in service in the
1988, 1989, and 1990 taxable years, respectively.

OPINION

A.  The Statutory Landscape

Before 1986, section 38(a)[95] of the Internal Revenue Code of
1954 provided businesses with an investment tax credit (ITC), and
section 46(a) determined the amount of the ITC available to
taxpayers.  Section 49(a) eliminated the ITC for all property
placed in service after December 31, 1985.[96]  However, section 49

---

[95] Unless otherwise indicated, all section references are to
the Internal Revenue Code for the years at issue, and all Rule
references are to the Tax Court Rules of Practice and Procedure.

[96] Sec. 49(a), which was added to the Internal Revenue Code
by the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 211,
100 Stat. 2166, provides:

SEC. 49. TERMINATION OF REGULAR PERCENTAGE.

(a) General Rule.--For purposes of determining the
amount of the investment tax credit determined under
section 46, the regular percentage shall not apply to
any property placed in service after December 31, 1985.

contained transitional rules that excepted "transition property"

from the repeal of the ITC.[97]  Sec. 49(b).  Section 49(e) defined

"transition property" as:

> SEC. 49(e). Transition Property.--For purposes of this section--
>
> (1) Transition property.--The term "transition property" means any property placed in service after December 31, 1985, and to which the amendments made by section 201[98] of the Tax Reform Act of 1986 do not apply, except that in making such determination--
>
>> (A) section 203(a)(1)(A) of such Act shall be applied by substituting "1985" for "1986",
>>
>> (B) sections 203(b)(1) and 204(a)(3) of such Act shall be applied by substituting "December 31, 1985" for "March 1, 1986",
>>
>> (C) in the case of transition property with a class life of less than 7 years--

---

[97] The transitional rules were intended to provide relief to taxpayers who may have committed to post-1985 investments in qualifying property in reliance on the availability of the credit.  See Newhouse Broad. Corp. v. Commissioner, T.C. Memo. 2000-270.  The House Ways and Means Committee made the following observation with respect to the repeal of the ITC:

> The committee is aware that commitments have already been made on the basis of present law capital cost recovery rules.  The committee bill provides for equitable transition rules in such cases, which are estimated to cover more than 50 percent of the new personal property to be placed in service in the first year the bill is effective.

H. Conf. Rept. 99-426, at 146 (1985), 1986-3 C.B. (Vol. 2) 1, 146.

[98] TRA sec. 201, 100 Stat. 2121, amended sec. 168, which relates to the accelerated cost recovery system.

(i) section 203(b)(2) of such Act shall apply, and

(ii) in the case of property with a class life--

(I) of less than 5 years, the applicable date shall be July 1, 1986, and

(II) at least 5 years, but less than 7 years, the applicable date shall be January 1, 1987, * * *

The pertinent portions of TRA section 203, 100 Stat. 2143, provide:[99]

SEC. 203. EFFECTIVE DATES; GENERAL TRANSITIONAL RULES.

(a) General Effective Dates.--

(1) Section 201.--

(A) In general.--Except as provided in this section, section 204, and section 251(d), the amendments made by section 201 shall apply to property placed in service after December 31, [1985] 1986, in taxable years ending after such date.

*    *    *    *    *    *    *

(b) General Transitional Rule.--

(1) In general.--The amendments made by section 201 shall not apply to--

(A) any property which is constructed, reconstructed, or acquired by the taxpayer

---

[99] Pursuant to sec. 49(e), date changes have been made in TRA secs. 203 and 204. The stricken portions are the original dates, unmodified by sec. 49(e). The inserted dates are those which were modified by sec. 49(e)(1)(A) and (B) and applicable to this case.

pursuant to a written contract which was binding on [December 31, 1985] ~~March 1, 1986~~,

(B) property which is constructed or reconstructed by the taxpayer if--

(i) the lesser of (I) $1,000,000, or (II) 5 percent of the cost of such property has been incurred or committed by [December 31, 1985] ~~March 1, 1986~~, and

(ii) the construction or reconstruction of such property began by such date, or

(C) an equipped building or plant facility if construction has commenced as of [December 31, 1985] ~~March 1, 1986~~, pursuant to a written specific plan and more than one-half of the cost of such equipped building or facility has been incurred or committed by such date.

(2) Requirement That Certain Property Be Placed In Service Before Certain Date.--

(A) In general.--Paragraph (1) and section 204(a) (other than paragraph (8) or (12) thereof) shall not apply to any property unless such property has a class life of at least 7 years and is placed in service before the applicable date determined under the following table:

| In the case of property with a class life of: | The applicable date is: |
| --- | --- |
| At least 7 but less than 20 years... | January 1, 1989 |
| 20 years or more.................... | January 1, 1991 |

(B) Residential rental and nonresidential real property.--In the case of residential rental property and nonresidential real property, the applicable date is January 1, 1991.

(C) Class lives.--For purposes of subparagraph (A)--

(i) the class life of property to which section 168(g)(3)(B) of the Internal Revenue Code of 1986 (as added by section 201) shall be the class life in effect on January 1, 1986, except that computer-based telephone central office switching equipment described in section 168(e)(3)(B)(iii) of such Code shall be treated as having a class life of 6 years,

(ii) property described in section 204(a) shall be treated as having a class life of 20 years, and

(iii) property with no class life shall be treated as having a class life of 12 years.

(D) Substitution of applicable dates.-- If any provision of this Act substitutes a date for an applicable date, this paragraph shall be applied by using such date.

The pertinent portion of TRA section 204, 100 Stat. 2146,

provides:

SEC. 204. ADDITIONAL TRANSITIONAL RULES.

(a) Other Transitional Rules.--

\*      \*      \*      \*      \*      \*      \*

(3) Supply or service contracts.--The amendments made by section 201 shall not apply to any property which is readily identifiable with and necessary to carry out a written supply or service contract, or agreement to lease, which was binding on * * * [December 31, 1985] ~~March 1, 1986~~.

We note that "provisions granting special tax exemptions are

to be strictly construed." Helvering v. Nw. Steel Rolling Mills,

311 U.S. 46, 49 (1940). This rule of interpretation applies equally to transitional rules. United States v. Commonwealth Energy Sys., 235 F.3d 11, 16 (1st Cir. 2000); see Apache Bend Apartments, Ltd. v. United States, 987 F.2d 1174, 1175 (5th Cir. 1993); United States v. Kjellstrom, 916 F. Supp. 902, 905 (W.D. Wis. 1996), affd. 100 F.3d 482 (7th Cir. 1996). As the Court of Appeals for the First Circuit explained:

> The transition rules were enacted to provide relief "to a very, very few specified favored taxpayers," * * * and although we must extend them to all qualifying taxpayers, * * * we need not broaden our interpretation so that entities that did not detrimentally rely on the old rule benefit from the transition exemption * * * [Citations omitted.]

United States v. Commonwealth Energy Sys., supra at 16. The taxpayer bears the burden of proving that it qualifies for the transitional rules. Rule 142(a); Payless Cashways, Inc. v. Commissioner, 114 T.C. 72, 80 (2000).

B. TRA Section 204(a)(3)--Supply or Service Contracts

Petitioner argues that it is entitled to ITCs for property FPL placed in service during the years at issue because FPL purchased and/or installed the property pursuant to binding, written supply contracts within the meaning of TRA section 204(a)(3). According to petitioner, the following contracts constitute binding, written supply contracts: (1) The tariff; (2) the Southern company contracts; and (3) the documents exchanged with respect to the DRIs. Respondent argues that

petitioner "did not enter into any written supply contracts that were binding on December 31, 1985."

Pursuant to TRA section 204(a)(3), property qualifies for relief from the ITC repeal only when it is "readily identifiable with and necessary to carry out a written supply or service contract, * * * which was binding on" December 31, 1985. See also sec. 49(e)(1). Many courts have grappled with interpreting this language and have looked to legislative history for guidance. See United States v. Commonwealth Energy Sys., supra; Bell Atl. Corp. v. United States, 224 F.3d 220 (3d Cir. 2000), affg. 82 AFTR 2d 7375, 99-1 USTC par. 50,119 (E.D. Pa. 1998); Maine Yankee Atomic Power Co. v. Commissioner, T.C. Memo. 2002-176. As the Court of Appeals for the First Circuit explained: "Still it is possible to think that there are ambiguities inherent in the clause 'readily identifiable with and necessary to carry out,' and that the level of specificity required as to both 'readily identifiable' and 'necessary' is not self-defining." United States v. Commonwealth Energy Sys., supra at 16. The conference report explains:

> This transitional rule is applicable only where the specifications and amount of the property are readily ascertainable from the terms of the contract, or from related documents. A supply or service contract or agreement to lease must satisfy the requirements of a binding contract * * *.

H. Conf. Rept. 99-841 (Vol. II), at II-60 (1986), 1986-3 C.B. (Vol. 4) 1, 60.

We glean from this that the specifications and amount of property must be readily or "easily" ascertainable from the terms of the source documents, which consist of the contract and related documents.  United States v. Commonwealth Energy Sys., supra at 16; Bell Atl. Corp. v. United States, supra at 224. Because the specifications and amount of the property must be readily ascertainable, this rule requires a "specific, although not exact", inquiry.  United States v. Commonwealth Energy Sys., supra.

1.  Property Purchased and/or Installed Pursuant to the Tariff

Petitioner argues that "FPL and its customers, through the * * * [FPSC], entered into a binding written supply or service contract in the form of a Tariff in 1984."  Petitioner further contends that the tariff is a contract under Florida law; therefore, it is a binding contract for Federal tax purposes. Accordingly, petitioner asserts that it acquired, installed, and constructed and/or reconstructed property that was readily identifiable within the tariff and/or related documents, and that this property was necessary to carry out FPL's supply obligations to its customers under the tariff.  Petitioner seeks ITCs for the

tariff related equipment that was placed in service during 1988,
1989, and 1990.[100]

a. The Tariff Is Not a Contract for Purposes of
TRA Section 204(a)(3)

In support of its argument, petitioner cites cases that
generally state that a tariff is a contract. For example, in
Life Sciences, Inc. v. Emery Air Freight Corp., 341 So. 2d 272
(Fla. Ct. App. 1977), a shipper brought suit against an air
carrier to recover damages to its cargo. Apparently, a tariff
filed by the freight forwarder contained a 1-year property damage

---

[100] Petitioner argues that the following equipment is readily
identifiable with the tariff and incorporated documents: (1) The
nuclear fuel assemblies; (2) the nuclear plant property (MSIV air
accumulation system, surveillance system for heat exchangers,
reactor vessel probes, raceway protection, spent fuel rack
equipment, and area radiation monitoring system equipment); (3)
environmental property (PCB transformers and wastewater
neutralization treatment system); (4) simulator and training
buildings; and (5) the LMS. The tax bases of the property for
which petitioner seeks ITCs are as follows:

| Property | 1988 | 1989 | 1990 |
|---|---|---|---|
| Nuclear fuel assemblies | $51,684,173 | $70,782,440 | $133,263,604 |
| MSIV air accumulation system | -- | 2,846,306 | 126,666 |
| Surveillance system for heat exchangers | -- | 123,742 | 324,668 |
| Reactor vessel probes | 826,767 | (126,353) | (12,983) |
| Raceway protection | -- | 969,676 | 239,161 |
| Spent fuel rack equipment | 6,713,729 | 532,892 | 6,646,960 |
| Area radiation monitoring system equipment | -- | -- | 657,253 |
| PCB transformers | 886,616 | 748,411 | 36,053 |
| Wastewater neutralization treatment system | 241,469 | -- | 233,742 |
| Simulator and training buildings | 1,486,050 | 1,458,213 | 354,914 |
| LMS | 362,837 | 15,156,624 | 39,351,031 |

claims limitation based upon a Florida statute.  The freight forwarder argued that the limitation period stated in the tariff was invalid as such power could only be granted by Federal law.  In holding against the freight forwarder, the court stated that "The tariff filed by * * * [a freight forwarder] constituted part of the contract of carriage between it and its customer".  Id. at 273; see also Bd. of Water, Light and Sinking Fund Commrs. v. FERC, 294 F.3d 1317, 1319 n.2 (11th Cir. 2002); Atlanta Gas Light Co. v. FERC, 140 F.3d 1392, 1395 n.1 (11th Cir. 1998) ("A tariff is the 'contract which governs a pipeline's service to its customers.'"); ANR Pipeline Co. v. FERC, 931 F.2d 88, 90 n.1 (D.C. Cir. 1991); Bell S. Telecomm., Inc. v. Jacobs, 834 So. 2d 855, 859 (Fla. 2002); Bella Boutique Corp. v. Venezolana Internacional de Aviacion, S.A., 459 So. 2d 440, 441 (Fla. Ct. App. 1984) ("A validly filed tariff constitutes the contract of carriage between the parties and conclusively and exclusively governs the rights and liabilities between the parties.").

In Bell Atl. Corp. v. United States, 82 AFTR 2d 7375, 99-1 USTC par. 50,119 (E.D. Pa. 1998), the District Court discussed this issue at length.  That court examined whether TRA section 204(a)(3) entitled the taxpayer to an ITC based upon, inter alia, a tariff.  As that court stated:  "A contract is 'a promise or set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a

duty.'"  Id. at 7379, 99-1 USTC par. at 87,037 (quoting 1

Restatement, Contracts 2d, sec. 1 (1981); Black's Law Dictionary

322 (6th ed. 1990)).  The District Court then explained:

> A tariff is "a public document setting forth
> services of a common carrier being offered, rates and
> charges with respect to services and governing rules,
> regulations and practices relating to those services."
> Black's Law Dict. 6th ed. (1990) at 1456-57.  * * *
>
> Tariffs set forth a description of the services
> that a particular regulated public utility provides,
> including the prices that customers may be charged for
> these services.  Tariffs are reviewed and may be
> challenged by the regulating authority and consumers.
> Once effective, tariffs bind the customer and the
> utility to the tariffs [sic] terms.  * * *

Id. at 7381, 99-1 USTC par. 50,119, at 87,039.  The court looked

at the broad terms of the tariffs and concluded that the tariffs

were not TRA section 204(a)(3) service or supply contracts.  The

court reasoned as follows:

> First, the court does not find that the tariffs
> are contracts under the normal definition of that term.
> However, even accepting arguendo that the tariffs are
> contracts, the court finds that these tariffs are not
> the type of contracts Congress contemplated under the
> ITC.  The tariffs are descriptions of services offered
> and prices to be charged.  They are terminable at will
> by the customers and * * * [the taxpayer] can modify
> them by filing a new tariff.  The regulating
> authorities can revoke the certifications and levy
> fines.  The tariffs are merely the rules with which
> * * * [the taxpayer] must conform if it chooses to
> conduct business in the particular jurisdiction.  * * *
> [The taxpayer] may decide that it does not agree with
> the terms and may decide not [to] apply to provide its
> service in a particular jurisdiction.  It would not be
> bound to do so.  None of the tariffs require the
> purchase of property.  None of the tariffs or related
> documents alone or together identify the property to
> the "contracts" or necessitate the purchase of the

property.  The court finds that the property for which
* * * [the taxpayer] claims the ITC was not "readily
identifiable with and necessary to carry out" these
"contracts."

Id. at 7382, 99-1 USTC par. 50,119, at 87,040.

We find the District Court's reasoning in Bell Atl. Corp.
persuasive.  Indeed, the tariff that petitioner argues is a TRA
section 204(a)(3) contract is strikingly similar in its broad
description of rights and duties to the tariff described by the
District Court in Bell Atl. Corp.[101]  The tariff at issue sets
forth the rates to be charged and the general service commitments
to which FPL had to adhere if it wanted to provide electrical
service to customers under the jurisdiction of the FPSC.
Customers could discontinue service at will and without penalty.
The price for electrical service was not permanently fixed; from
time to time, FPL could (and did) petition to change the price
term in the tariff.  The term establishing the fee that customers
must pay for electrical service was not fixed.  Thus, we agree
"that the tariffs are [not] contracts under the normal definition
of that term."  Id.  Rather, the tariff is more akin to a set of
operating rules imposed on petitioner by the State that

_____

[101] In Bell Atl. Corp. v. United States, 224 F.3d 220 (3d
Cir. 2000), the Court of Appeals for the Third Circuit affirmed
the District Court's holding, which denied the taxpayer's claimed
ITC.  In affirming the District Court, the Court of Appeals did
"not find it necessary to decide whether Bell Atlantic's tariffs,
franchises, and contracts with other telephone companies are
'written service contracts' within the meaning of the Act."  Id.
at 223.

petitioner must follow if it wishes to provide services to customers. The tariff does not obligate customers to continue the purchase of electrical services, and the price for future services can be adjusted by the State.

Petitioner also argues that respondent has taken the position in published guidance that a tariff is a contract. Petitioner cites Rev. Rul. 68-109, 1968-1 C.B. 10, which addressed "whether switchboards installed in furnishing communications services to tax-exempt organizations or government units qualify as 'section 38 property.'" Id. In the revenue ruling, the investment tax credit would not have been available had the property been owned by or leased to the tax-exempt organizations or government units. The taxpayer installed equipment pursuant to contracts between it and its customers that were tax-exempt organizations or government units. Under the terms of the contracts, the taxpayer retained all ownership and control of the equipment, and the customers paid the installation charges and provided an operator for the equipment. On the basis of these factors, the ruling concludes: "Hence, the agreement entered into between the taxpayer and the customer is not a sale or lease but a service contract." Id. After holding that the agreement was a service contract, the revenue ruling stated:

> Furthermore, the services furnished by the taxpayer [a regulated utility] and the manner in which they must be furnished are described in tariffs on file with the Federal Communications Commission * * *. These tariffs

> constitute a public offering by the utility which, when accepted by the subscribers, creates a contract embodying the terms and conditions of that tariff.
> * * *

Id.; see also Rev. Rul. 72-49, 1972-1 C.B. 125.

In Rev. Rul. 68-109, supra, there was a service contract independent of the tariff. The conclusion of the revenue ruling, that there was a service contract, is based upon the agreement entered into between the utility and its customers. After determining that such service contract existed, the revenue ruling found that "Furthermore" the provisions of the tariff also bound the parties.

The instant case is distinguishable because there was no binding contract independent of the tariff. The service agreement between the utility and its customers was the determining factor in the ruling. It was in this context that the ruling stated that the tariff was a contract. The revenue ruling does not address TRA section 204(a)(3), nor does it state that the tariff is a binding supply or service contract. Here, we must determine whether the tariff constitutes a binding supply or service contract for purposes of TRA section 204(a)(3). We do not think this revenue ruling supports a finding that the tariff is a binding supply or service contract for purposes of TRA section 204(a)(3).

b.  The Tariff Does Not Readily Identify the Property in Issue

Even assuming for the sake of argument that the tariff is the type of contract which Congress contemplated when it drafted TRA section 204(a)(3), we do not believe the property for which petitioner seeks an ITC was "readily identifiable" in that tariff.  The link between the tariff and the property for which petitioner seeks ITCs is "too attenuated" to be considered "readily identifiable" under TRA section 204(a)(3).  See United States v. Commonwealth Energy Sys., 235 F.3d at 17; Bell Atl. Corp. v. United States, 224 F.3d at 224.  Indeed, "Congress added the word 'readily' to imply a more immediate link between the terms of the contract and the property at issue."  United States v. Commonwealth Energy Sys., 235 F.3d at 17; see Bell Atl. Corp. v. United States, 224 F.3d at 224; S. Multi-Media Commcns., Inc. v. Commissioner, 113 T.C. 412 (1999); United States v. Zeigler Coal Holding Co., 934 F. Supp. 292, 294-295 (S.D. Ill. 1996).  "Congress did not want to extend ITC to all property that was identifiable and necessary to carry out a service contract."  Bell Atl. Corp. v. United States, 224 F.3d at 24.

As in Bell Atl. Corp., the tariff at issue does not specify any of the property for which petitioner seeks an ITC.  Under petitioner's construction of TRA section 204(a)(3), any property used in the generation of electricity or in supplying customers with electrical service would be considered readily identifiable.

The tariff is not concerned with the "hows" or the "whats" of generating electricity; it merely sets forth the expected services FPL will provide to its customers.  We do not think this is what Congress intended when it drafted the transitional relief to the repeal of the ITC.

c.    Documents Incorporated by Reference Into the Supply or Service Contract

Petitioner also argues that the documents incorporated into the tariff readily identify the specifications and amount of property for which it claimed ITCs.  Petitioner contends that it is irrelevant that the tariff does not reference the other documents because "'referencing' is not the test for a 'related document'."

The supply or service contract rule requires that property is readily identifiable from the terms of the contract or related documents.  TRA sec. 204(a)(3); H. Conf. Rept. 99-841 (Vol. II), supra at II-60, 1986-3 C.B. (Vol. 4) at 60.  When a contract specifically incorporates another document by reference, the referenced document constitutes a "related document".  See Maine Yankee Atomic Power Co. v. Commissioner, T.C. Memo. 2002-176.  Language within a contract that generally refers to industry standards and the applicable law, without specifically referring

to a document, fails to incorporate by reference those documents created according to the industry standards and applicable laws. See id.

For the documents to qualify as "related documents", the supply contract must adequately incorporate the documents by reference. In <u>Maine Yankee Atomic Power Co.</u>, the taxpayer claimed an ITC under TRA section 204(a)(3) with respect to nuclear fuel assemblies. The parties stipulated that the power contracts and amendments as of December 31, 1985, qualified as binding written supply or service contracts under TRA section 204(a). <u>Id.</u> However, the parties disputed whether the nuclear fuel assemblies were readily identifiable with the power contracts. <u>Id.</u> While the taxpayer conceded that the power contract failed to list the specifications of the fuel assemblies, it argued that the operating license, and amendments and appendices of the power contract constituted "related documents". <u>Id.</u> The taxpayer argued that the following language incorporated the "related documents" by reference:

> "Maine Yankee * * * will operate and maintain the Unit * * * <u>in accordance with good utility practice under the circumstances and all applicable law, including the applicable provisions of the Atomic Energy Act of 1954, as amended, and of any licenses</u> issued thereunder to Maine Yankee." [Emphasis added in original.]

<u>Id.</u>

This Court found that the operating licenses and their amendments were not "related documents" because the power contract contained only a general reference and failed to specifically refer to these documents.  Id.  "This general standard of operation and maintenance, without more, does not incorporate the operating license, or amendments or appendices thereto, into the power contracts."  Id.

In this case, petitioner argues:

The Tariff incorporated by reference applicable orders, rules and regulations of various governmental bodies, including, for example, the Nuclear Regulatory Commission ("NRC"), the Environmental Protection Agency ("EPA"), the Florida Department of Environmental Protection ("FDEP"), the FPSC and others.  FPL was required under the Tariff to comply with these orders, rules and regulations.

According to Mr. Wilson's testimony and the citations contained in petitioner's proposed findings of fact, the relevant language in the tariff states:

RULES AND REGULATIONS

Service under this schedule is subject to orders of governmental bodies having jurisdiction and to the currently effective 'General Rules and Regulations for Electric Service' on file with the Florida Public Service Commission.  In case of conflict between any provision of this schedule and said 'General Rules and Regulations for Electric Service' the provision of this schedule shall apply.

Mr. Wilson testified:

The Commission had rules and regulations itself that concerned the quality of service, how companies were to treat deposits for service for customers, the complaint procedure, things like that.  And this was

intended to incorporate, to refer to that, so that anyone looking at this tariff sheet would see that there were other conditions that apply.

Neither TRA section 204(a)(3) nor the conference report articulates a standard for identifying "related documents." Maine Yankee Atomic Power Co. indicated that a supply or service contract must incorporate an item by reference for it to constitute a "related document."  In light of Helvering v. Nw. Steel Rolling Mills, 311 U.S. at 49, we agree with the interpretation of the supply or service contract rule in Maine Yankee Atomic Power Co. because it strictly construed the ITC transitional rule, a provision which grants a special tax exemption.  Petitioner's position would expand the supply or service contract rule beyond its proper scope because property could be identified from documents that have not been referred to in the supply or service contract.  Therefore, we find that the language in the tariff must incorporate by reference the alleged "related documents".

The general language of the power contract in Maine Yankee Atomic Power Co. is analogous to the language petitioner relies upon in the tariff.  The taxpayer in Maine Yankee Atomic Power Co. asserted that the power contract incorporated "related documents" by providing that its power plant will operate "in accordance with good utility practice under the circumstances and all applicable law, including the applicable provisions of the

Atomic Energy Act of 1954, as amended, and of any licenses issued thereunder to Maine Yankee." Maine Yankee Atomic Power Co. v. Commissioner, T.C. Memo. 2002-176.

Both the Maine Yankee Atomic Power Co. power contract and petitioner's tariff contain general references to the authorities that govern service quality and standards. Each fails to refer to any specific document. The general statements referring to service standards and regulatory orders lack the details necessary to identify which documents constitute related documents. See Maine Yankee Atomic Power Co. v. Commissioner, supra ("This general standard of operation and maintenance, without more, does not incorporate the operating license, or amendments or appendices thereto, into the power contracts."). Because petitioner's tariff contains only a general statement identifying "orders of governmental bodies having jurisdiction and to the currently effective 'General Rules and Regulations for Electric Service' on file with the Florida Public Service Commission", we hold that the tariff fails to incorporate by reference the alleged "related documents".

> d. Property Readily Identifiable From the Related Documents

Assuming arguendo that the tariff qualifies as a contract and the documents cited by petitioner qualify as "related documents", the property in issue must be readily identifiable from the terms of these "related documents". TRA sec. 204(a)(3).

The conference report states that TRA section 204(a)(3) applies only when the specifications and amount of the property are readily ascertainable from the terms of the contract and related documents.  H. Conf. Rept. 99-841 (Vol. II), <u>supra</u> at II-60, 1986-3 C.B. (Vol. 4) at 60.

### i.    Statutes and Regulatory Materials

Petitioner argues that statutes and regulatory guidelines are "related documents" that readily identify the property it installed pursuant to the tariff.  Specifically, petitioner contends that the following statutes and regulatory materials are "related documents":  (1) The U.S. Nuclear Regulatory Commission, Office of Nuclear Reactor Regulation, Clarification of TMI Action Plan Requirements, NUREG-0737 (NUREG 0737); (2) a letter from the U.S. Nuclear Regulatory Commission, to all licensees of operating reactors, applicants for operating licenses, and holders of construction permits, Supplement 1 to NUREG-0737 (December 17, 1982) (Generic Letter 82-33); (3) the U.S. Nuclear Regulatory Commission, Office of Nuclear Regulatory Research, Regulatory Guide 1.97, Rev. 3 (1983) (Regulatory Guide 1.97, Rev. 3); (4) 10 C.F.R. sec. 50, App. R (1992) (appendix R); (5) the Nuclear Waste Policy Act of 1982, Pub. L. 97-425, 96 Stat. 2201 (Nuclear Waste Policy Act of 1982); (6) the Toxic Substance Control Act, Pub. L. 94-469,  sec. 6(e), 15 U.S.C. sec. 2605 (1976) (TSCA sec. 6(e)); and (7) the Environmental Protection Agency, Polychlorinate

Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce and Use Prohibitions; Use in Electrical Equipment, 47 Fed. Reg. 37,342 (Aug. 25, 1982) (codified at 40 C.F.R. pt. 761).

We find that these statutes and regulatory materials fail to provide the specifications and amount of property for which petitioner seeks ITCs. TRA section 204(a)(3) requires that the terms of the supply contract and related documents readily identify the specifications and amount of the property. These regulatory materials provide guidelines that are generally applicable; however, they do not specifically refer to petitioner's property.

Petitioner's reliance on regulatory guidance to readily identify its property is similar to that of the taxpayer in Bell Atl. Corp. v. United States, 224 F.3d at 221, which relied on service quality standards in its utility franchises, tariffs, and contracts with other telephone companies to identify property for purposes of TRA section 204(a)(3). In Bell Atl. Corp., the court found that the terms of the utility franchise, tariffs, and contracts with other telephone companies did not readily identify the taxpayer's property because "these alleged 'contracts' speak only of service quality standards, never mentioning property of any sort." Id. at 224.

The franchises, tariffs, and contracts in <u>Bell Atl. Corp.</u> failed to specifically refer to the taxpayer's property. The statutes and regulatory guidance petitioner relies on also fail to specifically identify any of FPL's property. These regulatory materials establish quality and service standards and lack references or descriptions that specifically relate to petitioner's property. We find that the documents lack the specifications and amounts necessary to readily identify petitioner's property for purposes of TRA section 204(a)(3).

### ii. Correspondence

In addition to the statutes and regulatory guidance, petitioner asserts that numerous items of correspondence are "related documents" that readily identify the property in issue. Particularly, petitioner relies on: (1) Letter No. L-85-385, dated October 11, 1985, from FPL to the Office of Nuclear Reactor Regulation; (2) a letter dated July 18, 1986, from FPL to the Office of Nuclear Reactor Regulation; and (3) Letter No. L-86-296 dated December 5, 1986, from the Nuclear Regulatory Commission (NRC) to Mr. C.O. Woody, group vice president of FPL's nuclear energy department.

FPL submitted to the NRC Letter No. L-85-385, which contained attachments relating to the requirements of appendix R. Attachment 1 states that FPL must install the following equipment at Turkey Point Unit 4:

- 18,095      feet of conduit installation

- 1,640       seismic hangers and supports

- 100         feet cable tray

- 88,810      feet of cable (reroute)

- 11,410      cable terminations and determinations

- 4,500       feet of raceway (conduit) protection

- 650         Supports to protect

- 75          Pull and terminal boxes to protect

- 300         Pieces of equipment to install (valves, valve actuators, switches, local control stations, instruments, etc.)

Attachment 2 contains a raceway-by-raceway list of the additional work needed at Turkey Point Units 3 and 4.  Unlike attachment 1, attachment 2 does not contain the same specific itemized and quantified descriptions of the raceway property.  We find that Letter No. L-85-385 readily identifies FPL's raceway protection property at Turkey Point Unit 4 because attachment 1 lists the components of the raceway protection system that FPL needed to install.[102]  However, we find that this letter fails to readily identify the specifications and amount of the Turkey Point Unit 3 raceway protection property.

---

[102] We address this issue to complete our analysis of the supply or service contract transitional rule.  However, the property does not qualify for an ITC because we have held that the tariff is not a supply or service contract for purposes of TRA sec. 204(a)(3), and we have held that the tariff does not incorporate the "related documents".

Two of the items of correspondence that petitioner cites as "related documents" are dated after December 31, 1985. FPL's letter to the NRC is dated July 18, 1986, and the NRC's letter to FPL's nuclear energy department is dated December 5, 1986. To qualify as transition property under the supply or service contract rule, the specifications and amount of property must be readily identifiable by December 31, 1985. Sec. 49(e)(1); TRA sec. 204(a)(3). Even had these documents readily identified the specifications and the amount of reactor vessel probes, we find that the property was not "readily identifiable" as of December 31, 1985.

### iii. Permits and Regulatory Orders

Petitioner also contends that several permits and regulatory orders readily identify its property: (1) The Final Hazardous Waste Temporary Operating Permit (TOP) for the Martin plant, effective November 30, 1982; (2) the TOP for the Port Everglades plant, effective November 30, 1982; (3) Confirmatory Order EA-84-55, dated July 11, 1984; and (4) an NRC Order Confirming Licensee Commitments on Emergency Response Capability, dated February 23, 1984 (order confirming licensee commitments).

We disagree with petitioner. As an illustration, we look at the TOP for the Port Everglades plant. Petitioner argues that specific conditions 12 and 17 identified the equipment that FPL

planned to install for its wastewater neutralization treatment system.  Specific condition 12 provides:

> The permittee shall inspect and/or certify the surface impoundment, dikes, liners and other associated structural and monitoring equipment as required by § 264.226 and in accordance with the approved schedule submitted to satisfy Specific Condition 16c.

Specific condition 17 provides:

a.   Within 30 days issuance of this permit, the permittee shall submit to the department for approval a schedule for closure of the existing surface impoundment(s) with a binding committment [sic] to construct and have operational an elementary neutralization unit or total enclosed treatment facility.  This binding committment [sic] shall include the authorization to commit funds by FP&L for the engineering, design, and construction of said units.  The elementary neutralization unit or total enclosed system shall be constructed and operational within ninety (90) weeks from issuance of this permit.  Said elementary neutralization unit or totally enclosed system must meet the definition specified in 40 CFR Part 260.10 and be approved by the department prior to construction.  If FP&L is unable to provide the binding committment [sic] for construction of said units: then

b.   Within 210 days from the issuance of the permit, the permittee shall submit a groundwater monitoring plan to comply with the applicable provisions of 40 CFR Part 264 Subpart F for department approval.  Specific elements of this plan shall include the information required on DER Form 17-1.207(3) Part XIII, specifically items A2, A3, A5, and A6.  This information shall be certified by an engineer registered in the State of Florida.

Within 30 days from approval of the groundwater plan, the permittee shall install the necessary monitoring wells included as part of item A.6.b of the approved monitoring system required in 40 CFR Part 264.98.  Within 15 days after completion of

the installation, certification of the well construction by the engineer of record, shall be submitted to the department for approval.

Within 15 days of department approval of the well construction and certification, the permittee shall commence sampling of the groundwater monitoring wells by procedures approved based on information submitted in A.6.d of the groundwater monitoring plan. Sampling and analysis shall be conducted for the parameters approved in Section A.6.a of the referenced plan and results of these analyses shall be submitted to the department within 30 days of the sampling.

Sampling and analyses of the wells shall be subsequently conducted every 90 days from the date of the initial sampling with analytical results submitted to the department within 30 days after each sampling.

We do not think that the TOP for the Port Everglades plant readily identifies petitioner's wastewater neutralization system. Although the TOP provides a specific timetable for completing the treatment system, it lacks specific details describing the property required for the treatment system. The TOP provides cross-references to other documents that may contain the specifications for the treatment system; however, the permit itself does not attach any of the cross-referenced documents. Without providing the specifications and amount of property at issue, the TOP fails to readily identify the wastewater neutralization system. As the relevant language in the TOP for the Martin plant is virtually identical to the TOP for the Port Everglades plant, we find that this document also fails to identify FPL's property.

We conclude that the regulatory orders petitioner cites also fail to identify the specifications and amount of property for which petitioner claims ITCs.  An attachment to the Confirmatory Order EA-84-55 states that FPL will "Develop detailed simulator specifications".  We do not think that this document contains the necessary details regarding the simulator and training building property when it directs FPL to develop such specifications.

Similarly, the order confirming licensee commitments includes an attachment that outlines FPL's commitment to Regulatory Guide 1.97.  For example, FPL's commitment entitled "Regulatory Guide 1.97 - Application to Emergency Response Facilities" states that FPL will:  "Implement (installation or upgrade) requirements".  This order and its attachment provide a general list of requirements that FPL must comply with but lacks details and specifics relating to FPL's area radiation monitoring system.

Because these permits and orders fail to provide the specifications for the property that FPL planned to install, we find that these documents do not readily identify the property for which petitioner claims ITCs.

### iv.   Memoranda, Studies, and Other Documents

Petitioner also argues that memoranda, studies, and other documents are "related documents" that readily identify the property for which it seeks an ITC.  Particularly, petitioner

cites:  (1) The licensee event report, dated July 29, 1985; (2) the substantial safety hazards evaluation, issued July 1985; (3) action item No. 19850484, dated April 30, 1985; (4) spent fuel disposition management action plan, dated February 4, 1986; (5) energy management plan for the '80s (energy management plan), dated November 1, 1980; (6) the bidirectional communication system (BCS) requirements studies, Vols. I and II, dated January 1983; and (7) FPL's request for engineering assistance, dated November 5, 1985.  With the exception of the request for engineering assistance, we disagree with petitioner and find that these documents fail to readily identify the specifications and amount of property for which petitioner claims ITCs.

For example, Mr. Bible testified that the second corrective action listed in the licensee event report described the specifications and amount of the MSIV air accumulation system property for which petitioner claims an ITC.  Specifically, the second corrective action provides that "The design of the MSIVs will be upgraded to assure that each MSIV will meet the Final Safety Analysis Report closure criteria without steam flow assistance."

In addition to the licensee event report, petitioner relies on the substantial safety hazards evaluation to readily identify the MSIV air accumulation system.  The evaluation states:

> It is recommended that design modifications be
> implemented on an expedited basis that will assure MSIV

closure in 5 seconds without steam flow assistance. (Note:  This design activity would also resolve the ISI deficiency identified in Inspection Report 85-05 in that fail safe testing can be accomplished.)

We find that the licensee event report and the substantial safety hazards evaluation do not satisfy the readily identifiable requirement of TRA section 204(a)(3).  Both the licensee event report and the substantial safety hazards evaluation provide vague summaries of the proposed upgrades; these descriptions of the property fail to indicate the type of material used, the specific components that it planned to upgrade, and the amount of property needed to upgrade the MSIV system.

Similarly, we believe that the other memoranda, studies, and documents that petitioner relies upon to readily identify its property lack specific details, as required by TRA section 204(a)(3) and the conference report.  Action item No. 19850484 is a two-page document that contains no information relating to the specifications or amount for the surveillance system property. Although TRA section 204(a)(3) requires that transition property be readily identifiable as of December 31, 1985, the spent fuel disposition management action plan was not created until February 4, 1986.  While the energy management plan establishes specific goals for reducing the energy load, the document does not provide any specifications relating to the LMS property or identify how FPL will accomplish the goal of reducing the energy load.  The BCS requirements studies generally describe the property, the

estimated number of customers the system will serve, and the basic outline of the three phases of the LMS plan; however, these documents do not detail the property needed for the LMS, nor do they provide the amount of property needed for the system.

With respect to the request for engineering assistance, petitioner argues that this document "defined 'the scope of the work that they wanted engineering to perform.'" Specifically, the request for engineering assistance states:

> Desired Project Considerations:
> A.   Provide PC/M to:
>
> 1.   Replace ICW thermometers TI 1415 thru TI 1420 inclusive in existing thermowells with 'K' type thermocouples.
> 2.   Replace CCW thermometers TI 633 A, B, & C and TI 663 A, B, & C in existing thermowells with 'K' type thermocouples.
> 3.   Install permanent wiring from thermocouples installed in #1 & 2 to rotary selector switch.
> 4.   Please provide connections to read the output of the selector switch (Item #3) via: (a) plug, (b) two foot extension cord with 'K' plug end, and (c) terminal posts.
> 5.   Locate Items 3 & 4 in weather proof box with door and locate box on east wall of CCW heat exchanger room near the ICW flow meters, so that both temperature and flow can be read at one location
> 6.   Provide and locate portable readout similar to those listed in B.2 below within the weather proof box.[103]
>
> B.   Considerations:

---

[103] Desired project consideration A.6. is a handwritten entry, whereas all of the other desired project considerations are typewritten.

1. Temperatures to be measured will be in 80-120"F vicinity and thermocouples should be selected to give maximum accuracy/linearity in this area.
2. Readout will be via portable instruments already on hand, such as Bailey Models TZFHR, TZF4, WAHL Model LXD T/C Alnor Digicon Model 6840 or Leeds & Northrup Millivolt Potentiometer.

We find that the request for engineering assistance provides a detailed description of the heat exchange system for which petitioner seeks an ITC. The request for engineering assistance identifies components of the system by name. As the court stated in United States v. Commonwealth Energy Sys., 235 F.3d at 16: "the requirement that the specifications and amount of the property be readily ascertainable indicates that the inquiry need be specific, although not exact." Because these descriptions specifically identify the property at issue, the "readily identifiable" requirement of TRA section 204(a)(3) has been satisfied by the request for engineering assistance for the heat exchange system.

The licensee event report, the substantial safety hazards evaluation, action item No. 19850484, the spent fuel disposition management action plan, the energy management plan, and the BCS requirements studies fail to readily identify the specifications and amount of property for which petitioner claims ITCs.

v. Contracts

Petitioner argues that several contracts readily identify

the property for which it claims ITCs.[104]  Particularly,

petitioner cites:  (1) The nuclear fuel fabrication and related

services contract between Westinghouse and FPL (Westinghouse

contract), entered into as of November 5, 1979, and amended in

February 1990 and June 1992; (2) the nuclear fuel fabrication and

related services contract between FPL and Exxon Nuclear Co.

(Exxon contract), dated January 30, 1982; (3) the A.B. Chance LMS

Contract (A.B. Chance contract); and (4) the LMS specifications,

dated November 1983.

Petitioner contends that article 5.1 of the Westinghouse

contract provides the quantity of enriched uranium necessary for

the fuel assemblies.  Article 5.1 states that FPL shall:

> a. Supply one hundred percent * * * together with an
> Excess of eight tenths of one percent * * * of the
> enriched uranium hexafluoride required to meet the
> final design uranium loading for each Region to be
> fabricated in the quantity, and enrichment and at
> the times specified by Westinghouse consistent
> with Article 31, SCHEDULES.  The enriched uranium
> hexafluoride shall be of the quality supplied by
> DOE as of February 1, 1979.

Petitioner asserts that the amount of nuclear fuel

assemblies that it acquired was "determinable from" the

fabrication contracts and the 18-month refueling cycle for the

nuclear reactors.  Article 5.1 of the Westinghouse contract

identified the percentage of the enriched uranium hexafluoride

---

[104] Petitioner does not argue that these contracts are themselves supply or service contracts.

(UF6) that FPL needed to provide; however, because it did not state the number of nuclear fuel assemblies that FPL planned to construct, the percentage of UF6 lacks specificity. The "readily identifiable" requirement demands a more explicit statement of the amount of property required for the nuclear fuel assemblies than contained in this contract. The nuclear fuel assemblies are "too attenuated" to be readily identifiable with the Westinghouse contract term that identifies the percentage of UF6 that petitioner must supply. See Bell Atl. Corp. v. United States, 224 F.3d at 224.

Petitioner argues that the Exxon contract readily identifies the fuel assemblies specifications. Specifically, petitioner relies on article 7.1, which states:

> FPL shall make SNM [special nuclear material] available to Seller f.o.b. carrier at either an Enrichment Facility or the Fabrication Facility pursuant to Article 7.3 and natural uranium available to Seller f.o.b. carrier at a converter's facility, consistent with the provisions of Article 5.6.1 hereof. Such SNM and natural uranium shall be equal to one hundred percent * * * of the loading requirements of the final design as agreed by the Parties together with the Excess for each Region to be fabricated hereunder. The SNM shall be in the form of uranium hexafluoride unless otherwise agreed to by the Parties. FPL will be responsible for withdrawal and packaging charges. FPL shall make such SNM and natural uranium available to Seller on a schedule consistent with the provisions of Appendix C. Should agreement not be reached on the quantity and/or enrichment of the SNM, or on the final design, the provisions of Article 15.7 shall apply.

At trial, Mr. Villard also testified that appendix A, Reference Fuel Assembly Design St. Lucie Nuclear Unit #1, to the Exxon

contract identified the specifications and amount of nuclear fuel contracts.  Appendix A contains diagrams and design parameters.

We conclude that the specifications for the nuclear fuel assemblies contained in appendix A to the Exxon contract satisfy the "readily identifiable" requirement.  The appendix contains the number of fuel assemblies in the core, diagrams depicting a fuel assembly and fuel rod array, the number of fuel rods per assembly, the distance between assemblies, etc.  Mr. Villard testified that "All fuel fabrication contracts have detailed specifications on not only the quantity, but also on the material, the size, manufacturing tolerances that needs to be supplied under that fuel fabrication contract."  TRA section 204(a)(3) and the conference report state that "related documents" must be specific, although not exact; on the basis of Mr. Villard's testimony and the contents of appendix A, we find that the spent fuel assembly property relating to the Exxon contract is readily identifiable.

Petitioner also asserts that the A.B. Chance contract readily identifies the specifications and amount of the LMS property.  The "Base Bid Schedule," dated September 9, 1985, an attachment to the A.B. Chance contract, lists the following components of the LMS:  (1) Master station and USW hardware, (2) master station and USW software, (3) field equipment (excluding transponders), (4) engineering and services, (5) interim master

station (IMS), (6) spare parts, (7) the LMS master communication/data link equipment, (8) MMI equipment, (9) field equipment, (10) installation/test equipment for phase II transponders, (11) installation of watthour meter input devices, (12) residential load control transponders, (13) residential meter transponders, (14) commercial industrial meter transponders, (15) load survey transponder, and (16) distribution automation transponders. The schedule also itemizes many subcomponents of the LMS components.

The A.B. Chance contract contains cross-references to the LMS specifications document. FPL created the LMS specifications, which contains more than 600 pages. Petitioner specifically cites appendix D, Tentative Delivery Schedule, and appendix E, Initial Phase Implementation. Appendix D summarizes the number of metering transponders that FPL planned to install in each year from 1985 to 1992 and identifies the transponder voltage, the number of residential meter transponders nondemand, commercial meter transponders demand, and commercial meter transponders nondemand.

We find that the description of the LMS property is sufficiently detailed so that it is "readily identifiable" with the terms of the A.B. Chance contract and the LMS specifications. The bid schedule in the A.B. Chance contract outlines the component parts for the LMS. Appendix D identifies the number of

transponders, the voltage of the transponders, the type of property that the transponders served, and the year that FPL planned to install the transponders.   While the terms of the related documents are not required to identify the exact property in issue, the terms must contain specific details.  See United States v. Commonwealth Energy Sys., 235 F.3d at 16.  Petitioner's "related documents" itemize many components and subcomponents of the LMS property and indicate the number of transponders needed for the system.

Although the Westinghouse contract fails to readily identify the nuclear fuel assemblies, appendix A of the Exxon contract contains specific details that identify the assemblies at St. Lucie Unit 1.  Also, the LMS property is readily identifiable from the terms of the A.B. Chance contract and the LMS specifications.  Therefore, the Exxon contract and the A.B. Chance contract and the LMS specifications readily identify the St. Lucie Unit 1 nuclear fuel assemblies and the LMS property, respectively.[105]

Because the tariff is not a contract for purposes of TRA section 204(a)(3), the tariff does not readily identify any

---

[105] We address this issue to complete our analysis of the supply or service contract transitional rule.  However, the property does not qualify for an ITC because we have held that the tariff is not a supply or service contract for purposes of TRA section 204(a)(3), and we have held that the tariff does not incorporate the "related documents".

property in issue, no related documents were incorporated by a supply or service contract, and the property generally was not readily identifiable from the related documents, we hold that the fuel assemblies, the nuclear plant property (the MSIV air accumulation system, surveillance system for the heat exchangers, reactor vessel probes, raceway protection, spent fuel equipment, and the area radiation monitoring system equipment), the environmental property (wastewater neutralization treatment system and replacement of PCB transformers), the simulator and training buildings, and the LMS do not qualify as transition property under TRA section 204(a)(3).

### e. Class Life of Nuclear Fuel Assemblies Pursuant to TRA Section 203(b)(2)

Finally, with respect to the ITC claimed for nuclear fuel assemblies placed in service in 1988, 1989, and 1990, we conclude that petitioner is not entitled to those credits even if the fuel assemblies would otherwise qualify as transition property under TRA section 204(a)(3).

Congress imposed restrictions on the availability of the ITC for transition property. One of these restrictions is contained in TRA section 203(b)(2), which provides:

(b) General Transitional Rule.--

        *    *    *    *    *    *    *

     (2) Requirement that certain property be placed in service before certain date.--

          (A) In General.--Paragraph (1) and section 204(a) * * * [which includes the supply and service contracts exception] shall not apply to any property unless such property has a class life of 7 years and is placed in service before the applicable date determined under the following table:

     In the case of property with a class life of:  The applicable date is:

    At least 7 but less than 20 years          January 1, 1989

    20 years or more                           January 1, 1991


          *    *    *    *    *    *    *

          (C) Class Lives.--

          *    *    *    *    *    *    *

          (ii) property described in section 204(a)
          shall be treated as having a class life of 20
          years.  * * *

At first blush, there appears to be an inconsistency between the requirement in subsection (b)(2)(A), which requires that TRA section 204(a) property have a class life of at least 7 years, and subsection (b)(2)(C)(ii), which provides that TRA section 204(a) property shall be treated as having a class life of 20 years.

The parties agree that the nuclear fuel assemblies have a class life of 5 years under Rev. Rul. 87-56, 1987-2 C.B. 674, and that petitioner treated these assemblies as having a class life

of 5 years for purposes of computing depreciation allowances. Respondent argues that TRA section 203(b)(2)(A) precludes any credits for 1988, 1989, or 1990 because the class life of the nuclear fuel assemblies is less than 7 years. Respondent argues that TRA section 203(b)(2)(A) mandates that TRA section 204(a) property must have a class life of at least 7 years before TRA section 203(b)(2)(C)(ii) is applied to that property. Petitioner argues that TRA section 203(b)(2)(C)(ii) contains a special provision that transforms the class life of the fuel assemblies to 20 years, thus negating the requirement in TRA section 203(b)(2)(A) that TRA section 204(a) property must have a class life of at least 7 years.[106]

This same issue of statutory construction with respect to TRA section 203(b)(2) was addressed by the Court of Appeals for the Ninth Circuit in Airborne Freight Corp. v. United States, 153 F.3d 967, 971-972 (9th Cir. 1998), revg. on this issue 78 AFTR 2d 6272, 96-2 USTC par. 50,552. The Court of Appeals explained:

> This section is not a model of clarity, but we read the opening restriction of subsection (A), standing alone, as requiring that the world headquarters exception [which is another exception contained in TRA section 204(a)] not be available to property with a class life of less than 7 years. The plain words dictate that reading. The difficulty arises from subsection (C)(ii), which assigns to property described in § 204(a) a class life of 20

---

[106] Before the trial, respondent moved for partial summary judgment on this issue. We reserved ruling on this motion and decide the issue as part of this opinion.

years. The district court read subsection (C)(ii) as establishing a 20-year class life for <u>all</u> § 204(a) property, thus entirely negating the 7-year-minimum requirement of subsection (A) of § 203(b)(2). We conclude that a more appropriate reading of subsection (C)(ii) is to consider it as "treating" § 204(a) property (which must have a class life of 7 years or more) as having a 20-year life for the purpose of the applicable date by which it must be placed in service-January 1, 1991. We recognize that this interpretation may negate the provision of subsection (A) with regard to such property with a life of at least 7 but less than 20 years. The district court's interpretation does even more violence to subsection (A), however, because it negates not only the same provision, but virtually all of subsection (A).

Our interpretation of § 203 is made more compelling by the fact that § 203 does not stand alone. It is supplemented by § 49(e)(1)(C), which provides in pertinent part:

(C) [I]n the case of transition property with a class life of less than 7 years-

(i) section 203(b)(2) of this Act shall apply, and

(ii) in the case of property with a class life-

(I) of less than 5 years, the applicable date shall be July 1, 1986, and

(II) at least 5 years, but less than 7 years, the applicable date shall be January 1, 1987. * * *

26 U.S.C. § 49(e)(1)(C). Here again, the draftsmanship leaves much to be desired, but the most reasonable reading of this subsection is that it renders additional property eligible for the investment credit, and for practical purposes adds it to the table of class lives and service dates contained in § 203(b)(2).[5] See H.R. Conf. Rep. No. 99-841, 99th Cong.2d Sess., at II-54. If the district court's reading of subsection 203(b)(2)(C) were accepted, however, it would give all § 204(a) property a life of 20 years and entirely negate the above provisions of § 49(e)(1)(C).[6] We adhere to our conclusion, therefore,

that the only effect of subsection (C)(ii) of § 203(b)(2) is to make applicable to eligible property with a class life of more than 7 years the required service date applicable to property with a class life of 20 years or more--January 1, 1991.

[5] Airborne's eligibility for credits under § 49(e) is not in issue, because this appeal concerns only property placed in service in 1989 and 1990, well after the dates required by § 49(e) for property having a class life of less than 7 years.

[6] Airborne contends that § 49(e)(1)(C) would still have a function because it could apply to the different type of transition property described in § 203(b)(1). But § 203(b)(1), like § 204(a), is rendered inapplicable by § 203(b)(2)(A) to property with a class life of less than 7 years. There is no reason why § 49(e)(1)(C) should be effective in one context but not in another, when both are governed by the same clause of § 203(b)(2)(A).

See also United States v. Kjellstrom, 916 F. Supp. 902 (W.D. Wis. 1996).

We apply the analysis of the Court of Appeals, and hold that TRA section 203(b)(2)(A) precludes any ITC for the nuclear fuel assemblies that petitioner placed in service in 1988, 1989, and 1990.[107]

2.  Are the Southern Company Contracts TRA Section 204(a)(3) Supply or Service Contracts?

Petitioner seeks ITCs for equipment related to the Southern company contracts.  Petitioner contends that the Southern company contracts constitute TRA section 204(a)(3) supply contracts and

---

[107] Petitioner cannot claim an ITC for 1988, 1989, and 1990 under sec. 49(e)(1)(C).  Transitional relief pursuant to sec. 49(e)(1)(C) applies only to property placed in service before Jan. 1, 1987.

that the property purchased and installed thereunder was readily
identifiable with and necessary to those contracts.  The
equipment was placed in service during the 1988, 1989, and 1990
taxable years with tax bases of $39,605,571, $2,648,789, and
$1,169,866, respectively.  Respondent argues that the Southern
company contracts are not TRA section 204(a)(3) contracts because
FPL was not supplying anything under those agreements.  Indeed,
respondent argues that FPL contracted for the purchase of
electricity and FPL's counterparties were obligated to supply
electricity.  For support of his interpretation, respondent cites
the House Ways and Means Committee report, which explains:

> An example of a case to which * * * [the supply or
> service contract rule] would apply is that of a
> taxpayer who entered into a written binding power sales
> contract before September 26, 1985, and is required to
> construct (or have constructed) two facilities that
> will produce the power necessary to fulfill a
> contractual obligation. * * *

H. Conf. Rept. 99-426, at 165 (1985), 1986-3 C.B. (Vol. 2) 1,
165.  Furthermore, respondent contends that the property and
equipment purchased and installed by FPL was not readily
identifiable in the Southern company contracts.

We disagree with respondent's interpretation that only the
"supplier" under a supply contract is entitled to transition
relief.  TRA section 204(a)(3) provides:

> The amendments made * * * [to repeal the ITC] shall not
> apply to any property which is readily identifiable
> with and necessary to carry out a written supply * * *
> contract * * * which was binding on * * * [December 31,
> 1985].

We believe that respondent's interpretation is too restrictive.
If Congress had wanted to except only the supplier under a supply
contract, it would have specifically so stated. The language
excepts any property that is readily identifiable with and
necessary to carry out a written supply contract. Surely,
equipment purchased and installed by the party receiving goods
and services under a supply contract constitutes "any" property
that is necessary to carry out that contract. Respondent's
interpretation is inconsistent with the plain meaning of TRA
section 204(a)(3) because, under the Southern company contracts,
FPL arguably needed to purchase and install certain equipment to
accept the electricity supplied by the Southern companies. We
hold that the Southern company contracts constitute supply
contracts for purposes of petitioner's potential entitlement to
the benefits of TRA section 204(a)(3). Accordingly, we must then
decide whether petitioner's property is readily identifiable with
and necessary to carry out the Southern company contracts.

The amendment to the power agreement entered into on
February 18, 1982, increased the amount of power that the
Southern companies would supply FPL. That agreement specified
the number of megawatts that the Southern companies would make

available to FPL until May 31, 1995. The agreement contemplated
that FPL would provide the necessary facilities and equipment to
receive this power. The agreement states, in pertinent part:

> 4.1 <u>Points of Delivery</u>: Southern Companies shall
> deliver the power and energy purchased by FPL hereunder
> to the Points of Delivery specified in Article III of
> the FPL-Southern Companies Interchange Contract dated
> October 18, 1979 and amended by Agreement dated
> February 19, 1981 and the points of delivery to be
> established pursuant to Section 4.2 below.

> \* \* \* \* \* \* \*

> 4.3 <u>Construction of FPL's Internal Transmission</u>:
> It is recognized that FPL must construct certain
> internal transmission lines to allow it to increase
> purchases of unit power capacity during the contract
> period beginning January 1, 1985 \* \* \*. Those
> facilities are (i) a 500 kV transmission line from its
> Duval Substation to its Rice Substation continuing to
> its Poinsett Substation, (ii) a separate 500 kV
> transmission line from its Duval Substation to its
> Poinsett Substation, and (iii) a 500 kV transmission
> line from its Poinsett Substation to its Martin
> Substation. \* \* \*

FPL completed each of the transmission lines by January 1, 1985,
as required by the amended power agreement.

Many of the documents that FPL offered as evidence to show
that it spent funds on facilities and equipment reference the
Southern company contracts. For example, BI Nos. 272, 273, and
274 and ER Nos. 1248, 1249, 1776, 1778, 2383, and 1224 all state
in pertinent part: "Additional bulk power transfer capacity
\* \* \* is also needed to reliably transfer contracted firm power
purchases from the Southern Company". Similarly, ER Nos. 3216,
3623, and 3219 all state: "According to the existing contracts

net firm interchange  power available to the FPL system during the 1988-1992 * * * which includes a 2000 MW firm interchange from Southern."  Some documents do not reference the Southern company contracts at all; i.e., BI Nos. 304 and ER Nos. 1984, 1479, and 3276.  Other documents appear to relate to the Southern company contracts; for example, ER No. 5334, which concerns the installation of one 500-kV bus tie breaker at the Poinsett substation, states:  "With the present configuration * * * a maintenance outage of one of the mid-breakers greatly reduces FPL's import capability."  Also, BI No. 129 and ER Nos. 9326, 9327, 9329, 9334, 9337 state:  "While importing large amounts of power".  (Emphasis added.)

Respondent cites United States v. Commonwealth Energy Sys., 235 F.3d 11 (1st Cir. 2000), for the proposition that FPL's property at issue was not readily identifiable with the Southern company contracts, and as such, should not receive transition relief.  The court explained that the legislative history indicated that the specifications and amount of the property must be readily ascertainable from the source documents, which are the contract and related documents.  Id. at 16.  Because the statute requires that the specifications and amounts of property be ascertainable, this examination must be specific, but not exact. Id.  In that case the taxpayer sought an ITC for replacement property.  Id. at 13.  The court found that the taxpayer could

not identify the future replacement property, nor specifications and amount of replacement property from the pertinent documents. Id. at 16. In holding against the taxpayer, the court stated that its decision was consistent with the reasoning of other courts that have interpreted the same provision. See Bell Atl. Corp. v. United States, 224 F.3d at 225; S. Multi-Media Commcns., Inc. v. Commissioner, 113 T.C. at 419; United States v. Zeigler Coal Holding Co., 934 F. Supp. at 294-295. Generally, those cases held that the contract must contain more than a casual link to the property purchased to qualify for transition relief. Bell Atl. Corp. v. United States, supra; S. Multi-Media Commcns., Inc. v. Commissioner, supra at 421-422; see also United States v. Zeigler Coal Holding Co., supra at 295.

We believe that only the equipment that is readily identifiable from the language of the amendment to the Southern company contracts should qualify for transition relief. See supra p. 131 (quoting amendment to power sales agreement, par. 4.3). Paragraph 4.3 of the amendment specifically identifies the following property:

> (i) a 500 kV transmission line from its Duval Substation to its Rice Substation continuing to its Poinsett Substation, (ii) a separate 500 kV transmission line from its Duval Substation to its Poinsett Substation, and (iii) a 500 kV transmission line from its Poinsett Substation to its Martin Substation. * * *

Petitioner seeks an ITC for property that it placed in service after placing the specifically identified property in service by January 1, 1985. The property for which petitioner seeks an ITC is not readily identifiable from the language in the amendment to the Southern company contracts. We do not believe that the transitional rules contemplated providing relief from the ITC repeal when taxpayers upgrade their electrical systems, even if the upgrades improved reliability. If we were to accept petitioner's position, any equipment that could somehow be traced back to the purchase of power under the Southern company contracts would be entitled to transition relief. The link between the Southern company contracts and the property in issue is too attenuated to be the type contemplated by Congress in providing transition relief.

3. Are the DRI Documents TRA Section 204(a)(3) Supply Contracts?

Developers of large projects applied to regional development boards for permission to develop properties, and those regional development boards required verification from FPL that the electrical needs of the development would be satisfied. Petitioner argues that the exchange of letters with respect to the DRI projects constituted TRA section 204(a)(3) supply contracts. Petitioner seeks ITCs for equipment related to the DRI projects. This equipment was placed in service during 1988,

1989, and 1990 taxable years with tax bases of $1,464,901,
$3,609,855, and $4,832,205, respectively.

We do not think the exchange of these letters contained
sufficient specificity to constitute binding contracts.  Rather,
they appear to merely state FPL's belief that it would be able to
supply service in anticipated but unspecified amounts.

Assuming arguendo that the exchange of documents concerning
the DRI projects constitutes a TRA section 204(a)(3) contract, we
do not think that any of the property for which petitioner claims
ITCs is "readily identifiable" in those documents.  The evidence
shows that, at the time of the supposed contract, FPL had only a
general idea of how much or what equipment it would need to meet
the developer's expected requirements.  For example, the record
contains a letter from FPL concerning a proposed DRI that states:

> [FPL] anticipates no problem in providing electric
> service to this project both during and after
> development.

In one of the responses, FPL explained:

> Electric service will be made available to the
> above development * * *.  The required installation of
> either overhead or underground electric facilities will
> be coordinated between the developer and * * * [FPL].
>
> Upon presentation of required plats and load data,
> the engineering required for the installation of
> electric service will be initiated by * * * [FPL].
> * * *

FPL had only a generalized idea of the DRI project demands for
power, and thus, only a general idea of the equipment that would

be needed to supply the power. As Mr. Hernandez, an FPL operations support supervisor, was asked and answered:

> Q: At the time FPL issues the response letter, is it possible to know exactly how much cable and trench will be required?

> A: No, it wouldn't because the developer hasn't finalized his plans; and, therefore, we don't know the exact routes of these cables.

The specifications and/or amount of property were not readily ascertainable from the DRI documents. See H. Conf. Rept. 99-841 (Vol. II), supra at II-60, 1986-3 C.B. (Vol. 4) at 60; cf. Newhouse Broad. Corp. v. Commissioner, T.C. Memo. 2000-270 ("Rather, we find that the description contained in the pre-1986 documents of the equipment to be utilized * * * is sufficiently detailed for us to determine whether any particular property is 'specifically described' in such documents."). Accordingly, we hold that the property/equipment purchased and installed by FPL with respect to the DRI projects fails to qualify for transition relief.

C. TRA Section 203(b)(1)(A)--The "Binding Contract" Rule

TRA section 203(b)(1)(A), known as the "binding contract" rule, in conjunction with section 49(e), grants transition relief to "any property which is constructed, reconstructed, or acquired by the taxpayer pursuant to a written contract which was binding on" December 31, 1985. Petitioner argues that the following items qualify for transition relief on the basis of the binding

contract rule: (1) A nuclear fuel transfer system pursuant to a contract with Stearns Catalytic Corp. (Stearns Catalytic); (2) transmission equipment constructed pursuant to the interchange contract with the Southern companies; (3) the LMS equipment acquired under the A.B. Chance contract; and (4) equipment purchased for the SJRPP pursuant to the JEA contract.

There are few cases that have interpreted the binding contract rule. However, the conference report sheds light on Congress's intent in granting transition relief to taxpayers:

> The conference agreement does not apply to property that is constructed, reconstructed, or acquired by a taxpayer pursuant to a written contract that was binding as of * * * (December 31, 1985, for investment tax credits), and at all times thereafter. * * *

> The general binding contract rule applies only to contracts in which the construction, reconstruction, erection, or acquisition of property is itself the subject matter of the contract.

> A contract is binding only if it is enforceable under State law against the taxpayer, and does not limit damages to a specified amount (e.g., by use of a liquidated damages provisions). A contractual provision that limits damages to an amount equal to at least five percent of the total contract price is not treated as limiting damages.

>          *     *     *     *     *     *     *

> A binding contract to acquire a component part of a larger property will not be treated as a binding contract to acquire the larger property under the general rule for binding contracts. * * *

>          *     *     *     *     *     *     *

The conferees wish to clarify the general binding contract rule with respect to investment credit * * *. Design changes to a binding contract to construct a project that are made for reasons of technical or economic efficiencies of operation and that cause an insignificant increase in the original price will not constitute substantial modifications of the contract so as to affect the status of the project under the binding contract rule. * * *

The conferees also wish to clarify that the general binding contract rule does not apply to supply agreements with manufacturers, where such contracts fail to specify the amount or design specifications of property to be purchased; such contracts are not to be treated as binding contracts until purchase orders are actually placed. A purchase order for a specific number of properties, based on the pricing provisions of the supply agreement, will be treated as a binding contract.

H. Conf. Rept. 99-841 (Vol. II), supra at II-54 to II-56, 1986-3 C.B. (Vol. 4) at 54-56.

1. Nuclear Fuel Transfer System

Petitioner seeks an ITC for the nuclear fuel transfer system purchased from Stearns Catalytic. This equipment was placed in service during the 1988 and 1990 taxable years with tax bases of $241,469 and $233,742, respectively. In support of its position, petitioner submitted copies of two purchase orders, its ERs and BIs, and the testimony of its employee. Respondent argues that petitioner failed to produce the required written contract.

We agree with respondent that a purchase order is not, by itself, a contract. Indeed, a purchase order is typically an offer. See, e.g., Philip Schwartz, Inc. v. Gold Coast Graphics, Inc., 623 So. 2d 819 (Fla. Ct. App. 1993). Performance

constitutes acceptance of that offer. Id. at 820. However, even assuming the existence of a contract, the evidence lacks any contract between FPL and Stearns Catalytic that was binding on December 31, 1985, an express requirement of the transitional rule. One purchase order has an effective date of December 17, 1984, and an expiration date of November 1, 1985. Apparently, a change order to the purchase order was issued, having an effective date of December 19, 1985. However, we have no evidence showing whether the agreement between Stearns Catalytic and FPL was a binding contract as of December 31, 1985. No testimony identifies the date that Stearns Catalytic accepted FPL's written offer. The purchase orders in evidence are FPL's purchase orders. Mr. Bible testified that FPL purchased equipment/services from Stearns Catalytic as stated in the purchase orders. But no evidence indicates when the contract to provide such equipment/services was created. The record contains only information establishing when FPL made its offer to Stearns Catalytic. Accordingly, we hold that the FPL/Stearns Catalytic relationship is not a binding contract for purposes of TRA section 203(b)(1)(A); therefore, petitioner is not entitled to an ITC with respect to the nuclear fuel transfer system in the 1988, 1989, and 1990 taxable years.

2. Southern Interchange Contract

Petitioner seeks ITCs for property/equipment purchased pursuant to the interchange contract with the Southern companies, which petitioner contends is a TRA section 203(b)(1)(A) binding contract. Petitioner argues that the interchange contract was binding on December 31, 1985, and required FPL to purchase certain property/equipment. This equipment was placed in service during the 1988, 1989 and 1990 taxable years with tax bases of $39,605,571, $2,648,789, and $1,169,866, respectively. Respondent argues that the property/equipment purchased was not the subject matter of the agreement and thus does not qualify for an ITC. Respondent supports his contention by referring to the following excerpt from the legislative history: "The general binding contract rule applies only to contracts in which the construction, reconstruction, erection, or acquisition of property is itself the subject matter of the contract." H. Conf. Rept. 99-841 (Vol. II), supra at II-55, 1986-2 C.B. (Vol. 4) at 55. To resolve this issue, we must examine the interchange contract and its amendments and the amended power agreement to determine the subject matter of that contract.

The interchange contract, dated October 18, 1979, established a mechanism to facilitate the contractual relationship between the Southern companies and FPL. The interchange contract provided for, inter alia, the creation of

the initial interconnection between the entities, the responsibilities of the parties to maintain their facilities, the services to be rendered, the methodology and periodic rate computation procedure, metering, delivery points, records and statements, billings and payments, and the establishment of an operating committee. Amendment No. 1 to the interchange contract (amendment No. 1) was entered into on February 19, 1981, to account for changes required when the parties executed a new unit power sales agreement.[108] Amendment No. 1 contemplated, inter alia, the establishment of a second and third interconnection at which:

> (b) FPL shall, at no expense to GPC, construct, operate, and maintain a 500 kV transmission line from FPL's Duval Substation to the point on the Georgia-Florida state line noted in (c) below.

> (c) The interconnection point is hereby defined as that point where the aforementioned 500 kV transmission line crosses the Georgia-Florida state line, approximately one and one quarter miles northeast of Boulougne, Florida at the St. Mary's River on the South side of the river bridge.

> (d) FPL and SOUTHERN COMPANIES shall each, respectively, for their 500 kV transmission line provide, install, operate, and maintain such associated terminal and other facilities as may be necessary to permit effective use of such interconnection.

FPL and the Southern companies entered into amendment No. 2 to the interchange contract as of July 23, 1981 (amendment No. 2).

---

[108] The copy of amendment No. 1 in the record does not contain a signature page.

Amendment No. 2 provided for the "potential acceleration of the effective date of the increase in the sale of long term power".[109]

On February 18, 1982, the Southern companies and FPL entered into an amended and restated power sales agreement (amended power agreement). In the amended power agreement, FPL agreed to acquire additional power from the Southern companies, and the Southern companies agreed to sell more power to FPL. FPL agreed to use its best efforts to construct internal transmission lines to allow FPL to increase purchases of unit power capacity during the contract period.[110]

In Katerelos v. Commissioner, T.C. Memo. 1996-340, the Court addressed whether equipment purchased and used by a taxpayer to operate a restaurant qualified for a credit under the binding contract transitional rule. During 1985, the taxpayers executed a lease for the premises where they operated a restaurant. The taxpayers argued that they were required to purchase property for use at the premises in order to operate the leased property; therefore, the binding contract rule applied to the

---

[109] The copy of amendment No. 2 in the record contains a signature page, which is signed only by FPL.

[110] Specifically, the amended power agreement provided that FPL would construct: (i) A 500-kV transmission line from its Duval substation to its Rice substation continuing to its Poinsett substation; (ii) a separate 500-kV transmission line from its Duval substation to its Poinsett substation; and (iii) a 500-kV transmission line from its Poinsett substation to its Martin plant. FPL completed each of these transmission lines by Jan. 1, 1985.

property/equipment that they purchased for the restaurant.  The Court disagreed and quoted the legislative history confirming that, for the exception to apply, the subject of the "binding contract" must be the "construction, reconstruction, or acquisition of property for use at that premises."  Id.

Despite petitioner's protestations, the subject matter of the interchange contract and the amendments was not the construction, reconstruction, or acquisition of property. Instead, this contract defined the relationship between the parties and the sale and exchange of electricity between them. Although we agree that the interchange contract acknowledged that FPL was responsible for providing the property or equipment to facilitate the exchange of power (at least on its side of the Florida State line), we do not believe that that provision was the subject matter of the contract.

Similarly, the subject matter of the amended power agreement is to provide the terms for the purchase and sale of electricity. While the amended power agreement includes a provision that describes the internal transmission lines that FPL would construct, these transmission lines were completed by January 1, 1985.  Rather than serving as the subject matter of the amended power agreement, the provision relating to the construction of the transmission lines describes how FPL shall satisfy its obligation to purchase the power.

We agree with respondent that the purchase of property/equipment for which petitioner seeks ITCs was not the subject matter of the interchange contract or the amended power agreement; accordingly, petitioner is not entitled to an ITC.

3. LMS Equipment Under A.B. Chance Contract

Petitioner argues that FPL acquired the LMS equipment (substation equipment and transponders)[111] "pursuant to a written contract with A.B. Chance, and that contract was binding on December 31, 1985." Petitioner seeks ITCs for the LMS property/equipment placed in service during the 1988, 1989, and 1990 taxable years with tax bases of $362,837, $16,045,190, and $39,351,031, respectively. Respondent argues that "No contract existed between A.B. Chance (or anyone else) and FPL regarding Phase II and III prior to January 1, 1986." Additionally, respondent argues that, even if there was a contract, it was not binding because FPL could terminate the contract for convenience.

To resolve this issue, we must examine the A.B. Chance contract to determine whether it is a TRA section 203(b)(1)(A) binding contract. In October 1985, both parties executed the "General Conditions" section of the A.B. Chance contract. As found above, the contract incorporates and includes a copy of

---

[111] "Petitioner limited its ITC claim strictly to the substation control equipment and the transponders acquired during the Periods in Issue because the computer equipment has a five-year class life."

FPL's purchase order.  The purchase order lists the documents that make up the contract and states a total contract price of $11,477,432.

To support the existence of a binding contract, petitioner relies heavily upon the testimony of its employee, Mr. Garcia. For example, petitioner argues in its brief that "Mr. Garcia testified that the [A.B.] Chance Contract was finalized in October 1985, and that it was in fact one contract from that point in time forward."  However, Mr. Garcia testified as a fact witness, not a legal expert.

Indeed, the A.B. Chance contract in evidence obligated FPL to expend more than $11 million for phase I, committing it to purchase a finite amount of equipment.  The contract had no term but did contain a price guarantee, which controlled and limited the price A.B. Chance could charge FPL for purchases of the LMS equipment after phase I.  The price guarantee clause obligated A.B. Chance to charge FPL the then-lowest price that it charged to its other customers for the LMS.  However, the A.B. Chance contract contained no obligation that FPL must purchase any other equipment from A.B. Chance.  In fact, a contrary intention is indicated in the contract:  "It is FPL's intent to competitively bid its requirements for Phases II and III."

We do not agree with petitioner's argument that the A.B. Chance contract was a binding contract for purchases after phase

I.[112]  Although the parties relied upon many of the terms and understandings embodied in that agreement for the purchases made after phase I, nonetheless, <u>that</u> contract obligated the parties only to phase I.  We believe that the legislative history sheds light on the contractual relationship for phases II and III:

> The conferees also wish to clarify that the general binding contract rule does not apply to supply agreements with manufacturers, where such contracts fail to specify the amount or design specifications of property to be purchased; <u>such contracts are not to be treated as binding contracts until purchase orders are actually placed.  A purchase order for a specific number of properties, based on the pricing provisions of the supply agreement, will be treated as a binding contract</u>.  [Emphasis added.]

H. Conf. Rept. 99-841 (Vol. II), <u>supra</u> at II-55 to II-56, 1986-3 C.B. (Vol. 4) at 55-56.  Petitioner has not offered <u>any</u> written contract or purchase order under which property was purchased after phase I.  The record contains only the A.B. Chance contract and FPL's ERs and BIs for the property/equipment claimed.  Accordingly, petitioner is not entitled to claim an ITC under TRA section 203(b)(1)(A) for the LMS equipment purchases after phase I.

---

[112] We think that the property and equipment purchases during phases II and III, the period before us, were more akin to a supply or requirements contractual relationship.  Under the Uniform Commercial Code, requirements contracts are enforceable. <u>E. Air Lines, Inc. v. Gulf Oil Corp.</u>, 415 F. Supp. 429, 435 (S.D. Fla. 1975); see Fla. Stat. Ann. sec. 672.306 (West 2004). However, we do not make a finding or conclusion that this relationship was a supply or requirements contract.

4.  St. John's River Power Park (SJRPP)

Petitioner claims ITCs for the property that was constructed or reconstructed at the SJRPP pursuant to FPL's written joint agreement (or JOA) with the JEA, and argues that this agreement is a TRA section 203(b)(1)(A) contract.  In claiming an ITC, petitioner, in its reply brief, states that it "clearly limited this argument to the JOA" and does not rely on the third-party construction contracts entered into by the JEA.[113]   The equipment in issue was placed in service during the 1988, 1989, and 1990 taxable years with tax bases of $1,702,649, $2,376,238, and -$360,804,[114] respectively.

Respondent argues that the joint agreement is not a construction contract because the binding contract rule applies only to contracts in which construction, reconstruction, erection, or acquisition of property is itself the subject matter of the contract.

TRA section 203(a)(3) provides relief from the ITC repeal for "any property which is constructed, reconstructed, or acquired by the taxpayer pursuant to a written contract which was

---

[113] Respondent had argued in his brief that, because FPL was not a signatory to the many contracts entered into by the JEA, there are no TRA sec. 203(b)(1)(A) contracts under which petitioner may claim an ITC.

[114] Petitioner claims a negative number as the ITC in its proposed ultimate findings of fact.  Mr. Engstrom testified that the negative number was the result of FPL's debit/credit accounting system.

binding on" December 31, 1985. The conference report clarifies that "The general binding contract rule applies only to contracts in which the construction, reconstruction, erection, or acquisition of property is itself the subject matter of the contract." H. Conf. Rept. 99-841 (Vol. II), supra at II-55, 1986-3 C.B. (Vol. 4) at 55.

The agreement for the SJRPP, dated April 2, 1982, is entitled "Agreement for Joint Ownership, Construction and Operation of St. John's River Power Park Coal Units #1 and #2 Between Jacksonville Electric Authority and Florida Power & Light Company". The agreement states part of its purpose as: "WHEREAS, the parties desire to provide for the construction and operation of Coal Units 1 and 2 by JEA and FPL in accordance with this Agreement". Section 2.1.4 of the agreement states that "This Agreement * * * [constitutes] legal, valid and binding obligations of FPL enforceable against it in accordance with their terms".

Section 3 of the agreement describes the ownership and construction of the SJRPP. Subsection 3.7 states:

> At or before Closing, JEA, as agent, shall establish a separate account or accounts in the name of the Co-owners (the "Construction and Plant Account") * * *. The Co-owners shall pay into the Construction and Plant Account (i) in proportion to their Ownership Interests amounts of Costs of Construction * * *. Such payment into the Construction and Plant Account shall be made in accordance with Section 3.8 hereof. * * *

Subsection 3.8 states:

     3.8 <u>Payment for Costs of Construction, Costs of Plant and Other Costs</u>. Payment by the Co-owners of their share of Costs of Construction and Other Costs * * * shall be made based upon the statements prepared and submitted to the Co-owners by the Project Management Committee * * *

Subsection 3.12 states:

     3.12 <u>Completion of Construction</u>. The Co-owners agree, consistent with their respective responsibilities and obligations and the other terms set forth in this Agreement, to complete the construction of the Joint Facilities in accordance with the schedule established pursuant to Section 5.4.2.

     Section 5 of the joint agreement is entitled "Coordination and Administration". Subsection 5.4.2 states:

     5.4.2 <u>Completion Of Construction</u>. The Date of Commercial Operation for Coal Unit 1 shall be December 31, 1986, and for Coal Unit 2 shall be June 30, 1988, unless such Dates of Commercial Operation are changed pursuant to this Section 5.4.2. The Project Management Committee shall perform its responsibilities hereunder to effect the completion of the construction of the Joint Facilities in accordance with such schedule. * * *

The project management committee is comprised of one representative and one alternate from each of the coowners. Subsection 5.4.1 describes the responsibilities of the project management committee with respect to the construction of the SJRPP.

     Section 9 of the agreement is entitled "Liabilities". Subsection 9.1 states, in pertinent part:

     any liability or payment, cost, expense or obligation arising from a claim of liability to a third party or

parties * * * against one or both of the Co-owners and arising out of or resulting from the acquisition of the Joint Facilities or any part thereof, the planning, engineering, design, licensing, procurement, construction, installation or completion of the Joint Facilities * * * shall be considered a Cost of Construction, Cost of Plant or Cost of Operation, as appropriate.

We agree with respondent that the subject matter of the joint agreement was not for the construction of property. As we discussed earlier, in Katerelos v. Commissioner, T.C. Memo. 1996-340, this Court found that the taxpayers were not entitled to an ITC for equipment used in a leased premises because the subject matter of the lease was the use of the premises, not the purchase of the equipment. Here, we think that the parties entered into the joint agreement to create a joint venture between FPL and the JEA, and to define the relationship of the coowners.

We do not think that the title of this agreement, which includes the construction of the SJRPP, defines the subject matter of the contract; instead, we look at the terms of the contract. The recitals indicate that "the parties desire to provide for the construction and operation of Coal Units 1 and 2 by JEA and FPL in accordance with this Agreement". This explains the parties' intentions or the expected plan for the joint venture. We do not think that this statement shows that the subject matter of the contract is the construction of the SJRPP.

While the purpose of the joint venture is to operate the SJRPP, the terms of the joint agreement do not provide for the

actual construction of this property. Instead, the contract explains how each coowner will pay for the construction, details the management structure that the coowners will use to construct the facility, and provides the dates when the parties plan to operate the power plant. Subsection 3.7 describes the "Construction and Plant Account", which the coowners use to pay for the construction of the plant. Subsection 3.8 provides for the billing and payment of the construction costs. Subsections 3.12 and 5.4.2 establish the date that construction will be completed. These terms relate to construction, but they provide few details regarding construction. The terms concern the coowner's obligations and responsibilities as joint venturers.

We think that the conference report's requirement that the subject matter of the contract be the construction, reconstruction, erection, or acquisition of property demands a contract between the taxpayer and the persons who will provide construction services or supply the property to be acquired. Neither party to the contract in issue was the general contractor nor was to provide labor or materials.

Because the subject matter of the contract is not the construction, reconstruction, or acquisition of property, we find that the joint agreement fails to satisfy the written contract requirement of TRA section 203(b)(1)(A). Accordingly, we hold

that petitioner is not entitled to ITCs for the SJRPP property

constructed pursuant to the joint agreement.

D.  TRA Section 203(b)(1)(B)--"Self-Constructed Property"

Section 49(e) and TRA section 203(b)(1)(B) provide taxpayers

with relief from the ITC repeal for "self-constructed property".

Specifically, TRA section 203(b)(1)(B) provides relief for:

> (B) property which is constructed or reconstructed
> by the taxpayer if--
>
> > (i) the lesser of (I) $1,000,000, or
> > (II) 5 percent of the cost of such property
> > has been incurred or committed by * * *
> > [December 31, 1985] ~~March 1, 1986~~,[115] and
> >
> > (ii) the construction or reconstruction
> > of such property began by such date, * * *

The repeal of the ITC does not apply to "transition

property".  Sec. 49(b)(1).  As a subcategory of "transition

property", self-constructed property, falls within the types of

property excepted from the ITC repeal.  Sec.  49(e)(1); TRA sec.

203(b)(1)(B).  TRA section 203(b)(1)(B) begins by providing that

it encompasses "property which is constructed or reconstructed by

the taxpayer".  (Emphasis added.)  Neither the statute nor the

regulations define property for purposes of the ITC.  Consumers

Power Co. v. Commissioner, 89 T.C. 710, 725 (1987).  The

definition of property is crucial because it provides the basis

for analyzing the requirements set forth in TRA section

---

115 See supra note 99.

203(b)(1)(B).  For example, in order to qualify under TRA section

203(b)(1)(B), a taxpayer must establish the identity of "the

property" in order to meet the requirements that it incurred or

committed a sufficient amount of the cost of such property by

December 31, 1985, and that construction of "such property" began

by December 31, 1985.

In determining whether components constituted a single

property for purposes of the safe-harbor leasing rule, courts

have examined the meaning of property in other contexts of the

Internal Revenue Code, including the ITC.  See Armstrong World

Indus., Inc. v. Commissioner, 974 F.2d 422 (3d Cir. 1992)

(citing, inter alia, Haw. Indep. Refinery, Inc. v. United States,

697 F.2d 1063 (Fed. Cir. 1983), affg. 49 AFTR 2d 675, 82-1 USTC

par. 9183 (Ct. Cl. Trial Div. 1982), and Consumers Power Co. v.

Commissioner, supra), affg. T.C. Memo. 1991-326.

> In sum, courts appear to agree that individual
> components will be considered a single property for tax
> purposes when the component parts are functionally
> interdependent--when each component is essential to the
> operation of the project as a whole and cannot be used
> separately to any effect.  The converse, thus, should
> be equally valid in this case.  Accordingly, if a
> project has component parts which can function as
> planned in a wholly independent manner, then a court
> may find that each component is a "property . . .
> placed in a condition or state of readiness and
> availability for a specifically assigned function."
> [Alteration in original.]

Id. at 434 (quoting Consumers Power Co. v. Commissioner, supra at

723).  We interpret the single property requirement to mean that

component parts constitute a single piece of property when the components are interdependent, essential, and integral to the operation of a unit at the time it is placed in service.  Id.; Haw. Indep. Refinery, Inc. v. United States, supra at 1069; Consumers Power Co. v. Commissioner, supra at 725-726.  For purposes of the ITC, the components that make up a unit on the date that the property is operational and placed in service constitute a single unit of property, even though additional components may be necessary in the future for the unit to continue to function properly.  These additional components would constitute separate property.  See Armstrong World Indus., Inc. v. Commissioner, supra at 434, 436.

Petitioner argues that components that are added to property in years subsequent to the year the property is placed in service can be considered part of the same property for purposes of the ITC.  Petitioner argues that section 1.46-3(d)(4), Income Tax Regs., allows property to qualify for an ITC in "'portions' from one year to the next, as construction continues and the remainder of the functionally integrated components * * * are completed and placed in service."

Section 1.46-3(d)(4)(i), Income Tax Regs., allows an ITC under section 38 "only for the first taxable year in which such property is placed in service by the taxpayer."  Section 1.46-3(d)(4)(i), Income Tax Regs., provides:

The credit allowed by section 38 with respect to any property shall be allowed only for the first taxable year in which such property is placed in service by the taxpayer. The determination of whether property is section 38 property in the hands of the taxpayer shall be made with respect to such first taxable year. Thus, if a taxpayer places property in service in a taxable year and such property does not qualify as section 38 property (or only a portion of such property qualifies as section 38 property) in such year, no credit (or a credit only as to the portion which qualifies in such year) shall be allowed to the taxpayer with respect to such property notwithstanding that such property (or a greater portion of such property) qualifies as section 38 property in a subsequent taxable year. For example, if a taxpayer places property in service in 1963 and uses the property entirely for personal purposes in such year, but in 1964 begins using the property in a trade or business, no credit is allowable to the taxpayer under section 38 with respect to such property. See § 1.48-1 for the definition of section 38 property.

Section 1.46-3(d)(4)(i), Income Tax Regs., illustrates two situations where an ITC is not allowed in subsequent years. First, when property is placed in service and it does not qualify for an ITC in that year, but does qualify for a credit in a subsequent taxable year, the taxpayer is not entitled to an ITC. Second, when only a portion of the property qualifies for an ITC in the year that it is placed in service, but in a subsequent year an additional portion of the property qualifies for a credit, the taxpayer is entitled to a credit only for the portion of the property that qualified for the ITC in the year that the property was placed in service. Except as provided in section 1.46-3(d)(4)(ii), Income Tax Regs., a credit is allowable only

for property in the first taxable year that it is placed in service.

Section 1.46-3(d)(4)(ii), Income Tax Regs., provides the following exception:

> if, for the first taxable year in which property is placed in service by the taxpayer, the property qualifies as section 38 property but the basis of the property does not reflect its full cost for the reason that the total amount to be paid or incurred by the taxpayer for the property is indeterminate, a credit shall be allowed to the taxpayer for such first taxable year with respect to so much of the cost as is reflected in the basis of the property as of the close of such year, and an additional credit shall be allowed to the taxpayer for any subsequent taxable year with respect to the additional cost paid or incurred during such year and reflected in the basis of the property as of the close of such year.

Section 1.46-3(d)(4)(ii), Income Tax Regs., provides the taxpayer with an ITC in subsequent years when the cost of the property actually placed in service is indeterminate in the year it is placed in service. However, this regulation does not allow a credit for additional components or property placed in service in subsequent years. We agree with respondent that this regulation has limited applicability. Section 1.46-3(d)(4)(ii), Income Tax Regs., applies only to property that the taxpayer actually placed in service in the first taxable year, where the "basis" of the components of the property that was actually placed in service does not reflect the full cost of the property because "the total amount to be paid or incurred by the taxpayer for the property is indeterminate".

The example contained in section 1.46-3(d)(4)(ii), Income

Tax Regs., supports this interpretation:

> in 1964 X Corporation, a utility company which makes
> its return on the basis of a calendar year, enters into
> an agreement with Y Corporation, a builder, to
> construct certain utility facilities for a housing
> development built by Y.  Assume further that part of
> the funds for the construction of the utility
> facilities is advanced by Y under a contract providing
> that X will repay the advances over a 10-year period in
> accordance with an agreed formula, after which no
> further amounts will be repayable by X even though the
> full amount advanced by Y has not been repaid.
> Assuming that the utility facilities are placed in
> service in 1964 and qualify as section 38 property, X
> is allowed a credit for 1964 with respect to its basis
> in the utility facilities at the close of 1964.  For
> each succeeding taxable year X is allowed an additional
> credit with respect to the increase in the basis of the
> utility facilities resulting from the repayments to Y
> during such year.

The regulation contemplates an ITC in subsequent years only when

the total cost of the property is indeterminable at the time the

property is placed in service.  The example does not suggest that

the taxpayer is entitled to an ITC in subsequent years for the

costs of components added after the property was placed in

service.

We interpret section 1.46-3(d)(4), Income Tax Regs., as

requiring all components to be placed in service simultaneously

in order to qualify as a single unit of property for purposes of

receiving an ITC.  This is consistent with the previously cited

cases.  Consequently, we hold that additional components added to

a unit of property after the first year that the property was placed in service do not qualify as being part of the same property for purposes of the ITC.[116]

Petitioner claims an ITC under TRA section 203(b)(1)(B) for the following items: (1) The "wrap up" work and "enhancements and deficiencies" work on Unit 1 and the common facilities at the SJRPP; (2) distribution and transmission substations; (3) the integrated transmission line systems at Jensen-Midway-Turnpike and Andytown-Lauderdale; (4) the "backfit" items at the St. Lucie nuclear power plant facility; and (5) the spent fuel rack systems installed at St. Lucie Unit 1 and Turkey Point Unit 4.

1. "Wrap Up" Work and "Enhancements and Deficiencies" Work at the SJRPP

Petitioner seeks an ITC under the "self-constructed property" rule for costs incurred in the acquisition, installation, and construction of the "wrap up" work and "enhancements and deficiencies" work at Unit 1 and the common facilities at the SJRPP during the 1988, 1989, and 1990 taxable years of $1,702,649, $2,376,238, and -$360,804,[117] respectively. Respondent disagrees. Respondent argues that petitioner did not: (1) Incur or commit $1 million or 5 percent of the construction

---

[116] To the extent that the additional components themselves constitute separate property that meet the requirements for the ITC, there could be an ITC for that separate property.

[117] See supra note 114.

costs by the applicable date; nor (2) begin construction by December 31, 1985.  Petitioner argues that it met these requirements because the "wrap up" work and "enhancements and deficiencies" work was part of the SJRPP Unit 1 property.

We find that the "wrap up" work and the "enhancements and deficiencies" work constitute separate property from Unit 1 and the common facilities because they were not essential or integral to the operation of Unit 1 and the common facilities at the SJRPP.  Both petitioner and respondent rely on Haw. Indep. Refinery, which we find particularly instructive.  In Haw. Indep. Refinery, Inc. v. United States, 697 F.2d at 1064, the court analyzed the meaning of property under section 50 of the 1971 Internal Revenue Code, which restored the ITC.  The taxpayer built an oil refinery facility comprised of a tanker-mooring facility, pipelines, and a refinery.  Id. at 1065-1066.  The taxpayer argued that the tanker-mooring facility and the pipelines qualified for an ITC because these two components were separate pieces of property from the refinery.[118]  Id. at 1069.

---

[118] Construction on the tanker-mooring facility and the pipelines began on May 21 and Nov. 30, 1971, respectively.  Haw. Indep. Refinery, Inc. v. United States, 697 F.2d 1063, 1069 (Fed. Cir. 1983).  The construction of these items began after sec. 50 restored the ITC.  Id.  If the tanker-mooring facility and the pipelines constituted separate property from the refinery, these two components would have qualified for the ITC.  Id.  However, if these components were considered a single piece of property with the refinery, they would not qualify for the ITC because construction of the refinery began before the effective date of
(continued...)

In an unpublished opinion, the Court of Claims reasoned that these three components constituted a single piece of property because the refinery could not function properly without the tanker-mooring facilities and the pipelines. Haw. Indep. Refinery, Inc. v. United States, 49 AFTR 2d at 691, 82-1 USTC par. 9183, at 83,311. The Court of Appeals for the Federal Circuit affirmed the holding of the Court of Claims that the refinery, tanker-mooring facility, and refined products pipelines constituted a single property for the purposes of the ITC. Haw. Indep. Refinery, Inc. v. United States, 697 F.2d at 1069. Agreeing that the components "functionally form a single property", the Court of Appeals noted that "the refinery complex was conceived, designed, and constructed as a unit, the three components being placed in operation concurrently." Id.

In Consumers Power Co. v. Commissioner, 89 T.C. 710 (1987), this Court addressed the meaning of "a single property" under a prior ITC repeal and its transitional rules. The taxpayer and Detroit Edison Co. built a hydroelectric plant, consisting of a pump storage plant and a reservoir. Id. at 716-717. The taxpayer and Detroit Edison Co. began pumping water into the reservoir in October 1972 as part of the preoperational testing. Id. at 717. In November 1972, the plant generated electrical

---

[118](...continued)
sec. 50. Id.

power during preoperational testing.  <u>Id.</u> at 718.  During the preoperational testing, the unit sustained damage to parts of the turbine generator and further testing was suspended.  <u>Id.</u> at 719. The repairs were completed in January 1973, and the taxpayer placed the unit in service later that month.  <u>Id.</u>  The taxpayer argued that, even if the entire power plant was not placed in service in 1972, then the reservoir was placed in service in 1972 when it was used in testing.  <u>Id.</u> at 725.  The Court found that the pump storage plant and the reservoir comprised a single unit of property because each item operated simultaneously and both of these components were necessary to produce electrical power.  <u>Id.</u> at 726.  The Court concluded that the plant was placed in service in 1973, when it was ready to produce power.  <u>Id.</u>

With respect to petitioner's property, the SJRPP Unit 1 and the common facilities were placed in service on March 27, 1987, while the "wrap up" work and "enhancements and deficiencies" work were placed in service during the 1988, 1989, and 1990 taxable years.

Unlike <u>Haw. Indep. Refinery, Inc.</u>, where the tanker-mooring facility, refinery, and pipelines were necessary to operate the unit, Unit 1 and the common facilities at the SJRPP were placed in service and commercially operational before petitioner completed the "wrap up" work and "enhancements and deficiencies" work.  To be considered a single property, the components must be

integral to the function of the unit at the time the taxpayer places the unit in service. Petitioner's facilities, however, had been placed in service and produced power without the "wrap up" work and "enhancements and deficiencies" work, demonstrating that these items were not essential to the SJRPP's ability to produce power when this unit was placed in service.

Similarly, we find that the power plant property in Consumers Power Co. is distinguishable from petitioner's "wrap up" work and "enhancements and deficiencies" work. In Consumers Power Co., even though the reservoir was used in preoperational testing, the hydroelectric plant was unable to produce power for commercial purposes until the testing was completed the following year. Because the taxpayer in Consumers Power Co. needed both the reservoir and the pump storage facility to produce power according to its intended function, the unit was not placed in service until both components were functional. Here, the SJRPP Unit 1 and the common facilities were placed in service in 1987, which was before the completion of the "wrap up" work and "enhancements and deficiencies" work. As these components were not necessary, or integral, to the production of power when Unit 1 and the common facilities were placed in service, the "wrap up" work and "enhancements and deficiencies" work do not qualify as a single property with Unit 1 and the common facility for purposes of the self-constructed property transitional rule.

Petitioner argues that the "wrap up" work and "enhancements and deficiencies" work serve no function on their own, and therefore, constitute a single unit of property with SJRPP Unit 1. We find it irrelevant that these components have no independent purpose because Unit 1 and the common facilities at the SJRPP were already placed in service and performed their designed function without these components. When Unit 1 and the common facilities were placed in service, these items formed a complete unit that served the intended purpose of producing power; these components functioned without the "wrap up" work and "enhancements and deficiencies" work. See Consumers Power Co. v. Commissioner, supra at 725. While the "wrap up" work and "enhancements and deficiencies" work might be necessary to the production of power at the SJRPP at some date in the future, these components were not essential on the date Unit 1 and the common facilities were placed in service.

Because the SJRPP Unit 1 and the common facilities were placed in service and produced power in a year before the "wrap up" work and "enhancements and deficiencies" work was completed, we conclude that these latter components constitute separate property. Petitioner makes no argument that the "wrap up" work and "enhancements and deficiencies" work qualify as self-constructed property independently from the SJRPP Unit 1 and the common facilities. As a result, petitioner has not shown that it

committed or incurred by December 31, 1985, the lesser of $1 million or 5 percent of the cost of property consisting of the "wrap up" work and "enhancements and deficiencies" work and therefore does not meet the requirements of TRA section 203(b)(1)(B).

TRA section 203(b)(1)(B) also requires that a taxpayer had to begin construction of the property for which it seeks an ITC by December 31, 1985. The conference report clarifies when construction begins for purposes of TRA section 203(b)(1)(B). Construction of a facility or equipment begins when "physical work of a significant nature starts." H. Conf. Rept. 99-841 (Vol. II), supra at II-56, 1986-3 C.B. (Vol. 4) at 56. "Physical work does not include preliminary activities such as planning or designing, * * * researching, or developing." Id. When the property at issue is a building, "'property' includes all of the normal and customary components that are purchased from others and installed without significant modification". Id. As we have previously held, petitioner cannot meet this requirement by treating the "wrap up" work and "enhancements and deficiencies" work as one property with Unit 1 and the common facilities at SJRPP.

Mr. Reid testified that "ER4110 was the ER that was opened as the wrap ER * * * to do the remaining construction items under unit 1 and common [facility]." This ER was first authorized on

July 22, 1988. With respect to the "wrap up" work, we find that petitioner did not begin construction by December 31, 1985, because this work was not authorized until 1988.

Similarly, Mr. Reid testified that the work orders for the "enhancements and deficiencies" work were authorized in 1989. With respect to the "enhancements and deficiencies" work, we find that petitioner did not begin construction by December 31, 1985, because this work was not authorized until 1989.

We hold that petitioner is not entitled to an ITC under TRA section 203(b)(1)(B) for the "wrap up" work and "enhancements and deficiencies" work because it did not incur or commit the lesser of $1 million or 5 percent of the cost of the property by December 31, 1985, and did not begin construction until after December 31, 1985.

2. Distribution and Transmission Substations

Petitioner seeks an ITC under the self-constructed property transitional rule for costs incurred for the components of the distribution and transmission substations during the 1988, 1989, and 1990 taxable years of $3,264,386, $8,091,517, and $4,413,670, respectively. Petitioner asserts that "Each Distribution and Transmission Substation constitutes one functionally integrated piece of property comprised of all its component parts, as evidenced by its original designs and plans, and its ultimate construction and use in FPL's business." As functionally

integrated pieces of property, petitioner argues that the components at issue satisfy the requirements of TRA section 203(b)(1)(B). Respondent argues that these component parts constitute separate pieces of property, which fail to satisfy the requirements of TRA section 203(b)(1)(B).

We find that petitioner misinterprets the single property rule to allow components to constitute a single piece of property when "all of the component sections and related substations were planned and designed to serve a specific, integrated function". As we discussed in the analysis of the SJRPP "wrap up" work and "enhancements and deficiencies" work, Haw. Indep. Refinery, Inc. and Consumers Power Co. hold that components make up a single unit of property when each component is necessary for the unit to operate as intended at the time that the unit is placed in service. Petitioner's components differ from those in Haw. Indep. Refinery, Inc. and Consumers Power Co. because petitioner's substations performed their intended function when they were placed in service several years before the addition of the components at issue.

Because the relevant facts for each component at issue are very similar, we shall not address each item individually.[119] We shall use the Alva substation as a representative example. The

---

[119] See appendix A for a list of the distribution and transmission substation components for which petitioner seeks an ITC.

Alva substation was commercially operational in 1980; however, FPL installed the second transformer at this substation at least 8 years later.  Although FPL originally designed the Alva substation as a two-transformer substation, petitioner installed the second transformer only when growth and reliability concerns demanded the additional transformer.  Because the substation operated for an extended period of time without the components at issue, these components were not required or essential to the substation's ability to produce power.  See Armstrong World Indus., Inc. v. Commissioner, 974 F.2d at 434 ("if a project has component parts which can function as planned in a wholly independent manner, then a court may find that each component is a 'property . . . placed in a condition or state of readiness and availability for a specifically assigned function.'")  The second transformer improved FPL's service.  While additional components may have been integral to the production of power at a later date, these components were not necessary for the production of power when the substations were placed in service.  As improvements, these components may allow petitioner to provide better service to its customers; however, the transitional rules establish a higher threshold than improving existing equipment.  Because the distribution and transmission substations were placed in service and operational in years before the installation of the components at issue, we conclude that these components

constitute separate property. Petitioner makes no argument that the distribution and transmission substation components at issue qualify as self-constructed property independently from the substations.

As a result, we find that petitioner did not incur or commit $1 million or 5 percent of the construction costs by December 31, 1985. Even though petitioner's original plan for these substations included the components at issue, petitioner provided no evidence that it actually incurred any costs for these components before 1986. Also, petitioner failed to offer any evidence showing that it had a binding obligation, or a commitment, to pay the construction costs for these components.

Similarly, we find that petitioner failed to establish that the construction of the distribution and transmission substation components began by December 31, 1985. For example, the ER authorizing the construction of the second transformer at the Alva substation was not authorized until late 1986/early 1987. Mr. Veronee testified that petitioner did not begin construction of a component before the budget items and expenditure requisitions were authorized. Further, petitioner did not provide any evidence to suggest that it did not follow this procedure when it installed the components at issue. As a result, we find that petitioner did not begin construction at the

Alva substation before 1986.  As with the Alva substation, FPL did not have authorization to construct the other components at issue as of December 31, 1985.[120]

Because petitioner did not incur or commit the lesser of $1 million or 5 percent of the construction costs of the property by December 31, 1985, and did not begin construction as of December 31, 1985, we hold that petitioner is not entitled to an ITC for the distribution and transmission substation components under the "self-constructed property" rule.

3.   Transmission Line Systems

Petitioner claims an ITC for costs incurred for the components that it added to the Jensen-Midway-Turnpike and the Andytown-Lauderdale transmission lines.[121]  With respect to the Jensen-Midway-Turnpike transmission line, petitioner placed property in service with tax bases of $119,911 and $3,109,573 in the 1989 and 1990 taxable years, respectively.  With respect to

---

[120] See appendix A, which lists the distribution and transmission substation components at issue and the authorization date as stated on its expenditure request.

[121] Specifically, petitioner claims an ITC for the following components of the Jensen-Midway-Turnpike transmission line: (1) Turnpike substation--install third-feeder position; (2) Turnpike substation--add a third 230-kV line terminal; and (3) Crane-Turnpike 230-kV line--construct a new line.

For the Andytown-Lauderdale transmission line, petitioner claims an ITC for the following components:  (1) Hiatus-Melaleuca 230-kV line construction; (2) Andytown-Trace 230-kV construction; (3) Andytown Sub-add 230-kV Lauderdale #4 Terminal; and (4) Lauderdale plant-revise relay for 230-kV Andytown.

the Andytown-Lauderdale transmission line, petitioner placed property in service with tax bases of $6,436,912, $545,188, and $16,707 in 1988, 1989, and 1990 taxable years, respectively. Petitioner claims that these transmission lines were essential components to the Jensen-Midway-Turnpike and Andytown-Lauderdale substations; therefore, the costs incurred and construction date requirements of TRA section 203(b)(1)(B) must be analyzed from the perspective of the transmission line system.

Respondent argues that the transmission line components constitute separate property from the transmission line system. As a separate property, respondent asserts that petitioner failed to incur or commit any costs before January 1, 1986, and that the construction of these components had not begun before that date. We agree with respondent.

Components will constitute a single property when all parts are functionally interdependent and essential to the operation of the unit as a whole when the unit becomes operational. Armstrong World Indus., Inc. v. Commissioner, 974 F.2d at 434; Haw. Indep. Refinery, Inc. v. United States, 697 F.2d at 1069; Consumers Power Co. v. Commissioner, 89 T.C. at 726. We find that the Jensen-Midway-Turnpike and the Andytown-Lauderdale transmission line components constitute separate property.

Unlike Haw. Indep. Refinery, Inc., where the refinery's function depended on the offsite components, petitioner received

power using the transmission line systems before the installation of the components at issue.  When a unit of property has been placed in service and is available to perform its intended function, component parts added to the unit after it has been placed in service constitute separate pieces of property.  See Armstrong World Indus., Inc. v. Commissioner, supra at 434-435. The fact that the transmission line systems received power before petitioner installed these components indicates that the Jensen-Midway-Turnpike and the Andytown-Lauderdale transmission lines functioned properly without the additional components at issue. Instead, the components at issue enhanced the reliability of the Jensen-Midway-Turnpike and the Andytown-Lauderdale transmission lines, helping petitioner meet the growing demand for power.[122]

---

[122] Mr. Sanders testified:

The dispatch of the resources to serve the load changes over time, and the facilities that you would place in service, say, initially to receive the power may not be all that's required to receive the power forever or through the duration of whatever period of time you plan on buying power.  As time marches on, the dynamics of the resources serving the load change.

Part of system planning is to continually review the plans that we have for expansion and decide whether or not it's prudent to add a particular facility at a particular point in time or not.  We may think we need A, B, C, D pieces, but we only need A and B to begin with, and part of planning is to continually reevaluate that plan and to decide whether or not you really need C and D * * *

Noell v. Commissioner, 66 T.C. 718 (1976), is
distinguishable from petitioner's case.  In Noell, the taxpayer
sought an ITC for a runway that he constructed on his property.
Id. at 719.  The construction of the paved runway began in 1965
and finished in 1968.  Id. at 721.  The runway consisted of three
base layers of rock and two layers of asphalt.  Id.  After the
rock base layers were installed in 1967, some planes used the
runway, but the roughness of the rock surface made it
unsatisfactory for permanent use, and pilots risked damaging
their planes by landing on the runway.  Id. at 721, 729.  In
addition, it was usable only in good weather.  The Commissioner
argued that the runway was placed in service in 1967 when the
rock surface allowed planes to use the landing strip.  Id. at
728.  The Court rejected this argument, reasoning that the rock
surface could not be used on a permanent basis, and that it "was
clearly only a stage in the construction of the facility."  Id.
at 729.  The Court found that the runway was placed in service in
1968, when the paved runway was in full service.  Id.

Unlike the temporary runway in Noell, FPL installed the
original equipment for the Jensen-Midway-Turnpike and the
Andytown-Lauderdale transmission lines to receive power
permanently.  The transmission lines were not temporary or works
in progress.  By subsequently adding the components in issue,
petitioner sought to enhance the existing transmission line

systems to satisfy increased demand and to improve reliability. The initial transmission line equipment was a completed unit that performed its intended purpose when petitioner placed it in service. The equipment for which petitioner claims an ITC constitutes an expansion or improvement to the original transmission lines.

Petitioner makes no argument that the components in issue qualify as self-constructed property independently from the Jensen-Midway-Turnpike and the Andytown-Lauderdale transmission lines.

We find that petitioner failed to incur or commit the lesser of $1 million or 5 percent of the construction costs by December 31, 1985. The costs to construct the Jensen-Midway-Turnpike transmission line components were authorized in late 1988/early 1989. Similarly, the Andytown-Lauderdale transmission line components were authorized in late 1986/early 1987.

In addition, petitioner argues that it had committed to the construction costs in its Application for Corridor Certification Under the State of Florida Transmission Line Siting Act.[123] We find nothing in the approved application that obligates petitioner to begin construction in the future or to make any future payments for the construction costs of the transmission

---

[123] We note that the application offered into evidence refers only to the Jensen-Midway-Turnpike transmission line.

lines.  We agree with respondent that "a granted application only constitutes permission to proceed" with the construction of the transmission lines, not a binding contract to incur the construction costs.  Petitioner further relies on Mr. Saunders's testimony that it was "not likely" that FPL would abandon the completion of the transmission lines after its certificate received approval.  While it may have been unlikely that FPL would have abandoned these plans to construct the transmission lines at issue, Mr. Saunders's testimony does not indicate that FPL had incurred any costs or had a binding obligation to incur these costs.

Additionally, TRA section 203(b)(1)(B) mandates that a taxpayer begin construction as of December 31, 1985, to receive an ITC under the "self-constructed property" transitional rule.  FPL generally does not begin construction before an expenditure requisition has been authorized.  The expenditure requisitions that relate to these items indicate that petitioner authorized the construction of the transmission lines after December 31, 1985.[124]

---

[124] The following table lists the transmission components at issue and the authorization dates stated on the expenditure requests:

| Transmission Line Component | Year Authorized | Expenditure Requisition |
| --- | --- | --- |
| Crane-Turnpike 230-kV line | 1989 | ER 5366 |

(continued...)

Also, the expenditure requisitions that relate to the transmission line components refer to budget items.  With the exception of the budget item for the Hiatus-Melaleuca 230-kV line,[125] each budget item states that petitioner planned to begin construction after December 31, 1985.[126]  We find that petitioner

---

[124](...continued)

| | | |
|---|---|---|
| Third feeder-<br>  Turnpike Substation | 1988 | ER 4512 |
| Third 230-kV line-<br>  Turnpike substation | Late 1988/early 1989 | ER 5056 |
| 230-kV line-<br>Andytown-Trace | Late 1986 | ER 1333 |
| Lauderdale #4 terminal-<br>  Andytown substation | 1987 | ER 1645 |
| 230-kV line-Andytown | 1987 | ER 1676 |
| 230-kV line-Hiatus-<br>  Melaleuca | 1986 | ER 1332 |

[125] ER 1332, which authorizes expenditures for the Hiatus-Melaleuca 230-kV line, refers to BI 254.  BI 254 states that the "Date work to be started" is November 1985.

[126] ER 5366, which authorizes expenditures for the Crane-Turnpike 230-kV line, refers to BI 206.  BI 206 states that the "Date work to be started" is September 1989.

ER 1333, which authorizes expenditures to construct the 230-kV Andytown-Trace line, refers to BI 246.  ER 1645, which authorizes expenditures to construct the Lauderdale #4 terminal at the Andytown substation, also refers to BI 246.  ER 1676, which authorizes expenditures to install relay equipment for the 230-kV line at Andytown, refers to BI 246.  BI 246 states that the "Date work to be started" is July 1987.

BI 634, relating to the third-feeder position and the third 230-kV line at the Turnpike substation, was not offered into evidence.  "[T]he failure of a party to introduce evidence within his possession and which, if true, would be favorable to him,
(continued...)

did not begin construction of the transmission line components at issue by December 31, 1985.

We hold that petitioner is not entitled to an ITC under TRA section 203(b)(1)(B) for the Jensen-Midway-Turnpike or the Andytown-Lauderdale transmission lines because it failed to incur or commit the $1 million or 5 percent of the construction costs by December 31, 1985, and petitioner did not begin construction of the components at issue before 1986.

4.    "Backfit" Items at St. Lucie

Petitioner claims an ITC for the following "backfit" items at the St. Lucie nuclear power plant facility:  (1) The underwater intrusion system; (2) the condensate polisher tie line; and (3) the instrument air upgrade.  Petitioner seeks an ITC for the cost of the underwater intrusion system of $338,665 in the 1990 taxable year.  Petitioner seeks an ITC for the costs incurred for the condensate polisher tie line during the 1989 and 1990 taxable years of $3,826,317 and $388,906, respectively. Petitioner also seeks ITCs for the costs of the instrument air upgrade property in the 1988, 1989, and 1990 taxable years of $1,541,721, $1,717,941, and $316,912, respectively.  Petitioner

---

[126](...continued)
gives rise to the presumption that if produced it would be unfavorable."  Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Thus, we conclude that BI 634 would have shown that petitioner began construction of the third-feeder position and the third 230-kV line at the Turnpike substation after Dec. 31, 1985.

makes no argument that these backfit items qualify as self-constructed property independently from St. Lucie Units 1 and 2. Respondent argues that FPL satisfies the requirements of TRA section 203(b)(1)(B) only by "bootstrapping" these items to St. Lucie Units 1 and 2.

### a.   Underwater Intrusion System

In arguing that the underwater intrusion system qualifies for the self-constructed property transitional rule, petitioner relies on Steelcase, Inc. v. United States, 76 AFTR 2d 5185, 95-2 USTC par. 50,336 (W.D. Mich. 1995). In Steelcase, the taxpayer began building its "Corporate Development Center" in October 1985. Id. On December 13, 1985, the taxpayer temporarily stopped construction to redesign the shape of the building. Id. The taxpayer continued construction using a new design on April 7, 1986. Id. The court found that the taxpayer was entitled to an ITC under the self-constructed property rule, reasoning that the self-constructed property rule does not prohibit the taxpayer from making modifications. Id. While the binding contract rule and the equipped-building rules specifically forbid taxpayers from making substantial modifications after the transition date, the self-constructed property rule does not include a similar restriction. Id. By failing to include this language, Congress chose not to limit modifications under the self-constructed property rule. Id.

We find that the underwater intrusion system is separate property for purposes of TRA section 203(b)(1)(B).  We disagree with petitioner that Steelcase supports a finding that the underwater intrusion system is entitled to an ITC under the self-constructed property rule.

Although Steelcase acknowledges that a taxpayer may modify construction plans and still qualify for an ITC for its self-constructed property, we do not think that this case applies to FPL's underwater intrusion system.  In Steelcase, the taxpayer redesigned the "Corporate Development Center" in the early stages of construction and before the building operated as the corporation's headquarters.  Petitioner, however, redesigned the underwater intrusion system after St. Lucie Units 1 and 2 became operational.

St. Lucie was placed in service and functioned as a power plant before the underwater intrusion system was redesigned and installed; therefore, the redesigned system was not integral or necessary to the operation of the plant.  See Armstrong World Indus., Inc. v. Commissioner, 974 F.2d at 434-435.  Because the redesigned underwater intrusion system was not essential for St. Lucie to produce power, we find that the system constitutes separate property.  See Haw. Indep. Refinery, Inc. v. United States, 697 F.2d at 1069; Consumers Power Co. v. Commissioner, 89 T.C. at 726.  Because we have found that the redesigned

underwater intrusion system constitutes separate property, the system must satisfy the requirements of TRA section 203(b)(1)(B) independently from St. Lucie Units 1 and 2.

As a result, we find that petitioner failed to incur or commit $1 million or 5 percent of the construction costs of the redesigned underwater intrusion system before December 31, 1985. ER 4866, which was not approved until late 1988/early 1989, authorized FPL to construct the underwater intrusion system. We find that FPL did not begin construction before December 31, 1985, because petitioner did not receive authorization for the redesigned underwater intrusion system until late 1988/early 1989. We find that the underwater intrusion system does not qualify for an ITC under the self-constructed property rule because petitioner failed to incur or commit $1 million or 5 percent of the construction costs as of December 31, 1985, and petitioner did not begin construction of the system as of December 31, 1985.

b.    Condensate Polisher Tie Line

Petitioner contends that the condensate polisher tie line qualifies for an ITC under the self-constructed property transitional rule. Petitioner asserts that the condensate polisher tie line and St. Lucie Unit 2 constitute a single unit of property. Respondent argues that these items constitute separate property, and that petitioner is not entitled to an ITC

under TRA section 203(b)(1)(B) because Unit 2 was placed in service before FPL built the condensate polisher tie line.

We disagree with petitioner, and find that the tie line constitutes separate property. Although a condensate polisher is necessary to prevent excessive corrosion in the steam generator, St. Lucie Unit 2 was placed in service and operated without the tie line system. Petitioner operated St. Lucie Unit 2 while it conducted a study to determine the best method for preventing corrosion, demonstrating that St. Lucie Unit 2 had an independent function before the completion of the condensate polisher tie line property in issue. See Armstrong World Indus., Inc. v. Commissioner, supra at 435-436. Petitioner states that the tie line was placed in service in 1989 and 1990. The parties stipulate that St. Lucie Unit 2 was operational in 1983. Unlike Haw. Indep. Refinery, Inc., where the oil refinery facility could not perform its function without the pipelines and the tanker-mooring facility, St. Lucie Unit 2 produced power years before the installation of the condensate polisher tie line.

Petitioner's condensate polisher tie lines are distinguishable from the "Corporate Development Center" in Steelcase, Inc. v. United States, supra. In Steelcase, the design modification took place during the construction of the building, which had not been placed in service. In this case, petitioner built St. Lucie Unit 2, placed it in service, and then

redesigned and installed the condensate polisher tie line. We find that St. Lucie Unit 2 and the condensate polisher tie lines are separate properties.

We find that petitioner did not incur or commit $1 million or 5 percent of the costs for the condensate polisher tie line as of December 31, 1985.[127] ER 195, which was processed in 1987, authorized the condensate polisher tie line at St. Lucie Unit 2. We find that petitioner failed to begin construction before January 1986. We hold that petitioner is not entitled to an ITC with respect to the condensate polisher tie line.

###### c. Instrument Air Upgrade

The final backfit item for which petitioner seeks an ITC is the instrument air upgrade system. Petitioner argues that the St. Lucie power plant's original design included the instrument air system. Further, petitioner asserts that the self-constructed property rule provides relief from the ITC repeal for the redesign of an essential component. Respondent argues that the instrument air upgrade system constitutes a separate piece of property from St. Lucie Units 1 and 2 because these power plants operated for several years without the instrument air upgrade.

---

[127] A condensate polisher was included in the design plan for St. Lucie Units 1 and 2. Petitioner, however, did not install the condensate polisher tie line at Unit 2 as designed, but instead, FPL conducted a study to determine the need for the condensate system. FPL's engineers recommended the condensate polisher tie lines in a November 1985 study, and FPL's corporate staff agreed to the engineering recommendation in January 1986.

Because the system constitutes separate property, respondent argues that petitioner failed to incur or commit $1 million or 5 percent of costs as of December 31, 1985, and failed to begin construction as of that date.

Petitioner relies on Steelcase, Inc. v. United States, 76 AFTR 2d 5185, 95-2 USTC par. 50,336 (W.D. Mich. 1995), to support its argument that "The redesign of 'property' during construction simply does not create separate 'property' as Respondent suggests." We find that the building in Steelcase is distinguishable from petitioner's instrument air upgrade. The taxpayer in Steelcase redesigned its building after construction had begun and before the completion of the building, while petitioner placed the instrument air system in service in St. Lucie Units 1 and 2 when they became operational, and then redesigned the system several years later. The rationale of Steelcase, which found that property could qualify as self-constructed property when a taxpayer made design modifications during construction, does not allow taxpayers to redesign property after the transition date when it has placed the facility in service and then decides to reconstruct the component at a later date. Because St. Lucie Units 1 and 2 were placed in service and operated before the installation of the instrument air upgrade, we think that the components at issue constitute separate property. Armstrong World Indus., Inc. v. Commissioner,

974 F.2d at 435-436; <u>Haw. Indep. Refinery, Inc. v. Commissioner</u>, 697 F.2d at 1069.

We find that petitioner failed to incur or commit $1 million or 5 percent of the construction costs for the instrument air system upgrade as of December 31, 1985.  In the fall of 1985, ER 9009 was approved for the instrument air upgrade at St. Lucie Unit 1 of $692,000.  However, this ER indicates that petitioner only received authorization to incur $692,000 to upgrade the instrument air system.  TRA section 203(b)(1)(B) demands that a taxpayer actually incur the expenses to construct its property, or that a taxpayer commit to such construction costs in the future.  Here, petitioner simply received authorization to expend funds of the construction for the instrument air upgrade; petitioner did not become liable for the instrument air system upgrade costs when it received this authorization.

Petitioner began construction of the instrument air upgrade at St. Lucie Unit 1 on October 16, 1985.  Construction of the instrument air upgrade at St. Lucie Unit 2 began on May 12, 1986. While petitioner has satisfied the construction date requirement with respect to St. Lucie Unit 1, it failed to begin construction of St. Lucie Unit 2 as of December 31, 1985.

Accordingly, we hold that petitioner is not entitled to an ITC for the instrument air system upgrade because it failed to incur or commit $1 million or 5 percent of the construction costs

of the instrument air upgrade at Units 1 or 2 as of December 31, 1985, and it failed to begin construction of the system at Unit 2 as of December 31, 1985.

    5.   <u>Spent Fuel Rack Systems</u>

Petitioner also claims an ITC for the costs of the spent fuel rack systems installed at St. Lucie Unit 1 and Turkey Point Unit 4 (spent fuel racks in issue) during the 1988, 1989, and 1990 taxable years of $6,713,729, $532,892, and $6,646,960, respectively. Petitioner contends that the spent fuel rack system was conceived, designed, and constructed as a unit, and that the spent fuel racks at St. Lucie and Turkey Point nuclear power plants constitute a single functionally integrated property. Respondent argues that the spent fuel racks in issue and the already existing spent fuel racks at St. Lucie Unit 2 and Turkey Point Unit 3 constitute separate property; and therefore, petitioner failed to (1) incur or commit any costs before 1986, or (2) begin construction before 1986.

Petitioner relies on the testimony of Mr. Bible, FPL's engineering manager, to support its contention that the spent fuel racks constitute a single property. Specifically, Mr. Bible testified:

> We have in the past had the licenses and we have
> transferred fuel from one pool to the other. The
> designs are such that they can accommodate fuel from
> either unit.

        *     *     *     *     *     *     *

Q:   Do FPL's nuclear engineers such as yourself view the total capacity of both spent fuel pools at each of the nuclear power facilities as available for the storage of any spent fuel generated at that facility?

A:   Yes, with any of our design activities, we're looking at spent fuel storage capability.  We consider the sum total of the pools as the useable inventory.

We find that the spent fuel racks in issue and the spent fuel racks at St. Lucie Unit 2 and Turkey Point Unit 3 are separate properties.  The spent fuel racks added at St. Lucie Unit 1 and Turkey Point Unit 4 increase FPL's overall storage capacity.  While the spent fuel racks in issue might have become necessary or essential at some future date, components constitute a single unit of property only when they are necessary for the unit to perform its intended function at the time the unit is placed in service.  See Armstrong World Indus., Inc. v. Commissioner, 974 F.2d at 432, 434; Consumers Power Co. v. Commissioner, 89 T.C. at 725.  Here, the nuclear power plants and the respective spent fuel rack systems operated before the installation of the spent fuel racks in issue.  Once petitioner placed operational spent fuel racks into service, any subsequent racks added to the power plants constitute separate units of property.

Further, the fact that the spent fuel rack system is designed to "accommodate" fuel from another unit fails to show that the units are functionally interdependent.  Although the

flexibility created by interchangeable spent fuel racks may make these items more useful to petitioner, we do not think that this feature makes the spent fuel racks interdependent or essential to the other racks.  Because the spent fuel racks at St. Lucie Unit 2 and Turkey Point Unit 3 were placed in service before the components in issue, we conclude that the spent fuel racks in issue constitute separate property.  As a result, we find that petitioner did not incur or commit $1 million or 5 percent of the construction costs for the spent fuel racks at St. Lucie Unit 1 or Turkey Point Unit 4 as of December 31, 1985.

We also find that petitioner did not begin construction of the spent fuel racks in issue as of December 31, 1985.  ER 9304 indicates that petitioner authorized construction of the spent fuel racks at St. Lucie Unit 1 in January or February 1986.  This ER refers to BI 190, which describes the spent fuel storage racks planned for St. Lucie Unit 1 and states that "Date work to be started January, * * * 1986".  We find that petitioner began construction of the spent fuel racks at St. Lucie Unit 1 after December 31, 1985.

With respect to the spent fuel racks at Turkey Point Unit 4, ER 1760 authorized the construction of the spent fuel racks at Turkey Point Unit 4 in March 1987.  ER 1760 refers to BI 198; however, this budget item is not contained in the record.  We believe that petitioner did not begin construction of the spent

fuel racks before it received authorization to expend funds on these items. We find that petitioner began construction of the spent fuel racks at Turkey Point Unit 4 after December 31, 1985.

Accordingly, we hold that petitioner is not entitled to an ITC under TRA section 203(b)(1)(B) for the spent fuel racks at St. Lucie Unit 1 and Turkey Point Unit 4 because petitioner did not incur or commit the lesser of $1 million or 5 percent of the cost of the property by December 31, 1985, and petitioner did not begin construction until after December 31, 1985.

E.   TRA Section 203(b)(1)(C)--"Plant Facility Rule"

In affording relief from the ITC repeal, section 49(e) incorporates the transitional rule provided in TRA section 203(b)(1)(C), known as the equipped building/plant facility rule. Specifically, TRA section 203(b)(1)(C) provides:

> (1) In general.-- The amendments made by section 201 shall not apply to--
>
> *     *     *     *     *     *     *
>
> (C) an equipped building or plant facility if construction has commenced as of [December 31, 1985] ~~March 1, 1986~~,[128] pursuant to a written specific plan and more than one-half of the cost of such equipped building or facility has been incurred or committed by such date.

TRA section 203(b)(4) defines "plant facility" as follows:

> (4) Plant facility.--For purposes of paragraph (1), the term "plant facility" means a facility which

---

[128] See supra note 99.

does not include any building (or with respect to which buildings constitute an insignificant portion) and which is--

    (A) a self-contained single operating unit or processing operation,

    (B) located on a single site, and

    (C) identified as a single unitary project as of [December 31, 1985] ~~March 1, 1986~~.[129]

TRA section 203(b)(1)(C) mandates that a taxpayer construct a plant facility "pursuant to a written specific plan". The statute and the regulations fail to define the term "written specific plan"; however, the legislative history explains why Congress included this requirement in the plant facility transitional rule. According to the conference report: "The plan referred to must be a definite and specific plan of the taxpayer that is available in written form as evidence of the taxpayer's intentions." H. Conf. Rept. 99-841 (Vol. II), <u>supra</u> at II-57, 1986-3 C.B. (Vol. 4) at 57. The two words "written" and "specific" modify the word "plan" to ensure that taxpayers have physical evidence that memorializes their intent to construct the specific items for which they claim the ITC. <u>Id.</u> We look to the plain meaning of the word "specific". Black's Law Dictionary 1434 (8th ed. 2004), defines the word "specific" as

---

[129] See <u>supra</u> note 99.

"Of, relating to, or designating a particular or defined thing; explicit".

Petitioner argues that TRA section 203(b)(1)(C) provides relief from the ITC repeal for the following items: (1) The "backfit" items at St. Lucie nuclear power plant; (2) the "wrap up" work and "enhancements and deficiencies" work at the SJRPP; and (3) the equipment installed at the distribution and transmission substations. Respondent argues that petitioner is not entitled to an ITC for these items because petitioner (1) failed to offer evidence of written specific plans, (2) did not begin construction by December 31, 1985, and (3) did not incur or commit more than one-half of construction costs by December 31, 1985.

1. "Backfit" Items at St. Lucie

In asserting that FPL is entitled to an ITC for the "backfit" items, petitioner specifically lists the following properties that qualify under the plant facility exception: (1) The underwater intrusion system; (2) the condensate polisher tie line; and (3) the instrument air system upgrade. Petitioner asserts that the construction plan for St. Lucie Units 1 and 2 satisfies the "written specific plan" requirement of the plant facility rule. St. Lucie Units 1 and 2 were placed in service in 1976 and 1983, respectively. The underwater intrusion system property was placed in service during the 1990 taxable year with

a tax basis of $338,665. The condensate polisher tie line was placed in service during the 1989 and 1990 taxable years with tax bases of $3,826,317 and $388,906, respectively. The instrument air upgrade property was placed in service during the 1988, 1989, and 1990 taxable years with tax bases of $1,541,721, $1,717,941, and $316,912, respectively. Respondent argues that petitioner fails to satisfy the written specific plan requirement because the one-page plot plan does not specifically identify the "backfit" items at the St. Lucie Units 1 and 2. We conclude that petitioner failed to introduce a "written specific plan" for the "backfit" items. Although the parties stipulate that the one-page plot plan constituted construction plans for the St. Lucie Units 1 and 2, petitioner has failed to prove that the plan satisfies the specificity required by TRA section 203(b)(1)(C). Mr. Paduano, a retired FPL manager,[130] testified that the construction plan identifies "the top view of the power plant showing the major buildings and some of the major equipment and the general layout locations of those equipments and buildings"; however, he further testified that this document does not specifically identify the "backfit" items at issue. Mr. Paduano testified that petitioner constructed St. Lucie Units 1 and 2 using "tens of thousands of drawings for this site plan";

---

[130] Mr. Paduano worked on a "broad area of projects", primarily resolving "technical issues and plan modifications and backfit."

however, petitioner failed to introduce any drawings detailing the "backfit" items.

Because the construction plans for St. Lucie Units 1 and 2 lacked the precise detail necessary to identify the "backfit" items, these plans fail to satisfy the requirements of the plant facility rule. While TRA section 203(b)(1)(C) requires a "specific" plan, petitioner's plot plan neither specifically identifies any of the "backfit" items nor identifies the location of these items at St. Lucie nuclear plant. Although Mr. Paduano testified that petitioner has specific drawings for these items, petitioner failed to introduce these drawings into evidence.

Absent written plans that precisely and unambiguously identify the "backfit" items, we hold that petitioner's plot plan lacks the specificity required by TRA section 203(b)(1)(C). The underwater intrusion system, the condensate polisher tie line, and the instrument air system upgrade do not qualify as transition property under TRA section 203(b)(1)(C).

2. "Wrap up" Work and "Enhancements and Deficiencies" Work at the SJRPP

Petitioner contends that the SJRPP "wrap up" work and "enhancements and deficiencies" work qualify for the plant facility rule of TRA section 203(b)(1)(C). This property was placed in service during the 1988, 1989, and 1990 taxable years with tax bases of $1,702,649, $2,376,238, and ($360,804), respectively. Respondent argues that the SJRPP items do not

qualify under TRA section 203(b)(1)(C) because petitioner failed to introduce a written specific plan and failed to incur or commit more than one-half of the construction costs by December 31, 1985.

a.   Written Specific Plan

Petitioner and respondent agree that the SJRPP was built pursuant to written specific plans.  However, respondent contends that petitioner fails to meet the written specific plan requirement of TRA section 203(b)(1)(C) because petitioner failed to proffer any plans, drawings, blueprints, etc., verifying its intentions to construct these items as of December 31, 1985.

Petitioner offered the testimony of Mr. Reid, a lead project scheduler for petitioner, that FPL constructed the SJRPP using more than 70,000 drawings.  He testified that specific plans were used for even the smallest components of the SJRPP's construction.  However, petitioner offered into evidence only the general maintenance drawings for the SJRPP.

TRA section 203(b)(1)(C) expressly requires that a taxpayer construct a plant facility pursuant to a "written specific plan". The conference report indicates that this element is necessary to establish that a taxpayer intended to construct the item for which an ITC is claimed.  H. Conf. Rept. 99-841 (Vol. II), supra at II-57, 1986-3 C.B. (Vol. 4) at 57.

No doubt, petitioner constructed the SJRPP using extensive and specific drawings and diagrams. Yet the plan introduced by petitioner lacked the specificity necessary to identify the "wrap up" work and "enhancements and deficiencies" work. While petitioner argues that Mr. Reid linked each work order in issue to the original written plan, TRA section 203(b)(1)(C) requires that a taxpayer introduce an actual written plan that specifically identifies the items in order to receive the ITC under the plant facility rule. Without the "written specific plan", we cannot determine whether these items were part of the plans for the SJRPP as of December 31, 1985, or whether these specific items result from subsequent plans.

We also note that the plan introduced by petitioner is the seventh revision, dated after December 31, 1985. The exact date of the revision is illegible, but it appears to have been made in 1988. The conference report indicates that insignificant modification to the "written specific plan" will not jeopardize an ITC under the plant facility rule; however, significant revisions after December 31, 1985, will disqualify a plant facility construction from the relief provided by TRA section 203(b)(1)(C). H. Conf. Rept. 99-841 (Vol. II), supra at II-57, 1986-3 C.B. (Vol. 4) at 57. Petitioner failed to prove that these revisions were insignificant, and Mr. Reid testified that he did not know whether the revisions were significant.

We find that petitioner failed to offer into evidence a "written specific plan" relating to the "wrap up" work and "enhancements and deficiencies" work.

### b.    Costs Committed or Incurred

Even assuming arguendo that petitioner's plan satisfies the written specific plan requirement, we find that petitioner did not commit or incur one-half of the construction costs as of December 31, 1985.  Petitioner asserts that it satisfied this requirement because it was jointly obligated for the construction contracts entered into by the JEA.  Respondent argues that petitioner cannot incur or commit more than 20 percent of the construction costs to the SJRPP because petitioner owns only a 20-percent interest in the power plant.

While respondent relies on Payless Cashways, Inc. v. Commissioner, 114 T.C. 72 (2000), petitioner attempts to distinguishes its case from Payless Cashways.  In Payless Cashways, this Court examined the equipped building rule of TRA section 203(b)(1)(C).[131]  The Court found that the taxpayer did not "incur or commit" more than 50 percent of the costs because

---

[131] TRA sec. 203(b)(1)(C) provides the elements for both the equipped building and the plant facility transitional rules.  The conference report indicates that the elements of these two transitional rules have the same meaning.  See H. Conf. Rept. 99-841 (Vol. II), supra at II-57, 1986-3 C.B. (Vol. 4) at 57 (noting that the equipped building rule applies when there is a building and that the plant facility rule applies "where the facility is not housed in a building.").

the limited partnership incurred the expenses under the construction contract, not the taxpayer who was a limited partner. Id. at 82. "The TRA transitional provisions make no accommodation for attributing costs incurred by a limited partnership to the partners for the purpose of determining whether they have 'incurred or committed' costs." Id. Furthermore, the Court stated that even if the taxpayer could attribute the costs incurred, those costs attributable to the taxpayer would be limited to its percent interest in the partnership, which was approximately 16 percent. Id.

According to the agreement for joint ownership, construction and operation, the JEA and FPL agreed to own the SJRPP as tenants in common. The JEA owned an 80-percent undivided interest, and FPL owned a 20-percent undivided interest. The agreement provides that "The Co-owners shall pay into the Construction and Plant Account (i) in proportion to their Ownership Interests amounts of Costs of Construction and Costs of Plant incurred or accrued after the date of the Closing".

We agree with respondent that petitioner's 20-percent ownership interest in the SJRPP limits its costs incurred or committed to no more than 20 percent. Payless Cashways supports the finding that petitioner did not satisfy the costs incurred or committed requirement of the plant facility transitional rule.

We find <u>Payless Cashways</u> instructive because it notes that "if such attribution were proper, we would be unwilling to attribute to Payless more than 16.67 percent of the costs of construction, which was the extent of Payless' interest in the TPS, partnership." <u>Id.</u> at 82. In this case, we find that attribution to FPL is proper because petitioner incurred the expenses as a tenant in common, not as a partner. We follow the guidance of <u>Payless Cashways</u> by limiting the construction costs committed or incurred by petitioner to its percentage of ownership. Because FPL owned only a 20-percent interest in the SJRPP, its percentage of the construction costs is limited to 20 percent; therefore, FPL does not satisfy the plant facility requirement because it has not incurred or committed more than one-half of the construction costs.

Because petitioner failed to provide a written specific plan, and failed to incur or commit one-half of the construction costs, we hold that petitioner is not entitled to an ITC for the "wrap up" work and "enhancements and deficiencies" work at the SJRPP under TRA section 203(b)(1)(C).

### 3. Distribution and Transmission Substations

Petitioner claims that transformers and other equipment installed at the distribution and transmission substations qualify for ITCs under the plant facility transitional rule. The distribution and transmission substation components for which

petitioner claims ITCs were placed in service during the 1988, 1989, and 1990 taxable years with tax bases of $3,264,386, $8,091,517, and $4,413,670, respectively. Respondent contends that petitioner failed to introduce written specific plans. In addition, respondent asserts that these substations do not qualify for the plant facility rule because petitioner did not begin construction and did not commit to the construction costs by December 31, 1985.

### a. Written Specific Plan

We find that petitioner satisfies the "written specific plan" requirement of the plant facility transitional rule. Ken Veronee, a substation engineer for FPL, testified that the plot plans showed "the location and the number of the transformers" at the substations. At trial, Mr. Veronee specifically identified the equipment on each plot plan and testified that the equipment for which petitioner seeks an ITC was "within the scope" of the original plan.[132] The plot plans consist of diagrams that

---

[132] For the following substations, petitioner introduced the plot plans and Mr. Veronee testified that the transformers and other equipment at issue were included in these plans: Alva substation; Babcock substation; Cedar substation; Court substation; Broward and Crystal substations; Deltona substation; Dumfounding substation; Golden Gate substation; Hollybrook substation; Lakeview substation; Lewis substation; Lindgren substation; Miami Lakes substation; Milam substation; Park substation; Howard and Proctor substation; Remsburg substation; Rubonia substation; Saga substation; Southside substation; Springtree substation; St. Joe substation; Sweetwater substation; Willow substation; and Winkler substation.

specifically depict and locate the transformers at the distribution and transmission substations.

Respondent asserts that petitioner does not satisfy the "written specific plan" requirement because the "diagrams submitted by FPL included revisions after December 31, 1985." We disagree with respondent. As we noted, the conference report indicates that a taxpayer may modify the written plan as long as the modifications are not significant. H. Conf. Rept. 99-841 (Vol. II), supra at II-57, 1986-3 C.B. (Vol. 4) at 57. Mr. Veronee testified that the revisions made after December 31, 1985, reflect the original design for each substation. Because these modifications adhere to the original design, we believe that they are insignificant and allowable under TRA section 203(b)(1)(C).

Although Mr. Veronee testified that the Hiatus substation plot plan would have contained information similar to that in the other plot plans, petitioner did not introduce the plot plan for this substation. As a result, petitioner does not satisfy the "written specific plan" requirement for the Hiatus substation. For the remaining substations at issue, the plot plans satisfy the "written specific plan" requirement of TRA section 203(b)(1)(C) because the plans provide written diagrams of the substations and specifically identify the equipment that petitioner constructed.

b.   Commencement of the Construction

Petitioner argues that it began construction of each substation before December 31, 1985, and for each of the items at issue, construction commenced on the same date as the underlying substation.  Respondent argues that construction did not begin until after December 31, 1985, because the plant facility rule requires that the equipment at these substations must be analyzed separately from the original construction.

TRA section 203(b)(1)(C) requires that the construction of a plant facility must have commenced as of December 31, 1985, to qualify for relief from the ITC repeal.  Further, TRA section 203(b)(4) defines the term "plant facility" as a "single operating unit" and as a "single unitary project".

In a prior repeal of the ITC, plant facility transitional relief applied to each operating unit separately.  In OKC Corp. v. Commissioner, 82 T.C. 638, 658 (1984), this Court rejected the taxpayer's argument that the entire refinery, including the alkylation unit, constituted a plant facility.  In citing the legislative history, the Court indicated that Congress rejected this interpretation of a plant facility.  The Court stated: "'the fact that a single operating unit or processing operation is connected, by pipes, conveyor belts, etc., to one or more other units or processing operations in an integrated processing or manufacturing system does not cause the whole system to be a

plant facility.'" Id. at 653-654 (quoting S. Rept. 91-552, at 235 (1969), 1969-3 C.B. 423, 572, and citing similar language in H. Rept. 91-413 (Part 1), at 187, 1969-3 C.B. 200, 317). The refinery's operation did not depend on the alkylation unit, as demonstrated by its operation for several years before the construction of the alkylation unit. Id. at 654. The Court held that the alkylation unit itself, not the refinery as a whole, was the "plant facility" under section 49(b)(3) of the 1969 Code. Id.

Like the alkylation unit in OKC Corp. v. Commissioner, supra, petitioner's transformers and other equipment at issue are distinct from the original substation construction. The substations were placed in service and in operation before the installation of the items at issue.[133] For example, the Alva

---

[133] See appendix A, which provides the dates that petitioner approved the ER for each of the items at issue. Each substation and the date that it was placed in service or scheduled to be completed is as follows:

| Substation | Date |
| --- | --- |
| Alva | Sept. 1980 |
| Babcock | May 1985 |
| Cedar | June 1981 |
| Court | May 1981 |
| Crystal | Sometime between 1970 and 1972 |
| Deltona | July 1984 |
| Dumfoundling | Nov. 1982 |
| Golden Gate | Dec. 1983 |
| Hollybrook | 1988 |
| Lakeview | Mar. 1982 |
| Lewis | May 1972 |

(continued...)

substation operated for at least 8 years before petitioner added the equipment for which it claims an ITC. Because petitioner operated these substations for several years before the addition of the items at issue, we conclude that the transformers, not the entire substations, constitute the plant facilities for purposes of TRA section 203(b)(1)(C).

Because we find that the equipment at issue, not the entire substation, constitutes the plant facilities, petitioner had to commence construction of these items by December 31, 1985. Sec. 49(e); TRA section 203(b)(1)(C). The record reveals that construction of the items at issue did not begin by December 31, 1985. Mr. Veronee testified that FPL's procedure generally requires that both a budget item and an expenditure requisition receive approval before construction begins. For the items at issue, all of the expenditure requisitions received approval after the year 1985. See appendix A (listing the expenditure

---

[133](...continued)

| | |
|---|---|
| Lindgren | Sometime between 1971 and 1973 |
| Miami Lakes | Sometime between 1970 and 1972 |
| Milam | 1973 |
| Park | June 1986 |
| Proctor | Nov. 1984 |
| Remsburg | May 1984 |
| Rubonia | Nov. 1985 |
| Saga | June 1981 |
| Southside | May 1983 |
| Springtree | July 1980 |
| St. Joe | 1973 |
| Sweetwater | Sometime between 1980 and 1982 |
| Willow | Dec. 1982 |
| Winkler | June 1986 |

requisition approval dates).  We find that petitioner failed to begin construction by December 31, 1985, as required by the plant facility transitional rule.

### c.    Costs Committed or Incurred

Even assuming arguendo that petitioner had commenced construction as required by TRA section 203(b)(1)(C), we agree with respondent that FPL failed to incur or commit to the construction costs by December 31, 1985.  TRA section 203(b)(1)(C) requires that "more than one-half of the cost of such * * * facility has been incurred or committed by" December 31, 1985.  See sec. 49(e).

Petitioner asserts that it had committed to 100 percent of the construction costs, as evidenced by the plot plan.  We disagree.  We think that the plain meaning of "committed", as used in TRA section 203(b)(1)(C), requires that a taxpayer contract for, or be obligated to, the construction of the property.  See Webster's Third New International Dictionary 457 (1986) (defining "commit" as to "contract or bind by obligation to a particular disposition").

Although the plot plans provide for additional transformers that petitioner may install in the future, Mr. Veronee testified that the plans did not mandate that petitioner construct these additional items.  Mr. Veronee further testified that petitioner

would only install the additional transformers when increased demand required FPL to expand.  Mr. Veronee testified:

> Q.   And Florida Power & Light would have put the second transformer in <u>only when and if</u> growth reached the point where it was necessary?  [Emphasis added.]
>
> A.   That is correct.

These plans were projections for the future, which allowed FPL to expand its facilities to satisfy increased demand or to improve reliability.  While the plot plans allowed petitioner to add transformers and other equipment as needed, the plans did not obligate petitioner to construct any of these items.  Because petitioner was never bound to complete the projects outlined in the plot plans, we conclude that petitioner did not commit to one-half of the construction costs as of December 31, 1985, as required by TRA section 203(b)(1)(C).

Because petitioner failed to begin construction or commit to one-half of the construction costs as of December 31, 1985, we hold that TRA section 203(b)(1)(C) does not provide petitioner with relief from the ITC repeal for the distribution and transmission substations.

## Conclusion

We find that petitioner is not entitled to relief from the ITC repeal pursuant to section 49(e) and TRA sections 203 and 204.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.

Appendix A

Equipment Installed at Substations

The first column of the table shows the name by which FPL refers to the substations. The second column, "plot plan," depicts the year the first plot plan was created and the number of transformers shown on that plot plan. Generally, FPL initially installed fewer transformers on a substation than were depicted on the plot plan.[134] The third column provides the ER for which FPL seeks an ITC. That column is further broken down into four subcolumns: (1) The ER number; (2) the date approved;[135] (3) the amount authorized; and (4) how the money was expended.[136]

----

[134] For example, Mr. Veronee explained:

Again, on the plot plan we lay the [Alva] substation out for an ultimate two transformer station. Our distribution planning group said, you know, that we needed to buy this piece of property and the ultimate development of this substation.

Mr. Veronee explained that FPL always planned, designed, and intended the Alva substation to have a second transformer, but "It just took those seven or eight years for the load to grow in the area for reliability to require us to add that second transformer." His testimony was generally consistent with the other substations shown on our table.

[135] The ER's contain numerous areas for signatures. Typically, the ER was not signed by all of the individuals at the same time. Accordingly, we have listed the year(s) during which the ER was signed.

[136] Generally, Mr. Veronee testified that equipment added

(continued...)

| Substation Name | Plot Plan | | Expenditure Requisition | | | |
|---|---|---|---|---|---|---|
| | Year | # Transformers | ER No. | Date Approved | Amount | Equipment for which ITC Claimed |
| Alva | 1979 | 2 | 1772 | 1986/1987 | $514,752 | 2$^d$ transformer |
| Babcock | 1984 | 3 | 3643 | 1988 | 103,230 | 3$^d$ feeder |
| | | | 7228 | 1989/1990 | 558,171 | 4th feeder |
| Cedar | 1980 | – | 4198 | 1988 | 664,050 | 138-kV terminal line |
| Court | 1980 | 3 | 4023 | 1988 | 226,500 | 5th & 6th feeders |
| | | | 6035 | 1989 | 773,918 | 3$^d$ transformer |
| Crystal | 1970 | 3 | 2422 | 1987 | 121,000 | 5th feeder |
| | | | 7867 | 1989/1990 | 952,345 | 3$^d$ transformer |
| Deltona | 1983 | 3 | 4475 | 1990 | 733,616 | 2$^d$ transformer |
| Dumfoundling | 1971 | 3 | 3091 | 1987/1988 | 78,591 | 4th feeder |
| Golden Gate | 1982 | 3 | 5180 | 1988/1989 | 97,633 | 4th feeder |
| Hollybrook | 1985 | 3 | 6029 | 1989 | 2,214,158 | Construct substation, 2 transformers, 3 feeders |
| Lakeview | 1975 | 3 | 2459 | 1987 | 89,750 | 6th feeder |
| | | | 3740 | 1988/1989 | 92,000 | 7th feeder |
| Lewis | 1972 | 3 | 2534 | 1987 | 83,150 | 4th feeder |
| | | | 4635 | 1988 | 83,327 | 5th feeder |
| | | | 6810 | 1989/1990 | 597,503 | add transformer |
| Lindgren | 1970 | 4 | 2406 | 1987 | 94,138 | 9th feeder |

---

[136](...continued)
under each ER was within the original scope of that substation's plot plan. He testified that the installation of the equipment in those ERs was with the original scope of the plot plans, and that FPL was committed to install the number of transformers/feeders as depicted on the original plot plan for each substation.

Generally, the ERs explain that the expenditures for such equipment were needed because of increased load growth.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | 6882 | 1989/1990 | 113,129 | 10th feeder |
| Miami Lakes | 1971 | 4 | 4443 | 1988 | 1,625,900 | Construct 2 transformer section of substation |
| Milam | 1972 | 3 | 4024 | 1988 | [137]100,395 | 6th feeder |
| | | | 6036 | 1989 | 688,007 | 3d transformer |
| Park | 1985 | 2 | 4021 | 1988 | 108,124 | 3d feeder |
| | | | 6019 | 1989 | [138]696,--- | 2d transformer 4th feeder |
| Proctor | 1985 | 3 | 2044 | 1987 | 639,169 | 2d transformer & 3d feeder |
| Remsburg | 1983 | 3 | 4261 | 1988 | 549,791 | 2d transformer |
| | | | 5216 | 1989 | 210,616 | 3d & 4th feeder |
| Rubonia | 1983 | 3 | 5336 | 1988/1989 | 760,002 | 2d transformer & 3d feeder |
| Saga | 1977 | 4 | 3245 | 1987/1988 | 590,893 | 2d transformer |
| Southside | 1982 | 4 | 4366 | 1988 | 81,457 | 6th feeder |
| Springtree | 1975 | 3 | 6603 | [139]1989 | [140]815,127 | 3d transformer |
| St. Joe | 1980 | 2 | 2707 | 1987 | 115,614 | 3d feeder |
| Sweetwater | 1981 | 3 | 4067 | 1988 | 103,669 | 5th feeder |
| Willow | 1982 | 3 | 2643 | 1987 | 88,222 | 5th feeder |
| Winkler | 1985 | 3 | 4385 | 1988 | 601,438 | 3d feeder & 2d transformer |
| Hiatus | 1985 | -(no plot plan) | 2522 | 1987 | 684,095 | 2d transformer |
| | | | 4557 | 1988 | 114,860 | 3d feeder |
| | | | 5662 | 1989 | 96,015 | 4th feeder |

---

[137]Because of the quality of the exhibit in evidence, we are not sure that this figure is accurate.

[138]Because of the quality of the photocopy in the record, the Court cannot read the exact amount of the ER.

[139]Illegible.

[140]Illegible.

Appendix B

DRI Project

The first column is the name of the DRI project.  The second column is the "effective date" of the DRI project.  The third column lists FPL's work order number (WO) or sometimes, as referenced, the ER number.  The fifth and sixth columns state the amount and date authorized under the specific WO or ER.[141]

| Name | Effective Date | Work Order | Amount Authorized | Year Authorized |
|---|---|---|---|---|
| Boynton Beach Mall | 5/7/1974 | 1450 | $115,734 | 1989 |
| Frenchman's Creek | 10/23/1973 | 199 | $24,933 | 1988 |
|  |  | 200 | $65,193 | 1990 |
|  |  | 201 | $37,187 | 1990 |
|  |  | 516 | $35,201 | 1990 |
|  |  | 517 | $19,017 | 1990 |
|  |  | 2474 | $30,121 | 1990 |
|  |  | 2552 | $34,064 | 1990 |
|  |  | 2885 | $16,570 | 1990 |
|  |  | 4259 | $25,983 | 1990 |
|  |  | 7922 | $26,355 | 1987 |
| Grand Harbor | 10/23/1985 | 7568 | $37,552 | 1988 |
| Harbour Ridge | 12/21/1982 | 2142 | $19,919 | 1990 |
|  |  | 2555 | $26,449 | 1990 |

---

[141] Generally, with respect to each WO there are many revisions, adjustments, etc.  These changes generally affected the amount authorized.  Additionally, the changes were made on various dates.  The amount authorized shown in our table is the amount authorized on the last change/revision in the record.  Additionally, the date authorized listed in the table is taken from the last change or revision and lists only the year authorized since the WO's and ER's contain numerous signature lines and dates signed.

| | | 3877 | $36,602 | 1988 |
|---|---|---|---|---|
| | | 3797 | $70,003 | 1990 |
| Maplewood | 2/6/1974 | 1123 | $56,332 | 1988 |
| | | 2341 | $35,978 | 1990 |
| | | 4322 | $80,148 | 1991 |
| | | 5523 | $17,678 | 1990 |
| | | 8537 | $15,060 | 1990 |
| Motorola | 1/7/1980 | 1729 | $15,468 | 1990 |
| | | 6390 | $61,160 | 1990 |
| Palm Beach Internatl. Airport | 2/16/1982 | 1942 | $62,584 | 1989 |
| | | 2188 | $152,745 | 1990 |
| | | 2617 | $40,322 | 1990 |
| | | [142]4378 | $346,203 | 1988 |
| PGA National | 8/31/1978 | 1029 | $65,273 | 1990 |
| | | 1139 | $20,645 | 1990 |
| | | 1634 | $204,505 | 1990 |
| | | 1755 | $53,922 | 1990 |
| | | 2156 | $60,971 | 1990 |
| | | 2779 | Missing | |
| | | 8795 | Missing | |
| Quantum Park | 12/18/1984 | 5002 | $79,164 | 1989 |
| | | 5010 | $27,568 | 1988 |
| | | 5011 | $39,368 | 1989 |
| | | 5019 | $47,420 | 1988 |
| | | 5020 | $32,830 | 1990 |
| | | 5511 | $111,014 | 1990 |
| | | 5514 | $53,763 | 1988 |
| | | 9309 | $52,161 | 1988 |
| Savanna Club | 4/27/1982 | 4762 | $34,777 | 1990 |
| | | 4763 | $57,845 | 1990 |
| | | 4764 | $62,653 | 1990 |

---

[142] This is an ER number not a WO number.

| | | | | |
|---|---|---|---|---|
| | | 4768 | $43,718 | [143]-- |
| | | 4914 | $31,308 | 1989 |
| Vista Center | 10/16/1984 | 2519 | $50,298 | 1990 |
| | | 1992 | $39,666 | 1990 |
| Willoughby | 9/24/1985 | 9009 | $12,195 | 1990 |
| | | 4122 | $51,345 | 1989 |
| | | 4729 | $85,855 | 1990 |
| | | 5559 | $18,807 | 1989 |
| Hammock Dunes | [144]3/1984 | 4774 | $76,748 | 1990 |
| | | 4788 | $4,604 | 1990 |
| | | 5029 | $51,559 | 1991 |
| | | 5205 | $21,023 | 1991 |
| | | 5221 | $157,858 | 1991 |
| | | 5383 | $33,392 | 1990 |
| Matanzas Shore | 2/1985 | 5410 | $26,160 | 1990 |
| | | 5447 | $41,487 | 1990 |
| | | 5668 | $54,711 | 1990 |
| | | 9313 | $16,980 | 1988 |
| Spoonbill Bay (Perico Bay) | 5/28/1975 | 3615 | $134,010 | 1989 |
| | | 3477 | $35,709 | 1989 |
| | | 3487 | $91,918 | 1989 |
| | | 3601 | $16,511 | 1989 |
| Airport Corp. Ctr. | [145]5/1984 | 2574 | $8,868 | 1988 |

---

[143] This WO contains no signature or date.

[144] The Development of Regional Impact Project List states "Date D.O. Issued".

[145] Council review date.

| Datran Ctr. | [146]9/10/1985 | 8169 | $102,246 | 1988 |
|---|---|---|---|---|
| Breakaway Trails | 10/2/1985 | 3838 | $13,089 | 1988 |
| Heathrow | 2/28/1974 | 1621 | $29,051 | 1989 |
| | | 678 | $42,609 | 1991 |
| | | 1618 | $54,074 | 1990 |
| Waterford | 4/24/1974 | 2862 | $16,854 | 1991 |
| | | 3007 | $20,950 | 1989 |
| | | 3172 | $21,509 | 1989 |
| | | 3531 | $20,965 | 1990 |
| | | 3533 | $24,015 | 1990 |
| | | 3645 | $25,548 | 1990 |
| | | 3646 | $45,486 | 1990 |
| | | 3647 | $24,907 | 1990 |
| Kings Lake | 1/15/1974 | 4757 | $24,756 | 1989 |
| Windemere | 9/16/1975 | 2760 | $11,203 | 1989 |
| | | 4960 | $26,005 | 1989 |
| | | 5744 | $19 | 1990 |
| | | 5779 | $23,580 | 1989 |
| Pelican Bay | 4/19/1977 | 856 | $95,965 | 1989 |
| | | 923 | $27,639 | 1991 |
| | | 926 | $114,020 | 1991 |
| | | 937 | $59,680 | 1990 |
| | | 1171 | $33,823 | 1991 |
| | | 3073 | $32,091 | 1989 |
| | | 5442 | $53,530 | 1988 |

---

[146] The record contains a letter from the South Florida Regional Planning Council dated Sept. 10, 1985, which explains to the then Dade County Mayor that the Datran Center Application for Development Approval contained sufficient information for regional impact review. The letter also states that a draft report and recommendations were tentatively scheduled to be presented for action at the regular council meeting on Nov. 4, 1985.

| | | | | |
|---|---|---|---|---|
| | | 5954 | $35,951 | 1991 |
| | | 6156 | $74,175 | 1990 |
| | | 6268 | $77,424 | 1991 |
| | | 6306 | $57,387 | 1990 |
| | | 6520 | $28,880 | 1990 |
| Burnt Store Marina | 2/27/1984 | 2219 | $61,605 | 1990 |
| | | 4351 | $26,562 | 1990 |
| Bonita Bay | 11/16/1981 | 4869 | $22,995 | 1989 |
| | | 4870 | $23,773 | 1990 |
| | | 4944 | $26,627 | 1990 |
| | | 5374 | $18,992 | 1988 |
| | | 5646 | $27,207 | 1990 |
| | | 5668 | $27,286 | 1990 |
| | | 5729 | $36,965 | 1990 |
| | | 6219 | $15,625 | 1990 |
| | | 6275 | $20,543 | 1989 |
| | | 6384 | $136,490 | 1991 |
| | | 6387 | $29,557 | 1990 |
| | | 6473 | $68,247 | 1991 |
| | | 6593 | $59,070 | 1990 |
| | | 6629 | $18,270 | 1991 |
| | | 6681 | $46,776 | 1990 |
| | | 6711 | $19,269 | 1990 |
| Emerald Lakes | 6/4/1985 | 5126 | $32,317 | 1989 |
| | | 5966 | $30,999 | 1990 |
| Parker Lakes | 1/10/1983 | 3718 | $65,191 | 1989 |
| | | 3990 | $93,658 | 1989/1990 |
| | | 9296 | $28,559 | 1990 |
| Berkshire Lakes | 8/16/1983 | 5197 | $49,794 | 1989 |
| | | 5308 | $47,068 | 1988 |
| | | 5309 | $16,499 | 1989 |
| | | 5760 | $92,232 | 1990 |
| | | 6512 | $65,903 | 1990 |

| | | 6770 | $25,740 | 1990 |
|---|---|---|---|---|
| Gateway | 5/31/1985 | 1007 | $22,385 | 1990 |
| | | 3155 | $165,354 | 1989 |
| | | 3239 | $38,722 | 1989 |
| | | 3244 | $54,324 | 1989 |
| | | 3597 | $56,386 | 1988 |
| | | 3598 | $19,209 | 1989 |
| | | 3768 | $19,245 | 1990 |
| | | 3829 | $28,686 | 1989 |
| | | 3850 | $34,395 | 1989 |
| | | 3928 | $33,348 | 1989 |
| | | 3937 | $25,739 | 1990 |
| | | 4177 | $43,808 | 1990 |
| | | 4208 | $43,501 | 1991 |
| | | 9195 | $34,800 | 1989 |
| Palmer Ranch | 12/18/1984 | 1980 | $27,463 | 1988 |
| | | 4367 | $60,819 | 1990 |
| | | 4378 | $59,444 | 1989 |
| | | 4731 | $53,266 | 1990 |
| Vineyards of Naples | 5/7/1985 | 2548 | $16,872 | 1988 |
| | | 2988 | $19,541 | 1989 |
| | | 3262 | $27,613 | 1988 |
| | | 3402 | $10,298 | 1989 |
| | | 4872 | $63,110 | 1988 |
| | | 4958 | $24,903 | 1988 |
| | | 5049 | $26,363 | 1989 |
| | | 5217 | $59,325 | 1988 |
| | | 6454 | $11,000 | 1990 |
| Stoneybrook (Corkscrew Pines) | 10/18/1984 | 7848 | $88,661 | 1990 |
| Lely Resort | 5/21/1985 | 5528 | $28,743 | 1990 |
| | | 6075 | $61,564 | 1991 |
| | | 6316 | $29,834 | 1990 |

| | | | | |
|---|---|---|---|---|
| | | 6456 | $84,443 | 1991 |
| | | 6457 | $29,255 | 1992 |
| | | 6510 | $187,810 | 1991 |
| Martin Downs | --[147] | 4686 | $7,234 | 1990 |
| | | 4893 | $2,542 | 1990 |
| | | 4894 | $2,414 | 1990 |
| | | 3616 | $97,753 | 1990 |
| | | 4161 | $113,422 | 1989 |
| | | 4264 | $13,880 | 1988 |
| | | 4404 | $74,433 | 1990 |
| | | 993 | $47,218 | 1991 |
| | | 4984 | $5,791 | 1990 |
| | | 895 | $14,175 | 1989 |
| Weston | [148]6/1984 | 6140 | $19,751 | 1988 |
| | | 6141 | $86,255 | 1989 |
| | | 5175 | $31,143 | 1990 |
| | | [149]2523 | $748,300 | 1988 |
| | | 5238 | $21,375 | 1990 |

---

[147] There is no evidence in the record as to the "effective date". The record does contain a letter from FPL dated Feb. 22, 1980.

[148] The document in evidence states "Review Date".

[149] This is an ER number, not a WO number.